IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

BARTRAM YIHNI DABNEY,

                Plaintiff,

      v.

M. STORMER, Corrections Officer,
Great Meadow Correctional Facility,

                Defendant.

Civil Action No.
9:10-CV-0519 (GTS/DEP)

─────────────────────────────

<u>APPEARANCES</u>:

<u>FOR PLAINTIFF</u>:

BARTRAM YIHNI DABNEY, *Pro Se*
93-A-7310
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

<u>FOR DEFENDANT</u>:

HON. ERIC T. SCHNEIDERMAN
Office of the Attorney General
State of New York
The Capitol
Albany, New York 12224

<u>OF COUNSEL</u>:

KEITH A. MUSE, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Bartram Yihni Dabney, a New York State prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his rights under the United States Constitution. Although plaintiff's complaint asserts several claims against eighteen separate defendants, as a result of motion practice, the only remaining claim is a First Amendment retaliation claim against defendant M. Stormer, a corrections officer stationed at the facility in which plaintiff was confined at the times relevant to this action.

Currently pending before the court is defendant Stormer's motion seeking summary judgment dismissing plaintiff's complaint both on the merits, and based upon qualified immunity from suit. For the reasons set forth below, I recommend that defendant's motion be granted.

I.    BACKGROUND[1]

Plaintiff is a prison inmate in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"). At all times relevant to this action, plaintiff was confined in the Great Meadow Correctional Facility ("Great Meadow"), located in Comstock, New York. *See generally* Compl. (Dkt. No. 1). In November 2008, plaintiff was housed in the B-2 unit of Great Meadow, which is also known as the keeplock unit. Muse Decl. Exh. 3 (Dkt. No. 46-6) at 21. During the same period, defendant Stormer, a corrections officer at Great Meadow, was the company officer in charge of the keeplock unit. Stormer Decl. (Dkt. No. 46-12) at ¶ 4.

On November 26, 2008, a nurse working at the facility tried to deliver plaintiff's pain medication to him at his cell; plaintiff, however, responded by yelling obscenities at him. Inmate Misbehavior Report (Dkt. No. 46-7) at 8. As a result of plaintiff's behavior, defendant Stormer, who witnessed the incident, issued plaintiff a misbehavior report. *Id.* When defendant Stormer and another corrections officer employed at the facility

_____

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

went to plaintiff's cell to escort him to the disciplinary hearing in connection with the incident three days before, defendant contends that plaintiff refused to leave his cell. Leonard Decl. (Dkt. No. 11) at ¶ 6. In contrast, plaintiff maintains that those two corrections officers asked him to sign a waiver of attendance to his disciplinary proceeding. He refused, and explicitly told them he wanted to attend the hearing. Muse Decl. Exh. 3 (Dkt. No. 46-6) at 61; Plf.'s Resp. Exh. A (Dkt. No. 48) at 17. The disciplinary hearing was conducted in plaintiff's absence. Hearing Disposition (Dkt. No. 46-7) at 5. At the conclusion, he was found guilty of harassment, and was sentenced to an additional thirty days of keeplock confinement and a corresponding loss of packages, commissary, and phone privileges. *Id.* There is no evidence in the record that plaintiff filed a grievance against defendant Stormer for allegedly refusing to allow him to attend his disciplinary hearing.

Plaintiff also contends that defendant Stormer turned off the electricity to his cell immediately after plaintiff asked him to stop eavesdropping on his conversation with a fellow inmate on November 26, 2008. Muse Decl. Exh. 3 (Dkt. No. 46-6) at 44-46; Plf.'s Resp. Exh. A (Dkt. No. 48) at 19. It is also alleged that defendant Stormer denied

plaintiff commissary access on November 13, 2008. Muse Decl. Exh. 3 (Dkt. No. 46-6) at 17-18, 24, 31-33; Plf.'s Resp. Exh. A (Dkt. No. 48) at 18. Lastly, plaintiff contends that defendant Stormer used derogatory language toward him. Muse Decl. Exh. 3 (Dkt. No. 46-6) at 18, 20-21; Plf.'s Resp. Exh. A (Dkt. No. 48) at 18. On November 26, 2008, plaintiff filed a grievance against defendant Stormer based on all of these allegations. Dkt. No. 46-8 at 7.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on May 3, 2010, by the filing of a complaint and accompanying *in forma pauperis* ("IFP") application with the court. Dkt. Nos. 1, 2. On January 4, 2011, District Judge Glenn T. Suddaby issued a decision in which he granted plaintiff's IFP request, and dismissed all but two of the claims asserted in plaintiff's complaint. Decision and Order (Dkt. No. 14) at 42-46. Plaintiff's claims were further narrowed by a motion to dismiss for failure to state a claim upon which relief may be granted, filed on March 17, 2011 by the remaining defendants. Dkt. No. 24. Specifically, only plaintiff's First Amendment retaliation claim asserted against defendant Stormer now remains. Report and Recommendation (Dkt. No. 33); Decision and Order (Dkt. No. 33).

Following the completion of discovery, defendant Stormer filed a motion seeking summary judgment dismissing the claim against him based on the merits, and arguing that he is entitled to qualified immunity from suit. *See generally* Def.'s Memo. of Law (Dkt. No. 46-14). Defendant's motion, which plaintiff has opposed, Dkt. Nos. 48, 53, is now ripe for determination, and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250. Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case. *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d

133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Blg. Trades Emp'rs' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B.    First Amendment Retaliation Claim

The court has construed plaintiff's complaint to assert a First Amendment retaliation claim against defendant Stormer arising from allegations that he retaliated against plaintiff in a variety of ways, motivated by plaintiff's filing of grievances against him. Decision and Order (Dkt. No. 14); Report and Recommendation (Dkt. No. 33); Decision and Order (Dkt. No. 36); Compl. (Dkt. No. 1) at ¶¶ 6-11. Specifically, plaintiff alleges that, as a result of the grievances filed by plaintiff against defendant Stormer, defendant Stormer (1) refused to permit plaintiff to attend a disciplinary proceeding, (2) denied him access to commissary, (3) severed the electrical supply to his cell, and (4) used derogatory language against him. Compl. (Dkt. No. 1) at ¶¶ 6-11. In his motion papers, defendant argues that, based on the record evidence, no reasonable

factfinder could conclude that he retaliated against plaintiff in any of the manners alleged. Def.'s Memo. of Law (Dkt. No. 46-14) at 7-13.

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To succeed on a section 1983 claim for retaliatory conduct, a plaintiff must establish that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Garrett v. Reynolds*, No. 99-CV-2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe,

M.J.).[2]

"[P]rison officials' conduct constitutes an 'adverse action' when it 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Alicea v. Howell*, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)).

In the context of the issuance of displinary charges alleged to have been prompted by retaliatory animus, analysis of the third element, causation, is informed by several relevant factors, including "(1) the temporal proximity between the protected activity and the alleged retaliatory act, (2) the inmate's prior good disciplinary record, (3) vindication at a hearing on the matter, and (4) statements by the defendant concerning his . . . motivation." *Jean-Laurent v. Lane*, No. 11-CV-0186, 2013 WL 600213, at *8 (N.D.N.Y. Jan. 24, 2013) (Dancks, M.J.), *report and recommendation adopted by* 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) (Mordue, J.).

In this case, even assuming that the record supports a finding that

---

[2]     Copies of all unreported decisions have been appended to this report for the convenience of the *pro se* plaintiff.

plaintiff has satisfied the first two elements of a retaliation analysis,[3] there is no record evidence to support the third, causation requirement. In the only grievance in the record, which is dated November 26, 2008, plaintiff complains that defendant Stormer harassed him because he is Muslim on unspecified dates, turned off the electricity to his cell on November 26, 2008, and denied him access to commissary on November 13, 2008. Dkt. No. 46-8 at 7. These complaints, however, are the same as those creating a basis for plaintiff's retaliation claim. More specifically, plaintiff alleges that defendant Stormer retaliated against him for filing a grievance by harassing him due to his religion, turning off his electricity, and denying him commissary. Compl. (Dkt. No. 1) at ¶¶ 6-11. Because the record does not reveal an earlier grievance filed by plaintiff against defendant Stormer, his grievance dated November 26, 2008 cannot serve as the protected conduct to which defendant Stormer acted adversely to form the basis of

---

[3]    It is well-settled that filing a grievance is constitutionally protected conduct. *Johnson v. Eggersdorf*, 8 F. App'x 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). In addition, the denial of an inmate's limited right to be present during his own disciplinary hearing is sufficient to rise to the level of adverse action. *See Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986) ("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."); *accord*, *Tuitt v. Chase*, No. 11-CV-0776, 2013 WL 877439, at *14 (N.D.N.Y. Jan. 30, 2013) (Dancks, M.J.), *report and recommendation adopted by* 2013 WL 877617 (N.D.N.Y. Mar. 8, 2013) (Hurd, J.).

plaintiff's complaint. Said differently, the record does not reveal that this particular grievance, which plaintiff filed *after* the alleged adverse conduct occurred, is causally related to the adverse action complained of therein. *See Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir. 1996) ("Clearly, [the plaintiff] may not base her claim of retaliation upon complained-of acts that predated her speaking out about [the defendant]'s alleged misrepresentations."); *see also Szarzynski v. Roche Labs., Inc.*, No. 07-CV-6008, 2010 WL 811445, at *14 (W.D.N.Y. Mar. 1, 2010) ("[T]he alleged [adverse] action predates any protected activity. Thus, plaintiff fails to make out a prima facie case of retaliation case because he cannot show a causal connection."); *Negussey v. Syracuse Univ.*, No. 95-CV-1827, 1997 WL 141679, at *12 (N.D.N.Y. Mar. 24, 1997) (Munson, J.) ("[A] plaintiff may not predicate a retaliation claim on acts that predate the protected activity[.]").

Similarly, I find that there is insufficient record evidence to support plaintiff's allegation that defendant Stormer refused to permit plaintiff to attend his disciplinary hearing on November 29, 2008 out of retaliatory animus. The grievance that forms the basis for plaintiff's protected conduct is dated November 26, 2008. Dkt. No. 46-8 at 7. Three days later,

12

plaintiff alleges that defendant Stormer refused to allow him to attend his disciplinary proceeding, despite plaintiff's explicit request to do so. Muse Decl. Exh. 3 (Dkt. No. 4-6) at 61. In addition to plaintiff's deposition testimony, plaintiff submits an affidavit from a fellow inmate, Mickey Cass, to support this allegation. Plf.'s Resp. Exh. A (Dkt. No. 48) at 17. Cass avers that, on November 29, 2008, defendant Stormer and another corrections officer demanded that plaintiff sign a hearing waiver, in which plaintiff would forego his right to attend the hearing, but that plaintiff refused and "stated that he wished to be present at his hearing and call witnesses." *Id.* In contrast to this evidence, defendant has produced an affidavit from the corrections officer that accompanied him to plaintiff's cell on November 29, 2008, which states that plaintiff refused to attend the hearing, and he informed plaintiff that the hearing would take place in his absence. Leonard Decl. (Dkt. No. 46-11) at ¶¶ 6, 10.

Despite this conflicting evidence regarding why plaintiff failed to attend his disciplinary proceeding, there is no evidence in the record that defendant Stormer was aware of plaintiff's grievance on November 29, 2008. Instead, defendant Stormer avers in his declaration that he did not learn of the grievance until December 28, 2008, and denied all of its

allegations on the same date. Stormer Decl. (Dkt. No. 46-12) at ¶ 6-7. In addition, the grievance is addressed to the "Grievance Office," and a copy was provided to a number of other corrections employees, but not defendant Stormer. Dkt. No. 46-8 at 7. It was not received by the DOCCS until December 3, 2008, three days after plaintiff alleges defendant Stormer took his adverse action against him. *Id*; Bezio Decl. (Dkt. No. 46-10) at ¶¶ 1, 7, 10. The combination of all of this evidence, which is undisputed by plaintiff, leads me to the conclusion that, even assuming defendant Stormer did refuse to allow plaintiff to attend his disciplinary hearing, he was not motivated by plaintiff's grievance dated November 26, 2008.

For all of these reasons, I find that no reasonable factfinder could conclude that defendant Stormer took adverse action against plaintiff as result of plaintiff's protected conduct under the First Amendment. Accordingly, I recommend defendant's motion be granted, and plaintiff's complaint be dismissed in its entirety.

IV.    SUMMARY AND RECOMMENDATION

In defendant's motion, he challenges plaintiff's remaining First Amendment retaliation claim. Because I find that the record fails to reveal

a dispute of material fact as to whether there is a causal connection between plaintiff's protected conduct, the filing of a grievance against defendant Stormer, and defendant Stormer's alleged adverse actions, I recommend that defendant's motion be granted.

Based upon the foregoing it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 46) be GRANTED, and that plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 86 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     July 24, 2013
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Troy GARRETT, Plaintiff,
v.
Edward REYNOLDS, Superintendent, Mohawk Corr.
Facility; James A. Mance, Deputy Superintendent of
Programs; John O'Reilly,[FN1] Deputy Superintendent; J.
Burge, First Deputy; M. Maher, DSS; R. Centore,
Correctional Officer, Defendants.

> FN1. In this case, the defendants maintain and
> the docket confirms that defendant John O'Reilly
> has never been served. Service must be made
> upon a defendant within 120 days of filing the
> complaint or any claims against that defendant
> will be dismissed. See Fed.R.Civ.P. 4(m). The
> original complaint, which named O'Reilly, was
> filed on November 26, 1999, and the amended
> complaint was filed on July 13, 2001. However,
> O'Reilly was never served. Since this defendant
> has never been served, this court lacks
> jurisdiction over him, and this court recommends
> the dismissal of this defendant.

No. Civ.9:99CV2065NAMGLS.

Oct. 7, 2003.
Troy Garrett, Peekskill, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York,
Syracuse, NY, for the Defendants.

Maria Moran, Asst. Attorney General, of counsel.

*REPORT-RECOMMENDATION*

SHARPE, Magistrate J.
 I. *Introduction* [FN2]
> FN2. This matter was referred to the undersigned
> for a Report-Recommendation by the Hon.

Norman A. Mordue, United States District
Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

 *1 Plaintiff, *pro se* Troy Garrett filed an action under
42 U.S.C. § 1983 claiming that the defendants violated his
civil rights when they retaliated against him for his
activities as an IGRC representative by subjecting him to
verbal harassment, physical abuse and subsequently, a
transfer. Garrett also claims that the supervisory
defendants failed to properly investigate his complaints
and failed to train/supervise their employees. This court
recommends denying the motion for summary judgment in
part and granting it in part.

 II. *Procedural History*

 On July 13, 2001, Garrett filed an amended complaint
against the defendants claiming that they violated his civil
rights under the First, Sixth Eighth, and Fourteenth
Amendments.[FN3] On September 28, 2001, the defendants
filed a motion for summary judgment. On January 18,
2002, this court issued an order informing Garrett of his
obligation to file a response and extended his time to
respond for thirty days. On April 24, 2002, this court
granted an additional sixty days to respond to the
defendants' motion. Despite having been given multiple
opportunities to respond, Garrett has failed to file a
response.

> FN3. Although Garrett claims to be raising
> violations under the Sixth, Eighth, and
> Fourteenth Amendments, the only viable claim
> based on this court's interpretation of the
> complaint is under the First Amendment for
> retaliation.

 III. *Facts* [FN4]

> FN4. The facts are taken from the defendants'
> statement of undisputed material facts since
> Garrett failed to file a response.

 On June 17, 1999, Garrett filed a grievance against

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Officer Kelley for verbal harassment.[FN5] This grievance was denied by the Central Office Review Committee (CORC) on July 21, 1999. On March 19, 2000, Garrett filed a grievance claiming that defendant Burge used intimidation tactics. Defendant Reynolds investigated the grievance and it was denied based on a finding that no harassment occurred. Garrett appealed to the CORC and they denied the grievance on April 5, 2000. On April 10, 2000, defendant Centore wrote a misbehavior report against Garrett for creating a disturbance and employee harassment. On April 12, 2000, Lieutenant Manell presided over Garrett's Tier 2 disciplinary hearing and he was found guilty of both charges. He was given a 21 day recreation penalty, and loss of packages and commissary. However, his recreation penalty was suspended and deferred. Garrett appealed the determination and it was affirmed on April 19, 2000.

FN5. Not a party in this suit.

On April 17, 2000, Garrett filed a grievance against Centore for harassment. Burge denied his grievance on May 4, 2000, and subsequently, the CORC denied it. On May 12, 2000, Garrett sent a letter to Burge concerning further harassment by Centore. On May 16, 2000, Garrett filed another grievance against Centore for harassment. His grievance was denied on May 26, 2000. After Garrett appealed, his grievance was again denied by the CORC. On June 22, 2000, the Superintendent's Office received a letter from Garrett alleging that Centore threw a piece of paper with a picture of a plunger and the words "always gets the job done" into his cell. He wrote a grievance against Centore for harassment due to the paper that he threw into his cell. Burge forwarded the grievance to the CORC on August 10, 2000. The CORC accepted the grievance on August 30, 2000, in order to investigate.

**\*2** On June 23, 2000, the Inspector General's Office interviewed Garrett at the Mohawk Correctional Facility regarding his complaints of Centore. That same day, Captain Naughton filed an administrative segregation recommendation. On June 29, 2000, an administrative segregation hearing was held. On July 14, 2000, Garrett was transferred [FN6] to the Mid-State Correctional Facility.

FN6. The defendants suggest that Garrett has

failed to exhaust his administrative remedies concerning his transfer. They claim that he agreed to the transfer and participated in the administrative hearing which resulted in his transfer. The issue of transfer will not be addressed in this Report-Recommendation because the court has insufficient information to determine whether he exhausted his remedies.

Finally, Garrett filed a claim alleging that his property was lost or damaged on October 8, 1999. However, he was paid $75.00 for this claim and he signed a release on December 13, 1999.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994)(alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U .S. 519, 520 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

**\*3** This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, at \*2 (S.D.N.Y. May 16, 2001). More specifically, Local Rule 7.1(a)(3) of this court specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00-CV-1178, 2002 WL 368534, at \*2 (N.D.N.Y. March 1, 2002)(interalia citing *Bundy Am. Corp. v. K-Z Rental Leasing, Inc.,* 00-CV-260, 2001 WL 237218, at \*1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470-71.

In this case, Garrett did not file a response to the motion for summary judgment. Consequently, this court will accept the properly supported facts contained in the defendants' 7.1 Statement (*Dkt. No. 49* ) as true for purposes of this motion.[FN7] With this standard in mind, the court now turns to the sufficiency of Garrett's claims.

> FN7. The court notes that this does not apply to the various conclusions of law contained in the defendants' 7.1 Statement.

B. *Eleventh Amendment*

In Garrett's complaint, he raises claims against the defendants in their official and individual capacities. The Eleventh Amendment provides that: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Although the Amendment does not specifically prohibit suits against a state by its own citizens, the Supreme Court has consistently applied that immunity to such cases. *See Burnette v. Carothers,* 192 F.3d 52, 57 (2d Cir.1999)(citing *Edelman v. Jordan,* 415 U.S. 651, 662-63 (1974)). Moreover, it is well established that Eleventh Amendment immunity applies not only when a state is a named defendant, but when liability must be paid from state coffers. *See New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir.1995)(citing *Edelman,* 415 U .S. at 665); *Dawkins v. State of New York,* 93-CV-1298, 1996 WL 156764, at \*2 (N.D.N.Y. Mar. 28, 1996).

**\*4** In this case, Garrett raises claims against the defendants in their official and individual capacities. Since the Eleventh Amendment bars official capacity claims against these state officers, this court recommends dismissal of Garrett's claims against the defendants in their official capacity.

C. *Retaliation*

In this case, Garrett claims that during the course of his appointment as an IGRC representative, he has been subjected to repeated acts of harassment, both verbal and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

physical, threatened with physical assaults, placed into disciplinary confinement in the SHU, and transferred.[FN8] The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

> FN8. This case turns on the interpretation of the complaint. Garret's complaint is not a model of clarity and as noted, he has failed to file a response to the motion for summary judgment. Nonetheless, a careful reading of Garrett's opening paragraph under the title "Facts" compels this court to interpret this complaint as one claiming retaliation for his activities and status as an IGRC representative.

In order for a plaintiff to prevail on a First Amendment retaliation claim, a plaintiff must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *See Dawes v. Walker,*[FN9] 239 F.3d 489, 492 (2d Cir.2001) (citation omitted) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). If Garrett makes these showings, DOCS may evade liability if it demonstrates that it would have disciplined or transferred him " 'even in the absence of the protected conduct." ' *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted).

> FN9. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

An inmate has a constitutional right to be protected from retaliation based upon his activities as an IGRC representative. *Alnutt v. Cleary,* 913 F.Supp. 160, 170 (W.D.N.Y.1996). However, a claim brought under "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp 2d 113, 129

(N.D.N.Y.2003)(citing *Alnutt,* 913 F.Supp at 165-66)). Ordinarily, a claim for verbal harassment is not actionable under 42 U.S.C. § 1983. *Aziz Zarif Shabazz v. Picco,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Moreover, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz,* 994 F.Supp. at 474.

In this case, Garrett claims that defendant Centore harassed him for his activities as an IGRC representative. Garrett also claims that he was removed as an IGRC representative when he was transferred. In addition, Garrett claims that defendants Reynolds, Mance, Burger and Maher failed to properly investigate his allegations against Centore. Garrett claims that these defendants failed to properly investigate his claims in retaliation for his activities as an IGRC representative.

*5 More specifically, Garrett claims that Reynolds and Mance recalled IGRC passes for one day in order to interfere with an investigation inquiry into a correctional officer's conduct involving inmates who were left in the yard during inclement weather. Finally, Garrett claims that his property was destroyed while he was in the SHU.[FN10] Garrett filed grievances against Centore in April, May, and June of 2000. One of his complaints involved Centore throwing a folded piece of paper into his cell which had a picture of a plunger with the words "always gets the job done" on it. On June 23, 2000, he was placed in administrative segregation in the SHU. Three weeks later he was transferred.[FN11]

> FN10. However, the defendants provide the court with documents which show that he was paid $75.00 in settlement of this claim.

> FN11. The defendants maintain that Garrett failed to exhaust this claim. At this juncture, it is unclear whether or not he exhausted this claim. As such, this court cannot, as a matter of law, recommend dismissal because the court has insufficient information to determine this issue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

Viewing the facts in the light most favorable to Garrett, the non-moving party, this court cannot, as a matter of law, find that Garrett fails to state a claim for which relief can be granted. He claims that he was retaliated against for his activities as an IGRC representative. As noted, verbal harassment alone will not constitute a violation of a prisoner's constitutional rights but in this case, it appears that he was transferred for his activities as an IGRC representative. The defendants rely on numerous grievances which were denied by the CORC to show that their actions were proper. They also claim that Garrett has failed to show injury, however, at this juncture of the litigation with virtually no discovery in this case, this court cannot recommend dismissal as a matter of law.

D. *Personal Involvement*

It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)(*citation omitted* ). Since there is no respondeat superior liability, the defendant must be shown to have personal involvement in the alleged violation of rights. *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisory officials cannot be held liable under § 1983 solely for the acts of their subordinates. *See Monell v. Department of Social Serv.,* 436 U.S. 658, 690-695 (2d Cir.1978). However, a supervisory official can be held liable for constitutional violations if he or she: (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Garrett contends that defendants Reynolds and Mance allowed staff members under their supervision to violate his rights. More specifically, Mance refused to properly investigate Garrett's complaints. Garrett also claims that defendant Burge refused to grant his request for redress against defendant Centore. Finally, Garrett claims that the defendants collectively failed to properly train and supervise their employees.

**\*6** The defendants contend that the claims against the supervisory defendants should be dismissed for lack of personal involvement. However, this court finds this contention without merit since it appears that all of the defendants were involved in the investigation process of Garrett's complaint and he accuses all of them of continuing the alleged constitutional violation by failing to properly investigate the grievances he filed. Accordingly, this court recommends denying the defendants' motion for summary judgment based on the lack of personal involvement.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Garrett's claims against the defendants in their official capacity under the Eleventh Amendment should be dismissed since these claims are barred; and it is further

RECOMMENDED, that defendant O'Reilly be dismissed since he was never served; and it is further

RECOMMENDED, that the defendants' motion for summary judgment be denied in all other respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

Garrett v. Reynolds
Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 22299359 (N.D.N.Y.)

(Cite as: 2003 WL 22299359 (N.D.N.Y.))

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1; John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt. Barkley; Supt. Hulihan; Dep. Comm. Linquist, Defendants.
No. 9:11–CV–186 (NAM/TWD).

Jan. 24, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Gregory J. Rodriguez, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### REPORT AND RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, was initially referred to Magistrate Judge George H. Lowe for Report and Recommendation by the Honorable Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c). Upon Magistrate Judge Lowe's retirement on February 9, 2012, the case was reassigned to me. Plaintiff Phillip Jean–Laurent ("Jean–Laurent") has brought this action against Defendants Correctional Officers Patrick Lane ("Lane"), Allen Briggs ("Briggs"), and Seth Tyndall ("Tyndall"); Correctional Sergeants Matthew Beard ("Beard") and David Pawlin ("Pawlin") (sued incorrectly as "Sgt. Pauline"); Correctional Lieutenant Norman Jones ("Jones"); Deputy Superintendent Security Brian McAuliffe ("McAuliffe"); Superintendents Warren Barkley ("Barkley") and William Hulihan ("Hulihan"); Appeal Review Officer Norman Bezio ("Bezio"); Deputy Commissioner Christopher Lindquist ("Lindquist") (sued incorrectly as "Dep. Comm. Linquist"); Dr. Charles Moehs ("Moehs") (sued incorrectly as "Dr. Mays"); John Does # 1 and # 2; Dr. John Doe; and Jane Doe. (Dkt. Nos. 1, ¶¶ 9–16, and 6–17.[FN1])

> FN1. Page numbers in citations to filed documents refer to the page numbers assigned by the Court's electronic filing system rather than to the page number in the original document.

Defendants, with the exception of the four Doe Defendants who have not yet been identified and served, now move to dismiss Plaintiff's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[FN2] (Dkt. No. 23.) For the reasons set forth below, the Court recommends that Defendants' motion be **GRANTED** in part and **DENIED** in part.

> FN2. Because the Doe Defendants have been excluded from the motion, this Report and Recommendation does not address the legal sufficiency of the claims asserted against them in the Complaint.

### I. BACKGROUND[FN3]

> FN3. The background facts set forth herein are taken from Plaintiff's Complaint.

**A. Facts Concerning Plaintiff's Claims Arising Out of his Storage of Draft Bags and the Destruction of His Legal Documents**

Plaintiff is a former prisoner of the New York State Department of Correctional and Community Supervision ("DOCCS"). (Dkt. No. 1, ¶ 8.) In January of 2008, Plaintiff was transferred from Elmira Correctional Facility ("Elmira") to Cape Vincent Correctional Facility ("Cape Vincent"). *Id.* at ¶ 17. Eight draft bags containing Plaintiff's personal property were sent from Elmira to Cape Vincent at the time of the transfer. *Id.* Plaintiff's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

personal belongings did not all fit into the storage lockers provided for his use at Cape Vincent, so he stored personal legal documents and materials and books in two draft bags placed neatly under his bunk. *Id.* at ¶ 18.

Defendant Lane, who was the steady housing unit officer at the time, advised Plaintiff that he could not store belongings in draft bags and would have to purchase storage containers from the commissary for his excess belongings. *Id.* at ¶ 19. When Plaintiff informed Lane that he had no funds to purchase the containers because of his transfer and assured him that he would purchase the containers when his funds arrived from Elmira, Lane agreed to allow him to use the draft bags until he was able to comply with the storage policy. *Id.* at ¶ 20. The funds transferred from Elmira were collected by Cape Vincent, so Lane allowed Plaintiff to use the draft bags for another two weeks. *Id .* at ¶ 21. Lane agreed to continued use of the bags when funds Plaintiff subsequently received from home were also collected by Cape Vincent. *Id.*

**\*2** Lane subsequently learned that Plaintiff was litigating an action against correctional officers and issued Plaintiff a misbehavior report for possessing the two draft bags in his living quarters the same day. *Id.* at ¶ 22. Defendant Pawlin, who was the hearing officer on the claimed rule violations, directed Plaintiff to discard several hundred pages of legal materials and documents essential to pending litigations. *Id.*

After the hearing, Plaintiff learned of a state-wide policy directive that he believed permitted him to retain two draft bags to store personal belongings in his cell.[FN4] *Id.* at ¶ 23. When he informed Defendant Lane of the directive, Lane "outburst his disregards for the policy directive." *Id.* Plaintiff sought redress through the administrative grievance procedure. When Lane learned of Plaintiff's grievance, he contacted Defendant Beard, a Corrections Sergeant at Cape Vincent, and during phone conversations with Beard, Lane repeatedly referenced departmental directives, facility policy manuals, and the inmate's misbehavior handbook. *Id.* at ¶ 24. Lane directed Plaintiff to turn over the draft bags and moments later Defendants Beard and Lane, along with other corrections officers, manacled Plaintiff and took him to the Special Housing Unit ("SITU"). *Id.* Plaintiff's Complaint does not state the length of time during which he remained in the SITU.

FN4. Plaintiff is presumably referring to Section III of DOCCS Directive # 4917 which provides in part:

> Personal property possessed by an inmate assigned to double cell housing shall be limited to the amount of property that will fit in three standard draft bags (including legal materials). Inmates will be responsible for proper storage of property and the neat and orderly appearance of their cells.
>
> A. *Storage of Property.* An inmate assigned to double occupancy cell housing will be allowed to possess in his or her cell two draft bags provided by the Department for storage of property. Any property beyond what can be stored in the individual locker may be stored in these bags.

Defendants Briggs and Tyndall subsequently packed Plaintiff's belongings, and while doing so, deliberately emptied a container of melted ice into a bag filled with legal documents, destroying several items and a significant portion of legal materials and documents essential to Plaintiff's appeal in an unidentified case pending in the Second Circuit Court of Appeals. *Id.* at ¶ 25. According to Plaintiff, the Second Circuit had granted him an enlargement of time to file a petition for a hearing or rehearing *en banc.* Because the documents were destroyed, Plaintiff was unable to file the petition within the enlargement period. *Id.*

Plaintiff thereafter had a disciplinary hearing on possession of the two draft bags and allegedly fabricated rule violations.[FN5] *Id.* at ¶ 26. Defendant Jones, the hearing officer, found Plaintiff not guilty of the fabricated rule violations. However, he found Plaintiff guilty of possessing the two draft bags, despite what Plaintiff believes to have been a clear departmental directive evidencing that no rule violation had occurred. *Id.* Plaintiff was punitively sanctioned for the draft bag violation. *Id.*

FN5. Plaintiff has not identified the nature of the

allegedly fabricated rule violations in his Complaint. (*See* Dkt. No. 1.) Although Plaintiff's Complaint does not specifically identify the person(s) responsible for filing the misbehavior report that led to the hearing, it can be inferred from other allegations that Defendants Lane and Beard were behind the report.

**B. Plaintiff's Claims of Cruel and Inhuman Treatment and Deliberate Indifference to his Serious Medical Needs Against Defendants Pawlin, Moehs, McAuliffe, and Bezio**

Prior to Plaintiff's SHU confinement, he had been scheduled for oral surgery and medical treatment for chronic low back pain. *Id.* at ¶ 27. Plaintiff was not allowed to keep his appointments because he was punitively confined in the SHU and was left to endure "unbearable toothaches, extreme eating and hygienical discomfort, as well as excruciating lower back pain during and after his SHU confinement." *Id.* Once Plaintiff was released from SHU confinement, he was required to start anew the lengthy and time consuming procedure of scheduling dental and medical appointments. *Id.* According to Plaintiff, Defendants McAuliffe and Barkley were cognizant of the routine practice of denying prisoners confined in the SHU reasonable and adequate dental and medical care and/or knowingly implemented or allowed the practice. *Id.*

**\*3** When Plaintiff was released from the SITU, he was required to carry his belongings, including at least eight draft bags weighing eighty or more pounds, to an assigned housing unit over four-hundred yards away in snowy frigid weather and was not allowed to use an available pushcart or have another inmate assist him, despite informing Defendant John Doe # 1 of his medical condition and level of pain. *Id.* at ¶ 28. Plaintiff strained his lower back as a result and endured tremendous pain for at least two weeks. *Id.* According to Plaintiff, Defendant Pawlin thereafter subjected Plaintiff to a pattern of harassing inter-facility movements that required Plaintiff to move his belongings to different housing units. *Id.*

Plaintiff was punitively confined in the SITU in April of 2008 as a result of sanctions imposed by Defendant Jones.[FN6] *Id.* at ¶ 29. Plaintiff was not permitted to keep his rescheduled dental and medical appointments because of

the confinement. *Id.* at ¶ 29. When he left the SITU after serving several weeks, Plaintiff was, for a second time, required to carry all of his personal belongings without assistance or a pushcart despite informing Defendant John Doe # 2 of his medical condition and pain. *Id.* Plaintiff hurt his back transporting his belongings. *Id.* When he reported to sick call, Defendant Jane Doe told him that she was not going to do anything for him, and she would not give him a medical excuse from carrying the rest of his personal belongings to his housing unit. *Id.*

> FN6. It is not entirely clear from the Complaint whether Plaintiff was confined in the SITU by Defendant Jones as a result of Jones' finding that Plaintiff was guilty of possessing two draft bags or for some other reason. *See* Dkt. No. 1 at ¶ 26.

Approximately four months later, after filing a grievance and personally seeking redress from DOCCS' Chief Medical Officer, Plaintiff was examined by Dr. Rosner and finally had one of two troubling wisdom teeth extracted and received a few physical therapy sessions, *Id.* at ¶ 30. Upon completion of the initial therapy sessions, the therapist concluded that the course of treatment had been effective and that Plaintiff was in need of further therapy. *Id.* at ¶ 31. The therapist also recommended that Plaintiff be given a TENS unit for self-administered therapy. *Id.* However, at a follow-up appointment with Defendant Moehs, who had replaced Dr. Rosner as Plaintiff's health care provider, Moehs informed Plaintiff that he would not continue with the recommended course of treatment or provide the TENS unit and told Plaintiff to live with the pain. *Id.*

**C. Plaintiff's Claim that he was Denied a Fair and Impartial Hearing by Defendant McAuliffe**

In preparation for an August 2008 disciplinary hearing, Plaintiff attempted to obtain documentary evidence he believed was relevant and necessary to his defense. *Id.* at ¶ 32. Plaintiff's request was denied by Defendant McAuliffe, who presided over the disciplinary hearing and allegedly made false representations to Plaintiff to induce him to enter into an involuntary and unintelligent plea agreement. *Id.* McAuliffe is alleged to have unfairly and unilaterally penalized Plaintiff for an altercation with another prisoner and sanctioned Plaintiff

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

to punitive segregation for six months at Mid–State Correctional Facility ("Mid–State"), with a concomitant loss of privileges and recommended loss of good time, which extended Plaintiff's term of imprisonment to the maximum. *Id.* at ¶ 33. The other prisoner was not sanctioned at all. *Id.*

**\*4** Plaintiff appealed McAuliffe's determination to Defendant Bezio on the grounds that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he had been denied due process and equal protection of the law as supported by documentary evidence. *Id.* at ¶ 34. Defendant Bezio affirmed McAuliffe's determination. *Id.*

**D. Alleged Indifference to Plaintiff's Serious Medical and Dental Needs While in the SHU at Mid–State**

During the period of his confinement in the SHU at Mid–State, Plaintiff continued to experience excruciating back pain and toothaches. *Id.* He requested and was denied treatment by Defendant Dr. John Doe based upon Moehs' medical entry, without any physical examination. *Id.* Plaintiff received dental care to the extent of having dental x-rays taken after grieving the matter to Defendant Hulihan. *Id.* However, his painful wisdom tooth was not extracted. *Id.* Despite making articulate, detailed complaints of being deprived necessary and adequate medical and dental care to Defendants Barkley, Hulihan, and Lindquist, Plaintiff's complaint was denied as unsubstantiated and no significant steps were taken to ensure that Plaintiff received necessary and adequate medical and dental care prior to his transfer from Mid–State to Downstate Correctional Facility. *Id.*

**II. PROCEDURAL HISTORY**

Plaintiff filed his Complaint on February 17, 2011. (Dkt. No. 1.) Plaintiff's application to proceed *in forma pauperis* was granted by Judge Mordue in a June 1, 2011 Decision and Order (Dkt. No. 2) in which the District Court dismissed Plaintiff's claim for destruction of property against Defendants Briggs and Tyndall, with prejudice, and his equal protection claim against Defendants McAuliffe and Bezio, without prejudice, under 28 U.S.C. § 1915(e). Section 1915(e) directs that when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case any time if the court determines that ... (B) the action ... (i) is frivolous or

malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B). *Id.* at pp. 6–8. Judge Mordue otherwise accepted the Plaintiff's complaint for filing, specifically noting that in doing so, the District Court was expressing no opinion as to whether Plaintiff's remaining claims could withstand a properly made motion to dismiss or for summary judgment. *Id.* at p. 9. The District Court also ordered Plaintiff to take reasonable steps to ascertain the identities of the "John Doe" and "Jane Doe" defendants and cautioned him that failure to serve the unnamed defendants in a timely manner may result in the action being dismissed against them. *Id.* at pp. 8–9.

**III. ANALYSIS**

**A. Legal Standard Governing Motions to Dismiss for Failure to State a Claim**

**\*5** A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6). The motion tests the formal legal sufficiency of a complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678. (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

(internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See* Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994); *see also* Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g.,* Donhauser v. Goord, 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (considering factual allegations in plaintiff's opposition papers) (citations and internal quotations marks omitted), *vacated and amended in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). *See also* Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002) ("Even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)).[FN7]

> FN7. Defendants have submitted DOCS Directive # 4913, entitled "Inmate Personal Property Limits" in support of their motion to dismiss. (Dkt. No. 23–2 at pp. 2–9.) Plaintiff has also relied upon the Directive in his opposition

papers as support for his argument that state-wide policy allowed him to store his excess personal belongings in the two draft bags under his bunk. (Dkt. No. 27 at p. 12.) Since the Directive is integral to the Plaintiff's Complaint, the Court can consider it on Defendants' Rule 12(b)(6) motion without converting the motion to one for summary judgment. However, because the Directive, on its face, can be construed to offer some support for both Plaintiff and Defendants' position, it is of little value in determining the motion before the Court.

> The Declaration of Sandra Prusak, also submitted in support of Defendants' motion to dismiss, references a disciplinary packet that was supposed to be attached to the Declaration. (Dkt. No. 23–3 at p. 2.) Inasmuch as the Disciplinary Packet is not attached to the Declaration as filed, the Court need not consider whether it, or Prusak's reference to its contents, can be considered on a Rule 12(b)(6) motion.

**\*6** Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

**B. Plaintiff's Official Capacity Claims For Money Damages Against the Defendants**

Defendants have moved for dismissal of Plaintiff's official capacity claims for money damages under 42 U.S.C. ¶ 1983. (Dkt. No. 1 at ¶¶ 9–10, 12–16.; Dkt. No. 23–1 at pp. 19–20.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)) and bars all money damages claims against state officials acting in their official capacities, including the moving Defendants herein.*Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against individual Department of Correctional Services employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity.) Therefore, I recommend that the Plaintiff's § 1983 claims brought against the moving Defendants in their official capacities be dismissed without leave to amend.

**C. Claim Against Defendants Briggs and Tyndall for Denial of Access to Court on a Matter Before the Second Circuit Court of Appeals**

Plaintiff claims that documents essential to an appeal he had pending in the Second Circuit Court of Appeals were destroyed when Defendants Briggs and Tyndall deliberately emptied a container of melted ice into Plaintiff's bag. As a result, Plaintiff was unable to file a petition for a hearing or rehearing *en banc* in the case before the filing deadline. (Dkt. No. 1 at ¶ 25.) Plaintiff has not identified the action, nor has he described the nature of the action or the appeal on which he was seeking an *en banc* hearing or rehearing.

The Supreme Court has long held that inmates are guaranteed a right of access to the courts under the First Amendment of the Constitution. *See Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) ("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure."). In order to state a claim for denial of access to court under § 1983, Plaintiff must assert non-conclusory allegations demonstrating that Defendants Briggs and Tyndall's alleged conduct in destroying his legal documents was deliberate and malicious. *See Lewis,* 518 U.S. at 349, 351; *Gonzales v. Carpenter,* No. 9:08–CV–629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan.3, 2011)

(Baxter, M.J.). Plaintiff's Complaint, liberally construed, satisfies that requirement.

**\*7** However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348–349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury,* 536 U.S. 403, 415–16, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Arar v. Ashcroft,* 532 F.3d 157, 188–89 (2d Cir.2008), *cert. denied,* —— U.S. ——, 130 S.Ct. 3409, 177 L.Ed.2d 349 (2010) (following *Christopher* in requiring that the complaint include a description of the "nonfrivolous," "arguable" claim that the plaintiff has lost). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher,* 536 U.S. at 416.

Plaintiff has provided no information whatsoever concerning the matter in the Second Circuit and has thus failed to state a claim for denial of his First Amendment right of access to court against Defendants Briggs and Tyndall. [FN8] For that reason, I recommend that Plaintiff's claim for denial of access to court against Defendants Briggs and Tyndall be dismissed. Inasmuch as it is possible that Plaintiff may be able to remedy the defect in his Complaint by including specific information regarding his underlying claim, I also recommend that he be granted leave to amend.

> **FN8.** The fact that Plaintiff was seeking a hearing or rehearing *en banc* raises the inference that he had been unsuccessful on an appeal to the Second Circuit.

**D. Retaliation Claims Against Defendants Lane, Pawlin, Beard, Briggs, Tyndall, and Moehs**

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1.

**\*8** To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary

record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Co-op. Extension,* 252 F.3d 545, 555 (2d Cir.2001)).

*1. Retaliation Claim Against Defendant Lane*

According to Plaintiff, Defendant Lane, who had been allowing him to keep two draft bags of personal items under his bunk, issued a misbehavior report against Plaintiff for possessing the two bags right after learning that Plaintiff was litigating a civil action against correctional officers. (Dkt. No. 1 at ¶¶ 20–22.) When Lane learned later that Plaintiff had filed a grievance in reliance upon a state-wide directive Plaintiff believed allowed him to possess two draft bags for temporary storage of his personal belongings [FN9], Lane ordered Plaintiff to turn over the draft bags and had him manacled and taken to SITU. *Id.* at ¶¶ 23–24.

FN9. *See* Dkt. No. 23–2 at p. 7.

Plaintiff claims that he was charged with a violation for possessing the two draft bags and other fabricated rule violations. (Dkt. No. 1 at ¶ 26.) The Court has inferred that Lane was involved in Plaintiff being charged with allegedly fabricated rule violations for which he was found not guilty following a disciplinary hearing. Plaintiff was found guilty of possessing the two draft bags and punitively sanctioned. *Id.*

The filing of lawsuits and administrative grievances is constitutionally protected activity for retaliation purposes. *See Colon,* 58 F.3d at 872 ("Prisoners ... have a constitutional right of access to the courts and to petition the government for redress of grievances, and prison officials may not retaliate against prisoners for exercise of that right."); *Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003) (the right of prisoners to file administrative grievances is a constitutionally protected activity for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

retaliation purposes). Plaintiff's retaliation claim against Lane can be construed to include retaliation for his lawsuit and the grievance he filed, both constitutionally protected activity. Therefore, the Complaint satisfies the first prong of a retaliation claim for pleading purposes.

**\*9** Liberally construing Plaintiff's Complaint, it appears that Plaintiff has set forth a facially plausible claim of adverse action satisfying the second prong. Plaintiff contends that the "motivating factor" behind Lane's initial rule violation charge against him with regard to the draft bags was finding out about Plaintiff's lawsuit. (Dkt. No. 27 at p. 4.) The filing of the charge led to Plaintiff being ordered to discard documents and legal materials by hearing officer Pawlin. *Id.* Destruction of a prisoner's legal papers and personal property has been found substantial enough to qualify as an adverse action for retaliation purposes. *See Smith v. City of New York, No. 03 Civ. 7576(NRB), 2005 WL 1026551, \*3, 2005 U.S. Dist. LEXIS 7903, at \*10 (S.D.N.Y. May 3, 2005)* (Buchwald, J.) Because Plaintiff did have the two draft bags under his bunk, Lane's initial rule violation charge was arguably not a false misbehavior report. However, since Plaintiff claims that the bags were under the bunk with Lane's consent at the time he charged Plaintiff with the rule violation, the violation charge can be viewed as an adverse action for pleading purposes.

Placing Plaintiff in the SHU and filing false misbehavior claims against him after learning that he had filed a grievance based upon the directive also constitute adverse action sufficient to satisfy the second prong of a retaliation claim. *See Hamilton v. Fisher, No. 9:10–CV1066(MAD/RFT), 2012 WL 987374, at \*14, 2012 U.S. Dist. LEXIS 39116, at \*41 (N.D.N.Y. Feb.29, 2012)* (Treece, M.J.) (alleged transfer to SHU in retaliation for complaints could be considered adverse action); *Smith v. Hash, No. 904–CV–0074 LEK/DRH, 2006 WL 2806464, at \*6, 2006 U.S. Dist. LEXIS 70362 (N.D.N.Y. Sept.28, 2006)* (Kahn D.J., Homer, M.J.) (same); *Kotler v. Daby, No. 10–CV–136 (TJM/DRH), 2011 WL 915312, \*5, 2011 U.S. Dist. LEXIS 26173, at \*14 (N.D.N.Y. Feb.10, 2011)* (Homer, M.J.) (both filing false misbehavior report and sending plaintiff to SHU for filing grievances and lawsuits constitute adverse actions); *Mateo v. Fischer, 682 F.Supp.2d 423, 433*

*(S.D.N.Y.2010)* (filing false misbehavior report against plaintiff constituted an adverse action for purposes of retaliation claim).

Plaintiff's Complaint also satisfies the third prong of the retaliation analysis—a causal connection between Plaintiff's lawsuit and grievance and the adverse actions by Lane. Although Lane was not himself the subject of Plaintiff's lawsuit, the temporal proximity between Lane's learning of the lawsuit against other correctional officers and charging Plaintiff with a rule violation makes a facially plausible showing of causation. Further, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SITU and having an allegedly false misbehavior report filed against him supports causation for purposes of this motion. *See Baskerville, 224 F.Supp.2d at 732.* In addition, Plaintiff was found not guilty with respect to the allegedly false misbehavior reports. *Id.*

**\*10** For the foregoing reasons, I recommend that Defendant Lane's motion to dismiss Plaintiff's retaliation claim against him be denied.

### 2. *Retaliation Claim Against Defendant Pawlin*

Plaintiff has also asserted a retaliation claim against Defendant Pawlin, the hearing officer who directed him to discard documents and legal materials. (Dkt. No. 27, at p. 4.) Plaintiff's Complaint does not adequately state a claim for retaliation against Defendant Pawlin. Plaintiff has not alleged that Pawlin was aware of the lawsuit Plaintiff had filed against correctional officers, nor is there any allegation that Pawlin was a defendant in that lawsuit. As a result, Plaintiff has failed to allege plausibly that the lawsuit was causally connected to Pawlin's allegedly adverse action. *See Wilson v. Kelly, No. 9:11–cv–00030 (MAD/RFT), 2012 WL 3704996, at \*9, 2012 U.S. Dist. LEXIS 121293, at \*24 (Aug. 27, 2012)* (D'Agostino, D.J., Treece, M.J.) (claim dismissed due to failure by plaintiff to allege plausibly that protected activity was causally connected to any alleged adverse action taken by the defendant where plaintiff failed to allege that the defendant was aware of the protected activity). Therefore, I recommend that Plaintiff's retaliation claim against Defendant Pawlin be dismissed with leave to amend.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

3. *Retaliation Claim Against Defendant Beard*

The Complaint does not allege that Defendant Beard was aware of the lawsuit that Plaintiff had filed against correctional officers. However, Plaintiff has alleged that when Defendant Lane learned that Plaintiff had filed a grievance with regard to storage of the draft bags in his cell, he began phoning Defendant Beard "and reporting to him the situation." (Dkt. No. 1 at ¶ 23.) The Court can reasonably infer from that allegation that Beard was aware that the grievance had been filed when he subsequently joined Lane in escorting the manacled Plaintiff out of his housing unit and taking him to SHU. *Id.* at ¶ 24. Placing Plaintiff in SHU constitutes an adverse action for purposes of the retaliation analysis. *See Hamilton,* 2012 WL 987374, at *14, 2012 U.S. Dist. LEXIS 39116, at *14 (putting Plaintiff in SHU for filing a grievance constitutes an adverse action). Furthermore, the temporal proximity between Plaintiff's grievance concerning the bags and his being placed in SHU supports causation for purposes of this motion. *See Baskerville,* 224 F.Supp.2d at 732. Therefore, I recommend that Defendant Beard's motion to dismiss the Plaintiff's retaliation claim against him be denied.

4. *Retaliation Claim Against Defendants Briggs and Tyndall*

Destruction of Plaintiff's legal material and documents for his Second Circuit appeal constitutes an adverse action for purposes of the retaliation analysis. *See Smith v. City of New York,* 2005 WL 1026551, *3, 2005 U.S. Dist. LEXIS 7903, at *10 (destruction of prisoner's legal papers and personal property qualifies as an adverse action for retaliation purposes). However, Plaintiff has not alleged that either Briggs or Tyndall was involved in or even aware of Plaintiff's lawsuit or grievance at the time they are alleged to have emptied a container of melted ice into a bag filled with legal documents. Therefore, the Complaint does not make a facially plausible showing of causation against Briggs and Tyndall, and for that reason I recommend that Plaintiff's retaliation claim against those defendants be dismissed. Because Plaintiff may be able to correct the deficiency in an amended complaint, I recommend that he be granted leave to amend.

5. *Retaliation Claim Against Defendant Moehs*

**\*11** The only factual allegations in Plaintiff's Complaint regarding Defendant Moehs are that he replaced Dr. Rosner as Plaintiff's health care provider, informed Plaintiff that he would not continue with the recommended course of treatment necessary to improve Plaintiff's medical condition or provide him with the recommended TENS unit, and told Plaintiff to live with the pain. (Dkt. No. 1 at ¶ 31.) In his opposition to Defendants' motion to dismiss, Plaintiff has asked the Court to infer that Defendant Moehs substituted himself for Dr. Rosner in order to disapprove the recommended course of treatment because Plaintiff had complained to the Chief Medical Officer about not receiving adequate medical care. (Dkt. No. 27 at p. 5.)

The Court finds that the allegations in Plaintiff's Complaint do not permit the inference Plaintiff has asked it to make. *See Friedl v. City of New York,* 210 F.3d 79, 86 (2d Cir.2000) (retaliation claim must be "supported by specific and detailed factual allegations" and "not stated in wholly conclusory terms.") (citation and internal quotation marks omitted).

Plaintiff has failed to allege that Moehs had any knowledge of his complaint to the Chief Medical Officer when he denied Plaintiff the treatment recommended by the therapist, thus failing to satisfy the causal relationship prong of the retaliation analysis. *See Wilson,* 2012 WL 3704996, at *9, 2012 U.S. Dist. LEXIS 12193, at *24. Plaintiff filed the grievance and made complaints to the Chief Medical Officer prior to his examination by Dr. Rosner and to the initial therapy sessions. *See Id.* at ¶¶ 30–31. There are no allegations in the Complaint suggesting that Moehs was the subject of the grievance or complaints or that he would otherwise have any reason to retaliate against Plaintiff by denying him necessary medical care.

In light of Plaintiff's failure to make a facially plausible showing of causal connection, I recommend that his retaliation claim against Defendant Moehs be dismissed. However, because Plaintiff's grievance and complaints to the Chief Medical Officer constitute constitutionally protected activity, and the denial of necessary medical treatment in retaliation for the filing of a grievance or making a complaint is sufficient to satisfy the adverse action requirement of the retaliation claim

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

analysis, I recommend that Plaintiff be granted leave to amend should he be able to plead specific facts supporting causation.[FN10]

> FN10. *See Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610, at *10–11, 2003 U.S. Dist. LEXIS 16442, at ——33–34 (S.D.N.Y. Sept.18, 2003) (McKenna, J) (allegation that prison doctor revoked plaintiff's necessary medical treatment because he filed a grievance is sufficient for second prong of retaliation claim analysis).

**E. Claims of Cruel and Inhuman Treatment and/or Medical Indifference Against Defendants Pawlin, Moehs, McAuliffe, Barkley, Hulihan, and Lindquist**

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citation omitted).

**\*12** A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement. Under the objective requirement, "the deprivation alleged must be objectively sufficiently serious [;] ... a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834 (citations and internal quotation marks omitted). Under the subjective requirement, a plaintiff must demonstrate that a prison official acted with deliberate indifference to an inmate's health or safety. *Id.* In *Farmer,* the Supreme court found it "fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk." *Id.* at 837.

In fulfilling their duty to "provide humane conditions of confinement," prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). There are two elements to a prisoner's claim that prison officials violated his or her Eighth Amendment right to receive medical care. "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). There is no bright-line test to measure the seriousness of a prisoner's medical condition. *Stevens v. Goord,* 535 F.Supp.2d 373, 383 (S.D.N.Y.2008). However, the Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702. Inquiry into whether a plaintiff had a serious medical need "must be tailored to the specific circumstances of each case." *Smith,* 316 F.3d at 185.

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer, 511 U.S. at 837; Chance, 143 F.3d at 702–03.* The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *See Farmer, 511 U.S. at 825; Ross v. Giambruno, 112 F.3d 505 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle, 429 U.S. at 105–6.*

**\*13** Prison officials can deprive inmates of medical treatment by unnecessarily delaying adequate medical treatment. *Smith, 316 F.3d at 185.* Where a plaintiff's claim is one of a temporary delay in the provision of otherwise adequate treatment, "it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support an Eighth Amendment claim." *Id.*

### 1. Claim of Cruel and Inhuman Treatment By Defendant Pawlin

Plaintiff has alleged that he suffered from lower back strain after being required to carry his personal belongings from SHU to his assigned housing unit. (Dkt. No. 1 at ¶ 28.) According to Plaintiff, Defendant Pawlin thereafter subjected him "to a pattern of harassing inter-facility movements ... which required him to move his belongings to different housing units." (Dkt. No. 1 at ¶ 28.) "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837.* Even if requiring Plaintiff to move his personal belongings to different housing units when he was suffering from lower back strain could pass as an "unnecessary and wanton infliction of pain ... incompatible with the evolving standards of decency that mark the progress of a maturing

society," *Estelle, 429 U.S. at 102,* Plaintiff has not alleged facts showing that Pawlin was aware of Plaintiff's back strain at the time he directed the moves, that Plaintiff complained to Pawlin about any impact the moves had on his back, or that Plaintiff suffered any further harm to his back as a result of the moves to different housing units. Therefore, Plaintiff has failed to plead a facially plausible claim of deliberate indifference to Plaintiff's health or safety, and the Court recommends that Plaintiff's Eighth Amendment claim against Defendant Pawlin for cruel and inhuman treatment be dismissed, and that Plaintiff be given leave to amend.

### 2. Claim of Medical Indifference Against Defendant Moehs

Plaintiff claims that the physical therapist who had worked with him had recommended that Plaintiff be given additional physical therapy sessions and a TENS unit for his lower back pain, and that Defendant Moehs refused to authorize both when he took over as Plaintiff's physician. (Dkt. No. 1 at ¶ 31.) An inmate's "mere disagreement over the proper treatment does not create a constitutional claim ... [s]o long as the treatment given is adequate." *Chance, 143 F.3d at 703.* Construing Plaintiff's complaint liberally, as is required in light of his *pro se* status, and accepting the allegations as true, Plaintiff claims that Moehs not only rejected the treatment recommended by the therapist, but that he declined to provide any treatment at all to address Plaintiff's excruciating back pain, telling him instead to learn to live with the pain. (Dkt. No. 1 at ¶ 31.)

**\*14** Plaintiff has described himself as having "excruciating lower back pain" over an extended period of time. (Dkt. No. 1 at ¶¶ 27, 35–36.) Severe back pain, especially if it lasts for an extended period of time, as Plaintiff claims, can constitute a "serious medical need" under the Eighth Amendment, there by satisfying the first element of a medical indifference claim. [FN11] *See Guarneri v. Hazzard, No. 9:06–CV–0985, 2008 WL 552872, at *6, 2008 U.S. Dist. LEXIS 14809 (Feb. 27, 2008)* (Mordue, C.J., Homer, M.J.) (citing *Nelson v. Rodas, No. 01 Civ. 7887(RCC)(AJP), 2002 WL 31075804, at *14, 2002 U.S. Dist. LEXIS 17359, at *50 (S.D.N.Y. Sept. 17, 2002)* (Peck, M.J.) (collecting cases)). Given Plaintiff's alleged level of back pain and the length of time over which it lasted, Moehs' refusal to allow him to follow through with the recommended therapy and allow Plaintiff a TENS unit,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

compounded by his alleged failure to prescribe any treatment whatsoever to address Plaintiff's back condition and pain, constitutes a facially sufficient claim of deliberate indifference for purposes of Plaintiff's 12(b)(6) motion. [FN12] Therefore, the Court recommends that Defendant Moehs' motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against him be denied.

> FN11. Dental conditions left untreated for a significant period of time can also constitute a serious medical need under the Eighth Amendment. *See, e.g., Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (tooth cavity which will degenerate with increasingly serious implications if neglected over sufficient time presents a serious medical need); *Chance,* 143 F.3d at 702 (untreated dental problems resulting in chronic tooth pain for six months resulting in tooth degeneration constitute serious medical needs); *see also Fields v. Gander,* 734 F.2d 1313, 1314–15 (8th Cir.1984) (claim based on plaintiff's inability to eat properly due to dental problems).

> FN12. If it turns out that Defendant Moehs did provide Plaintiff with some course of treatment for his back, albeit not the treatment recommended by the therapist or the treatment Plaintiff would have chosen for himself, and did not merely tell Plaintiff to live with the pain as alleged, Plaintiff's medical indifference claim is unlikely to survive a motion for summary judgment.

### 3. Claim of Medical Indifference Against Defendants McAuliffe and Bezio Regarding Medical and Dental Care to Inmates in SHU

Plaintiff has alleged that on two separate occasions when he in SHU he was not allowed to attend scheduled dental and medical appointments because of a routine practice denying inmates in SHU reasonable adequate dental and medical care. (Dkt. No. 1 at ¶¶ 27 and 29.) The basis for Plaintiff's Eighth Amendment medical indifference claim against Defendants McAuliffe and

Bezio is that they "were cognizant of this routine practice, and/or have knowingly implemented or allowed the implementation of the practice of denying prisoners confined in the SHU reasonable adequate dental and medical care." *Id.* at ¶ 27. The dental appointment Plaintiff missed was for "troubling wisdom teeth," which were painful and one of which was ultimately extracted after Plaintiff filed a grievance. *Id.* at ¶ 30. The medical appointment was for Plaintiff's chronic lower back problem that left him with excruciating pain. *Id.* at ¶ 27.

In a § 1983 action against a defendant in his or her individual capacity, the plaintiff must establish that the defendant, acting under color of state law, caused the plaintiff to be deprived of a federal right. *Kentucky v. Graham,* 473 U.S. at 166. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). The United States Supreme Court has made it clear that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.* "); *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) ("[R]espondeat superior liability does not lie against corrections officers in Section 1983 actions; holding a position in a hierarchical chain of command is insufficient by itself to support personal involvement").

**\*15** However, the Second Circuit has held that personal involvement by a supervisor under § 1983 may be found where the supervisor has: "(1) participated directly in the alleged constitutional violation, (2) failed to remedy a violation after learning of it through a report or appeal,[FN13] (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in managing subordinates who committed constitutional violations, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[FN14]

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN13. There are no allegations in the Complaint that McAuliffe and Bezio had direct knowledge that Plaintiff had a serious medical need while he was in SHU and nonetheless refused to allow him to keep his dentist and medical appointments. *See Farmer,* 511 U.S. at 825, 837 (deliberate indifference requires defendant's awareness of facts from which he or she could draw an inference that plaintiff had a serious medical need, that inference was actually made, and that defendant consciously and intentionally disregarded or ignored the need).

FN14. The Supreme Court's decision in *Ashcroft,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009). However, the Second Circuit has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of these motions that *Colon* remains good law.

Under *Colon,* if McAuliffe and Bezio, acting in a supervisory capacity, either created a policy resulting in violation of an inmate's Eighth Amendment rights, or allowed the continuation of such a policy, they could be subject to liability under 42 U.S.C. § 1983. In this case, however, under even the most liberal reading of Plaintiff's Complaint, he has not alleged any facts to support such a claim. The Complaint is devoid of any factual enhancement of his conclusory assertion that McAuliffe and Bezio were aware of the allegedly routine practice, were involved in implementing it, or that they had authority to stop the practice of denying SHU prisoners "reasonable adequate dental and medical care" and allowed it to continue. *Id.* at ¶ 30. *See Iqbal,* 556 U.S. at 678 ("naked assertion[s] devoid of further factual enhancement [do] not suffice" to state a claim) (internal quotation marks omitted). Therefore, the Court recommends that Defendants McAuliffe and Bezio's motion to dismiss Plaintiff's Eight Amendment medical indifference claim against them be granted with leave granted Plaintiff to amend.

4. *Claim of Indifference to Serious Medical Needs Against Defendants Barkley, Hulihan, and Lindquist*

Plaintiff identifies Defendants Barkley and Hulihan as superintendents of correctional facilities and Defendant Lindquist as a grievance appeal officer. (Dkt. No. 1 at ¶¶ 14 and 16.) Plaintiff has alleged that while he was in SHU at Mid–State, he continued to experience excruciating back pains and a painful wisdom tooth and requested and was denied treatment by Defendant Dr. John Doe based upon Defendant Moehs' medical notation entry. *Id.* at ¶ 35. According to Plaintiff, the only dental or medical care he received while in SHU at Mid–State was dental x-rays. *Id.* Plaintiff has alleged in conclusory fashion that he made detailed and articulate complaints to Defendants Barkley, Hulihan, and Lindquist about being deprived of necessary and adequate medical and dental care at Mid–State, that the complaints were denied as unsubstantiated, and that no significant steps were taken to ensure that care was given during the time period he was at Mid–State prior to his transfer to Downstate. (Dkt. No. 1 at ¶ 36.)

**\*16** Supervisory personnel may be held liable under § 1983 for "fail[ure] to remedy a violation after learning of it through a report or appeal." *Colon,* 58 F.3d at 873. However, mere receipt of a report or complaint or request for an investigation by a prison official is insufficient to hold the official liable for the alleged constitutional violations. *See, e.g., Johnson v. Wright,* 234 F.Supp.2d 352, 363 (S.D.N.Y.2002) (claim that official ignored prisoner's letter of protest not enough to hold official liable); *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040, at *12, 2002 U.S. Dist. LEXIS 7067, at *43 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to black-letter law that 1983 does not impose *respondeat superior* liability.").

"On the other hand, where a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found under the second *Colon* prong: the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Walker,* 2002 WL 664040, at *13,

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

2002 U.S. Dist. LEXIS 7067, at *44 (citations and internal quotation marks omitted) (in denying superintendent's motion for summary judgment the court noted that responses to grievances or other inmate complaints "which attempt to defend or explain alleged constitutional violations have been found sufficient to sustain a plaintiff's claim of personal involvement."); *see also Johnson,* 234 F.Supp.2d at 363 ("personal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievances or otherwise reviews and responds to a prisoner's complaint.").

Allegations of awareness on the part of a correctional facility superintendent of an ongoing failure by prison officials to provide a plaintiff with medical treatment for injuries, coupled with failure to remedy the wrong after learning of it through a grievance procedure have been found to be sufficient to survive a Rule 12(b)(6) motion. *See Cicio v. Graham,* No. 9:08–CV–534, 2009 WL 537534, at *7, 2009 U.S. Dist. LEXIS 16675 (N.D.N.Y. Mar.3, 2009) (Mordue, C.J.) (Peebles, M.J.). However, the naked assertion in Plaintiff's Complaint that he complained to Defendants Barkley, Hulihan, and Lindquist that he was being deprived of reasonable and adequate dental care, and that his complaints were found unsubstantiated is simply too lacking in factual detail to show that Plaintiff is entitled to relief. *See Iqbal,* 556 U.S. at 678 (Rule 8(a)(2) "demands more than an unadorned, the defendant-harmed-me accusation.") Plaintiff's Complaint contains absolutely no factual enhancement regarding the manner in which complaints were conveyed to each of the defendants, the content of the complaints, the timing of the complaints, or the responses of each of those Defendants to those complaints. Therefore, I recommend that Defendants Barkley, Hulihan, and Lindquist's motion to dismiss Plaintiff's Eighth Amendment medical indifference claim against them be granted and that Plaintiff be granted leave to amend.

## G. Claims for Denial of Due Process Against Defendants Lane, Beard, Jones, McAuliffe, and Bezio

**\*17** To make out a Section 1983 claim for denial of Fourteenth Amendment due process rights, a plaintiff must demonstrate: "(1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 238 F.3d

223, 225 (2d Cir.2001) (internal quotation marks omitted). As to the first prong, an inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandlin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As to the second prong, the minimal due process requirements include: "(a) written notice of the claimed violations ...; (b) disclosure [to the prisoner] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body ...; and (f) a written statement by the fact finders as to the evidence relied on ...." *Wolff v. McDonald,* 418 U.S. 539, 559, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

*1. Due Process Claim Arising Out of Misbehavior Reports Involving Plaintiff's Draft Bags*

Plaintiff has asserted a claim for denial of his due process rights under the Fourteenth Amendment against Defendants Lane, Beard, McAuliffe[FN15] and Jones arising out of the institution, execution, and enforcement of a disciplinary proceeding against him based upon fabricated allegations and in violation of the state-wide directive allowing inmates to store two draft bags of personal possessions in their cells on a temporary basis. (Dkt. No. 1 at ¶¶ 47–48.) Construing Plaintiff's Complaint liberally, Defendants Lane and Beard are accused of filing fabricated charges and a draft bag possession charge against him. Defendant Jones was the hearing officer on the charges and ruled in favor of Plaintiff on the allegedly fabricated charges but found him guilty on the draft bags possession charge in violation of the state-wide directive. *Id.* at ¶ 28.

> FN15. Although Plaintiff has asserted a due process claim against Defendant McAuliffe in connection with the misbehavior report filed by Lane and Beard that resulted in the imposition of punitive sanctions by Defendant Jones, there are no factual allegations in the Complaint connecting Defendant McAuliffe to that claim.

The Court's initial inquiry is whether Plaintiff has

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

pleaded facts supporting a facially plausible claim that a liberty interest was infringed by the false charges and hearing determination since Plaintiff had no right to due process unless a liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). In his Complaint, Plaintiff has alleged he was punitively confined to SITU by Jones.[FN16] (Dkt. No. 1 at ¶ 29.) Plaintiff claims that he was in SITU for a few weeks. *Id.* While he was unable to attend dental and medical appointments while he was in SITU, Plaintiff has described it as a routine practice rather than an atypical occurrence. *Id.* at ¶ 27. *See Palmer,* 364 F.3d at 64 (both duration and conditions are considered in determining whether SHU confinement rises to the level of "atypical and severe hardship"). The alleged violation of the state-wide DOCCS storage directive by Defendants Lane, Beard, and Jones help Plaintiff because failure to follow a DOCCS directive does not give rise to a Section 1983 claim. *See Cabassa v. Gummerson,* No. 9:01–CV–1039, 2008 WL 4416411, *6, n. 24, 2008 U.S. Dist. LEXIS 72975, at *6, n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, D.J.) (violation of a DOCCS directive does not give plaintiff a claim under 42 U.S.C. ¶ 1983).

> **FN16.** The Court has inferred that the SHU sanction was imposed by Jones as a result of the guilty determination on the draft bag possession charge.

**\*18** Because the Plaintiff has failed to allege a liberty interest, it is not necessary to reach the issue of whether he was provided sufficient process in the hearing on the allegedly fabricated charges.[FN17] Therefore, the Court recommends that Defendants Lane, Beard, and Jones' motion to dismiss Plaintiff's Fourteenth Amendment due process claim be granted with leave to Plaintiff to amend.

> **FN17.** The Court has recommended that Defendants Lane and Beard's motion to dismiss Plaintiff's retaliation claim arising out of the allegedly false misbehavior report be denied. *See Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (filing of a false misbehavior report may be actionable when made in retaliation for the exercise of constitutional rights).

*2. Due Process Claim Against McAuliffe and Bezio Arising Out of Plaintiff's Alleged Denial of a Fair and Impartial Hearing*

Plaintiff has also asserted a due process claim against Defendants McAuliffe and Bezio in connection with his disciplinary hearing in front of McAuliffe. Plaintiff's due process claim against McAuliffe arises out of his denial of Plaintiff's request for access to documentary evidence needed to defend himself in a disciplinary hearing, his deliberate and purposeful misrepresentation to Plaintiff, and his denial of a fair and impartial disciplinary hearing. His claim against Bezio arises out of Bezio's affirmance of McAuliffe's determination of guilt. (Dkt. No. 1 *at* ¶ 49.) Plaintiff was placed in SHU for six months, with a concomitant loss of all privileges and good time credit, which extended his sentence to the maximum, as a result of the guilty finding. *Id.* at ¶ 33.

The Supreme Court ruled in *Sandlin* that the Constitution did not require that restrictive confinement be preceded by a hearing providing procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 484. The Second Circuit considers the duration of SHU confinement as well as the severity of the conditions. *See Palmer,* 364 F.3d at 65. Although no bright-line rule establishes a period of SHU confinement beyond which a due process right is implicated, *id.* at 64, the Second Circuit has held that a 101 day confinement does not alone meet the *Sandlin* standard of atypicality. *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004), *cert. denied,* 543 U.S. 1187, 125 S.Ct. 1398, 161 L.Ed.2d 190 (2005) (citing *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir.1999)). A liberty interest has, on the other hand, been found to be infringed by a confinement of 305 days. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000).

SHU confinement of less than 101 days can constitute atypical and significant hardships if the conditions were more severe than normal SHU conditions or "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65 (citing *Ortiz,* 323 F.3d at 195 & n. 1 and *Colon,* 215 F.3d at 232 & n. 1) In *Palmer,* the Second Circuit explained "[w]here the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

plaintiff was confined [in SHU] for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required [to determine whether a prisoner's liberty interest has been infringed]." 364 F.3d at 64–65.

**\*19** Plaintiff's allegations of a 180 day confinement in SITU with no medical care for an excruciatingly painful back and painful wisdom tooth is sufficient to satisfy the atypical conditions requirement for a liberty interest for pleading purposes. Plaintiff has also asserted facts adequate to satisfy the pleading requirements for a denial of due process in his disciplinary hearing. "Chief among the due process minima outlined in *Wolff* [is] the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board." Ponte v. Real, 471 U.S. 491, 496, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). Plaintiff has alleged that McAuliffe twice denied his request for documents relevant to his defense.

Prisoners also have a constitutional right to a fair and impartial hearing officer. *See, e.g.,* Sira v. Morton, 380 F.3d 57, 69 (2d Cir.2004). Plaintiff claims that McAuliffe made false representations to him to induce him to enter into an involuntary plea. While Plaintiff's due process claim against McAuliffe may not survive a motion for summary judgment, the allegations in the Complaint are adequate to assert a facially plausible claim of denial of due process.

Plaintiff has also alleged facts adequate to state a claim against Defendant Bezio for denial of due process in affirming the hearing determination. According to Plaintiff, in his appeal, he informed Bezio that he had been denied a fair and impartial hearing, that his guilty plea was unconstitutionally induced, and that he was denied due process and equal protection. (Dkt. No. 1 at ¶ 34.) It appears from the Complaint that Bezio affirmed the hearing determination while Plaintiff was still in SHU, and that as a result of the affirmance, Plaintiff ended up serving the full 180 day SITU confinement and the maximum of his original sentence. *Id.* Personal involvement of a supervisory official may be shown by evidence that after learning of the violation of a prisoner's

rights through an appeal, he failed to remedy the wrong. Colon, 58 F.3d at 873.

The consequences of McAuliffe's alleged violation of Plaintiff's due process rights—Plaintiff's confinement in SHU and loss of good time—were ongoing at the time Bezio affirmed the hearing determination. *Id.* at 34. Bezio therefore had the opportunity to remedy the violation at least to some degree and failed to do so, thereby leaving him potentially subject to personal liability. *See* Williams v. Smith, 781 F.2d 319, 324 (2d Cir.1986) (finding personal involvement where superintendent denied appeal from hearing that allegedly violated plaintiff's rights); Delgado v. Bezio, No. 09 Civ. 6899(LTS), 2011 WL 1842294, at \*8, 2011 U.S. Dist. LEXIS 51917, at \*25–26 (S.D.N.Y. May 9, 2011) (Swain, D.J.) (denying motion to dismiss claim against official who heard appeal from disciplinary hearing); Johnson v. Coombe, 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (denying appeal officer's motion to dismiss because prisoner alleged he had been denied the opportunity to call a witness at disciplinary hearing); Moore v. Scully, No. 90 Civ 3817(MEL), 1993 WL 22129, at \*3, 1993 U.S. Dist. LEXIS 841, at \*10–11 (S.D.N.Y. Jan. 26, 1993) Laker, D.J.) (denying summary judgment where superintendent denied affirmed disciplinary hearing result where plaintiff alleged that hearing denied due process).

**\*20** Based upon the foregoing, the Court recommends that Defendant Bezio's motion to dismiss Plaintiff's Fourteenth Amendment due process claim be denied.

## H. Plaintiff's Pendent State Claims

Plaintiff has asserted three distinct claims for relief under New York State law against Defendants for acts or omissions within the scope of their employment. (Dkt. No. 1 at ¶¶ 51–55.) They are: (1) *respondeat superior* claims against Defendants Lindquist, Barkley, and Hulihan for negligence in performing their administrative duty to supervise their subordinates' work performance as it related to Plaintiff's care and treatment, *Id.* at ¶ 51; (2) claims against Defendants Lane, Beard, Jones, McAuliffe, and Bezio for wrongful confinement and deprivation of Plaintiff's liberty interest by denying him the right to offer relevant documentary evidence for the preparation and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

presentation of his defense in a disciplinary proceeding in violation of New York State Rules and Regulations and DOCCS policy directives, *Id.* at ¶¶ 52–53; and (3) negligence and malfeasance in providing Plaintiff medical and dental care. Defendants argue that Plaintiff's state law claims should be dismissed pursuant to New York Correction Law § 24. (Dkt. No. 23–1 at pp. 20–22.) Defendants are correct. Section 24 provides as follows:

1. No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

This statute precludes inmates from suing DOCCS employees in their personal capacity in New York State courts. *See Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 62, 527 N.E.2d 1194 (1988). The statutory bar is intended to permit correction officers to perform the task of maintaining safety and security in correctional facilities "undeterred by the fear of personal liability and vexatious suits, which could substantially impair the effective performance of a discretionary function." *Ierardi v. Sisco,* 119 F.3d 183, 187 (2d Cir.1997). The bar also applies to pendent state law claims in federal court because "[i]n applying pendent jurisdiction, federal courts are bound to apply state substantive law to the state claim." *Baker v. Coughlin,* 77 F.3d 12, 15 (2d Cir.1996) (citations omitted). "If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court exercising pendent jurisdiction ... must follow the state's jurisdictional determination and not allow that claim to be appended to a federal law claim in federal court." *Id.* at 15.

**\*21** In 2009, the United States Supreme Court held Correction Law § 24 unconstitutional to the extent it

precludes inmates from pursuing § 1983 claims. *Haywood v. Drown,* 556 U.S. 729, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009). However, the courts in this District have held that the *Haywood* decision does not affect the question of the district court's jurisdiction to hear pendent state law claims against DOCCS employees and have continued to dismiss those claims under Correction Law § 24. *See O'Diah v. Fischer,* No. 08–CV–941 (TJM/DRH), 2012 WL 987726, at \*21, 2012 U.S. Dist. LEXIS 39232, at \*60 (N.D.N.Y. Feb.28, 2012) (Homer, M.J.); *Joy v. New York,* No. 5:09–CV–841 (FJS/ATB), 2010 WL 3909694, at \*4–5, 2010 U.S. Dist. LEXIS 104641, at \*15–16 (N.D.N.Y. Sept.30, 2010) (Scullin, S.D.J.); *Gillard v. Rovelli,* No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at \*16, 2010 U.S. Dist. LEXIS 124737, at \*47–48 (N.D.N.Y. Sept.29, 2010) (Lowe, M.J.); *Crump v. Ekpe,* No. 9:07–CV–1331, 2010 WL 502762, at \*18, 2010 U.S. Dist. LEXIS 10799, at \*61 (N.D.N.Y. Feb.8, 2010) (Kahn, D.J., Peebles, M.J.). For the reasons set forth in those decisions, I recommend that Defendants' motion to dismiss Plaintiff's pendent state law claims in this case be granted, without leave to amend.

**ACCORDINGLY,** it is hereby

**RECOMMENDED,** that Defendants' motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. No. 23) be ***GRANTED IN PART AND DENIED IN PART.*** Specifically, the Court recommends that Defendants' motion be ***GRANTED*** as follows:

1. Dismissal on Eleventh Amendment grounds of all claims seeking money damages against the moving Defendants in their official capacities, without leave to amend;

2. Dismissal of all of Plaintiff's state law claims against Defendants Lindquist, Barkley, Hulihan, Lane, Beard, Jones, Moehs, McAuliffe, and Bezio (Dkt. No. 1, Counts XV–XIX), without leave to amend; and

3. Dismissal of the following claims, with leave to amend: (a) First Amendment claim against Defendants Briggs and Tyndall for denial of access to courts; (b) First Amendment retaliation claims against Defendants Pawlin,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 600213 (N.D.N.Y.)

(Cite as: 2013 WL 600213 (N.D.N.Y.))

Briggs, Tyndall, and Moehs; (c) Eighth Amendment claim of cruel and inhuman treatment against Defendant Pawlin; (d) Eighth Amendment claim for indifference to serious medical needs against McAuliffe, Bezio, Barkley, Hulihan, and Lindquist; and (e) Fourteenth Amendment denial of due process claims against Defendants Lane, Beard, and Jones; and it is further

**RECOMMENDED** that Defendants' motion be **DENIED** as to the following: (a) Plaintiff's claim for retaliation against Defendants Lane and Beard; (b) Plaintiff's Eighth Amendment medical indifference claim against Defendant Moehs; and (c) Plaintiff's Fourteenth Amendment violation of due process claim against Defendants McAuliffe and Bezio; and it is further

**RECOMMENDED** that Defendants be directed to answer those allegations in the Plaintiff's Complaint that relate to the claims on which dismissal is denied and those which relate to the Doe Defendants.

**\*22** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 600213 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 599893 (N.D.N.Y.)

(Cite as: 2013 WL 599893 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Phillip JEAN–LAURENT, Plaintiff,
v.
C.O. LANE; C.O. Briggs; C.O. Tyndall; John Doe # 1;
John Doe # 2; Sgt. Beard; Sgt. Pauline; Lt. Jones; DSS
McAuliffe; Dr. Mays; Dr. John Doe; Jane Doe; Supt.
Barkley; Supt. Hulihan; Dep. Comm. Linquist,
Defendants.
No. 9:11–CV–186 (NAM/TWD).

Feb. 15, 2013.
Phillip Jean–Laurent, Ozone Park, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Gregory J. Rodriguez, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### ORDER

NORMAN A. MORDUE, District Judge.

*1 The above matter comes to me following a
Report–Recommendation by Magistrate Judge Therese
Wiley Dancks, duly filed on the 24th day of January 2013.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein,
including the Magistrate Judge's ReportRecommendation,
and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in
its entirety.

2. The Clerk of the Court shall serve a copy of this
Order upon all parties and the Magistrate Judge assigned

to this case.

### IT IS SO ORDERED.

N.D.N.Y.,2013.

Jean-Laurent v. Lane
Slip Copy, 2013 WL 599893 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Brian TUITT, Plaintiff,
v.
P. CHASE, M. Lopez, N. Benware, Liemuex, Redel,
John Doe 1–3, Defendants.
No. 9:11–CV–0776 (DNH/TWD).

Jan. 30, 2013.
Brian Tuitt, Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Christopher W. Hall, Esq., of Counsel, Albany, NY, for Defendants.

***REPORT–RECOMMENDATION and ORDER***

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Brian Tuitt alleges that Defendants conspired and retaliated against him for filing grievances by filing a false misbehavior report against him, removing him from the Sex Offender Counseling and Treatment Program, wrongfully placing him in the general population, and transferring him to a different facility. (Dkt. No. 1.) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 23.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. BACKGROUND**

The following facts are derived from the face of the operative complaint and are accepted as true for the purposes of deciding the pending motion to dismiss. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007).

In 2008, Plaintiff was mandated to enroll in the Sex Offender Counseling and Treatment Program ("the Program") at the Clinton Annex. (Dkt. No. 1 at 4.) The Program uses various therapeutic techniques to help participants recognize behaviors that may lead to committing sex offenses. *Id.* Participants in the Program are required to accept responsibility for the conduct that resulted in their criminal convictions. *Id.*

In February 2008, Plaintiff filed a grievance. *Id.* One of his reasons for filing this grievance was that he was having trouble "accepting responsibility" as required by the Program because he was appealing his conviction. *Id.* However, counselors and staff in the Program worked with Plaintiff on this issue and Plaintiff ultimately excelled in the Program. *Id.* at 4–5. Plaintiff was appointed as a team leader for the Program. (Dkt. No. 1 at 5.) He earned college credits, made goals, assisted other inmates, examined his behaviors, and applied Program techniques. *Id.* at 6.

Plaintiff was informed in January 2010 that he would complete the Program. *Id.* at 5. Thereafter, however, Plaintiff "started to get excuses from staff when [he] was not selected to finish the program." *Id.* Defendant N. Benware told Plaintiff that he would not complete the program due to his many court appearances and his failure to confess to each and every element of his conviction offense. *Id.* Plaintiff complied but this did not satisfy Defendant Benware. *Id.*

> FN1. Defendant N. Benware is a licensed social worker for the Program. (Dkt. No. 1 at 2.) He interviews, tests, and counsels participants in the program and is responsible for treating and monitoring them. *Id.*

Plaintiff filed a grievance and a state court action. (Dkt. No. 1 at 5.) On February 11, 2010, Plaintiff filed another grievance regarding Program "policies and threats of being removed." *Id.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))

Plaintiff was away from the Clinton Annex from March 12, 2010, to April 12, 2010, attending court hearings in New York City. *Id.* at 6. While he was gone he received two packages from Westfields Comic. *Id.* Plaintiff alleges that Defendant Lieutenant P. Chase,[FN2] Defendant Counselor Lopez,[FN3] Defendant Benware, Defendant Correction Officer Liemuex,[FN4] and John Doe 1–3 "reviewed the contents of the package[s] ..., saw some questionable material which might violate [Program] policy, arra[ng]ed for the plaintiff to pick up the package[s], snare the plaintiff with the material, issue a misbehavior report and attempt to remove the plaintiff from the program and/or delay his date of finishing the program." *Id.*

> FN2. Defendant Chase is in charge of security for the Program. (Dkt. No. 1 at 2.) He also acts as the hearing officer when an inmate from the Program receives a misbehavior report. *Id.*

> FN3. Defendant Lopez is the Senior Counselor of the Program. (Dkt. No. 1 at 2.) As such, he oversees the Program and maintains the welfare of the inmates and staff. *Id.*

> FN4. Defendant Correction Officer Liemuex works in the general population at Clinton Annex and is responsible for the safety and welfare of the inmate population. (Dkt. No. 1 at 2.)

**\*2** On April 14, 2010, Plaintiff was informed by the package room officer that his magazines were at Media Review and that he would have to wait several days to receive them. *Id.* Plaintiff received a large manila envelope the next morning from Media Review. (Dkt. No. 1 at 6.) The envelope contained magazines and a letter. *Id.* When Plaintiff opened the envelope, Defendant Liemuex walked up to Plaintiff, confiscated the magazines, and told Plaintiff that the magazines had to be re-reviewed by staff. *Id.* at 6–7. Later, Defendant Liemuex issued a misbehavior report charging Plaintiff with possessing unauthorized material. (Dkt. No. 1 at 7; Dkt. No. 1–1 at 4–5.)

Plaintiff filed a grievance, claiming that he was being retaliated against. (Dkt. No. 1 at 7.)

On May 3, 2010, Plaintiff attend a Program community meeting. *Id.* At that meeting, Defendant Lopez "addressed the community in an angry ... speech about failures and punishing people." *Id.* Turning to Plaintiff, he stated that "the inmate that was caught with pornography ... will be punished and will go to the box." *Id.* This speech "confirmed to the plaintiff that his hearing outcome was pre-determined ...." *Id.*

Plaintiff told Defendant Chase, the hearing officer, that Defendant Lopez had publicly pre-determined Plaintiff's guilt. *Id .* at 7–8. Defendant Chase angrily refused to believe Plaintiff. (Dkt. No. 1 at 8.) Defendant Chase then conducted a biased disciplinary hearing. *Id.* at 8–9. Plaintiff was found guilty, removed from the Program, sent to another part of the facility, and kept in keeplock for thirty days with loss of all privileges. *Id.* at 9.

Plaintiff appealed the result of his disciplinary hearing. *Id.* at 10. When his appeal was denied he filed a proceeding in New York state court pursuant to Article 78. *Id.* In February 2011, the Deputy Superintendent of Security at Coxsackie Correctional Facility reversed and expunged the disposition of the hearing that Defendant Chase conducted. (Dkt. No. 1–1 at 45.) Thereafter, Plaintiff received a letter from an assistant Solicitor General informing him that the office would not be contesting the Article 78 proceeding. (Dkt. No. 1 at 14.) By the time this occurred Plaintiff had already served his keeplock sentence.

When Plaintiff was moved to serve his keeplock sentence, an unknown block officer placed a paper marked "SOP" (an acronym for "Sex Offender Program") in Plaintiff's cell. *Id.* at 9. "This sign clearly marked the plaintiff's cell and its occupant [as] a sex offender. This cell is in front of a general population dorm. This placed the plaintiff in fear of his safety." *Id.* at 9–10. Defendant Chase "visited the location and did not do anything to remove this sign." *Id.* at 10.

While Plaintiff was serving his keeplock sentence, another inmate informed Plaintiff that he had overheard Defendant Chase telling John Doe 1–3 that he was "going to take care of Tuitt and put an end to our problem." *Id.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))

**\*3** Plaintiff finished his keeplock sentence on June 2, 2010. *Id.* As he was packing, he received an Involuntary Protective Custody ("IPC") referral ticket issued by Defendant Chase. (Dkt. No. 1 at 10.) As a result, Plaintiff had to remain in confinement until a hearing was conducted. *Id.* Defendant Chase told Plaintiff that he could not file a grievance because the issue was non-grievable. *Id.* Plaintiff filed a grievance anyway. *Id.*

The hearing was conducted on June 7, 2010. *Id.* Plaintiff and Defendant Chase testified. *Id.* at 10–11. Defendant Chase testified that placing Plaintiff in IPC was Defendant Redel's [FN5] idea. (Dkt. No. 1 at 11.) The hearing officer released Plaintiff from IPC. *Id.*

> [FN5.] Defendant Correction Officer Redel works in the law library at Clinton Annex and oversees the operation and safety of the inmates who work in and use the law library. (Dkt. No. 1 at 2.) Previously she was assigned to work in the Program for several months. (Dkt. No. 1 at 2.)

When Plaintiff returned to the Program, Defendants Lopez and Benware "admitted that they arranged for the plaintiff to be caught with the magazine and to give him a harsh punishment to teach him a lesson." *Id.* Defendants Lopez and Benware told Plaintiff that he would have to "openly admit that he has a problem with pornography ... and it was part of his cycle to commit sex offenses. If the plaintiff did not, he would be removed from the program and would be considered in denial." *Id.* Plaintiff complied. *Id.* However, Defendant Benware "was not satisfied with his presentation and wanted a better admission." *Id.* at 12. Defendant Benware's "behavior and attitude transmitted to the plaintiff that the behavior and attitude wanted the plaintiff to fail, get in serious trouble and he would make sure it would happen." (Dkt. No. 1 at 12.)

Plaintiff, "fearing that he would be subjected to a retaliatory attack," filed another Article 78 proceeding. *Id.* The court issued an order directing Defendants to allow Plaintiff to remain in the Program pending resolution of the proceeding. *Id.*

On or about July 14, 2010, after all the parties were served with the Article 78 pleadings, Defendant Benware became agitated and irate during a group session with Plaintiff. *Id.* This was despite the fact that, a few days earlier, he had informed Plaintiff that he was on the fast track to finish the Program. *Id.* Defendant Benware called Plaintiff a liar and told Plaintiff to stop filing grievances. *Id.* As a result, Plaintiff "lost all trust" in the Program and feared retaliation. (Dkt. No. 1 at 13.) He filed another grievance. *Id.*

Defendants Lopez and Benware removed Plaintiff from the Program and placed him in the general population, where he was at risk as an identified sex offender. *Id.* Defendants Lopez and Benware told Plaintiff that the Article 78 court's order meant nothing to them. *Id.*

A few days after Plaintiff was placed in the general population, Defendant Chase met with Plaintiff, informed him that he should not have been placed in the general population, and told Plaintiff to pack his belongings and go back to the Program. *Id.*

Plaintiff was ultimately transferred out of the facility. *Id.* at 14. His Article 78 proceeding was then dismissed as moot. *Id.* Plaintiff believes that Defendants transferred him deliberately to avoid court action. (Dkt. No. 1 at 14.)

**\*4** Plaintiff alleges that Defendant Redel prevented Plaintiff from accessing the law library in retaliation for Plaintiff filing grievances and court actions. *Id.* at 19. Plaintiff also alleges that Defendant Redel violated a court order by denying Plaintiff access to a notary. *Id.* at 20.

Plaintiff alleges that Defendants violated DOCCS Directive 4040, which prohibits reprisals by staff. *Id.* at 23–25.

Plaintiff filed this lawsuit on July 8, 2011. (Dkt. No. 1.) Plaintiff asserts thirty-five causes of action. *Id.* at 17–25. Plaintiff requests declaratory relief, injunctive relief, credit for the loss of thirty-seven days lost in the Program, compensatory damages, punitive damages, nominal damages, costs, and fees. *Id.* at 26.

Defendants move to dismiss the complaint. (Dkt. No. 23.) Plaintiff has opposed the motion. (Dkt. Nos. 27 and

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))

31.)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

## III. ANALYSIS

### A. Official Capacity Claims

Plaintiff has sued Defendants in their individual and official capacities. (Dkt. No. 1 at 3.) Plaintiff has also, in Count 24, alleged that Defendant Benware acted in his "official capacity" when he called Plaintiff a liar. *Id.* at 22. Defendants move to dismiss the official capacity claims. (Dkt. No. 23 at 20.[FN6]) For the reasons discussed below, I recommend that the Court dismiss Plaintiff's official capacity claims without leave to amend.

> FN6. Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

**\*5** The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10–21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 142–47 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101–06 (1984).

The Eleventh Amendment bars suits for damages against state officials acting in their official capacities.[FN7] All DOCCS employees are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Therefore, I recommend that the Court dismiss Plaintiff's official capacity claims.

> FN7. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))

which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ( "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165–66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* No. 9:05–CV–0501 (GLS/RFT), 2007 U.S. Dist. LEXIS 8530, at *3, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) (citing cases).

Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not

cure it." *Id.* (citation omitted). Here, better pleading could not cure the deficiency in Plaintiff's official capacity claims. Therefore, I recommend that the Court dismiss Plaintiff's official capacity claims without leave to amend.

**B. Conspiracy Claims**

Plaintiff claims that each of the actions taken by Defendants was the result of a conspiracy. (Dkt. No. 1.) Defendants move to dismiss Plaintiff's conspiracy claims, arguing, *inter alia,* that the claims are barred by the intracorporate conspiracy doctrine. (Dkt. No. 23 at 5–11.) Defendants are correct.

The intracorporate conspiracy doctrine states that employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* No. 97–cv–1337, 1999 U.S. Dist. LEXIS 3164, at *6, 1999 WL 151702, at *2 (W.D.N.Y. Mar. 17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). The Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, ( *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Ave. Corp.,* 530 F.2d 66, 72 (2d Cir.1976)), but has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have applied the doctrine, without discussion, to § 1983 cases. *See Samms v. Fischer,* No. 9:10–CV–0349 (GTS/GHL), 2011 U.S. Dist. LEXIS 97807, at *22 n. 8, 2011 WL 3876528, at *15 n. 8 (N.D.N.Y. Mar. 25, 2011) (collecting cases) FN8. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S .D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases. Like that court, in the absence of any authority to the contrary, this Court

FN8. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*6** will continue to apply the intracorporate conspiracy doctrine to Section 1983 claims because the doctrine's logic is sound. A civil rights conspiracy requires an

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))

agreement between two or more actors to inflict an unconstitutional injury. This 'two or more actors' requirement cannot be satisfied where all of the alleged conspirators are employees of a single entity and acting within the scope of their employment [FN9] as agents of that entity.

> FN9. Even where the intra-corporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06–2951, 249 Fed. App'x 217 (2d Cir. Sept. 28, 2007). Judge Hurd, the District Court judge assigned to this case, has found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05–CV–1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No. 03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). Here, Plaintiff does not allege that any of the Defendants engaged in excessive force or that they were pursuing personal interests wholly separate and apart from their DOCCS employment. Therefore, the exception is inapplicable.

*Id.* (citation omitted).[FN10] Therefore, I recommend that the Court dismiss Plaintiff's conspiracy claims without leave to amend.

> FN10. On appeal, the Second Circuit affirmed the trial court's judgment but declined to address the intra-corporate conspiracy issue. *Anemone,* 629 F.3d at 121.

### C. Retaliation

Plaintiff claims that Defendants retaliated against him in a number of ways. (Dkt. No. 1.) Defendants move to dismiss these claims. (Dkt. No. 23 at 11–13.)

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *Id.* at 381–383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

F.3d 489, 492 (2d. Cir.2001)).

Here, Plaintiff alleges that he engaged in protected conduct by filing a series of grievances and court actions. (Dkt. No. 1.) The filing of a grievance against prison officials is constitutionally protected conduct. *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, "[p]risoners ... have a constitutional right of access to the courts and to petition the government for the redress of grievances." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Therefore, I find that the complaint alleges facts plausibly suggesting that Plaintiff was engaged in protected conduct.

**\*7** In the following sections, I will separately examine each of the events discussed in the complaint to determine whether the complaint alleges facts plausibly suggesting adverse actions and causal connections.

1. *Magazine Incident*

Plaintiff alleges that Defendant Liemeux issued a false misbehavior report accusing him of possessing unauthorized material, that Defendant Chase found Plaintiff guilty, and that each acted with retaliatory motives. (Dkt. No. 1 at 7–9; Dkt. No. 1–1 at 45.) Plaintiff also alleges that Defendants Lopez and Benware were involved in this retaliation. (Dkt. No. 1 at 6.)

Although this is a close case, I find that Plaintiff has alleged facts plausibly alleging that Defendants Lopez and Benware took adverse action against Plaintiff. Plaintiff alleges that these defendants admitted to setting Plaintiff up to be caught with an unauthorized magazine "to teach him a lesson." *Id.* at 11. The Second Circuit defines " 'adverse action' objectively, as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superceded by* 320 F.3d 346, 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)). The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Id.* Accepting the allegations of the complaint as true, I find that setting

a person up to be punished would deter a person of ordinary firmness from exercising constitutional rights.

Plaintiff has also alleged facts plausibly suggesting that Defendants Liemuex and Chase took adverse action against him. The filing of a misbehavior report and a guilty finding after a hearing would deter a person of ordinary firmness from exercising constitutional rights. Therefore, I find that Plaintiff has alleged facts plausibly suggesting that Defendants Liemuex and Chase took adverse action against him.

Plaintiff has alleged facts plausibly suggesting a causal connection between his protected conduct and the adverse actions by Defendants Lopez, Benware, Liemuex and Chase. Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon,* 58 F.3d at 873). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* Here, Plaintiff alleges that he filed a grievance regarding the Program in February 2010, two months before Defendant Liemuex issued the misbehavior report. (Dkt. No. 1 at 5, 7.) The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing *Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 555) (2d Cir.2001)) (suggesting that lapse of five months between protected activity and retaliation may show a causal connection). Plaintiff alleges that he was ultimately vindicated when the disposition of the hearing was reversed and expunged. (Dkt. No. 1–1 at 45.) And, as recounted above, Plaintiff has alleged that Defendants Lopez and Benware stated that they set Plaintiff up to teach him a lesson. Therefore, I recommend that the Court deny Defendants' motion to dismiss the retaliation claims against Defendants Lopez, Benware, Chase, and Liemuex

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

regarding the magazine incident.

2. *Placement in IPC Custody*

**\*8** Plaintiff alleges that Defendants Chase and Redel retaliated against him by placing him in IPC. (Dkt. No. 1 at 10–11.) Defendants argue that this action was not "adverse" because, as Plaintiff admits on the face of the complaint, sex offenders are at risk in the general population. (Dkt. No. 23 at 13.) Defendants are correct. The complaint does not allege facts plausibly suggesting that placement in IPC would deter a similarly situated person of ordinary firmness from exercising constitutional rights. However, Plaintiff's opposition to the motion to dismiss explains that being placed in IPC negatively impacted his ability to attend the Program and access the law library. (Dkt. No. 27 at 5.) It is possible that these allegations, if pleaded, could plausibly suggest adverse action. Therefore, I recommend that the Court dismiss this claim with leave to amend.

3. *Removal from the Program*

Plaintiff alleges that Defendants Lopez, Benware, and Chase retaliated against him by removing him from the Program. (Dkt. No. 1 at 18.) Defendants move to dismiss this claim, arguing that "[t]here is no causal connection alleged between these acts and the grievances." (Dkt. No. 23 at 12.) It appears that Defendants do not dispute that removing Plaintiff from the Program constituted an "adverse action."

Considering the factors discussed above,[FN11] I find that the complaint alleges facts plausibly suggesting a causal connection. First, the complaint alleges facts plausibly suggesting temporal proximity between Plaintiff's grievances and his removal from the Program. Plaintiff alleges that he filed grievances or court actions in February, April, June, and July 2010. (Dkt. No. 1 at 5, 7, 10, 12.) Plaintiff was removed from the Program twice: temporarily in May 2010 and permanently in July 2010. *Id.* at 9, 13. The temporary removal occurred at about the same time that Plaintiff filed grievances regarding the magazine incident. *Id.* at 7, 9. The July removal occurred immediately after Plaintiff filed an Article 78 proceeding. *Id.* at 12–13. Second, the complaint alleges facts plausibly suggesting that Defendants made statements concerning their retaliatory motives. In particular, Plaintiff alleges that

Defendant Benware told him to stop filing grievances. *Id.* at 12. Therefore, I recommend that the Court deny Defendants' motion to dismiss Plaintiff's retaliation claims regarding his removal from the Program.

> [FN11.] Only two of the factors are applicable to this claim because it does not involve an allegedly false misbehavior report.

4. *Placement in the General Population*

Plaintiff alleges that Defendants Lopez and Benware retaliated against him by placing him in the general population. *Id.* at 13. Defendants move to dismiss this claim, arguing that "[t]here is no causal connection alleged between these acts and the grievances." (Dkt. No. 23 at 12.) It appears that Defendants do not dispute that placing Plaintiff in the general population constituted an "adverse action."

Plaintiff has alleged facts plausibly suggesting a causal connection between the Article 78 proceeding he filed in July 2010 and his placement in the general population. The complaint alleges that the parties were served with the Article 78 pleadings in July 2010. (Dkt. No. 1 at 12.) The complaint alleges that after the parties were served, Defendant Benware became irate during a group program and told Plaintiff to stop filing grievances. *Id.* The complaint alleges that Defendants Lopez and Benware placed Plaintiff in the general population soon thereafter. *Id.* at 13. Therefore, I recommend that the Court deny Defendants' motion to dismiss Plaintiff's retaliation claim regarding his placement in the general population.

5. *Transfer*

**\*9** Plaintiff alleges that Defendants Lopez, Benware, and Chase retaliated against him by transferring him to another facility. (Dkt. No. 1 at 18–19.) Defendants move to dismiss this claim. (Dkt. No. 23 at 12.) For the reasons discussed below, I recommend that the Court grant Defendants' motion and dismiss this claim with leave to amend.

The transfer of a prisoner is not considered an "adverse action" unless it results in the prisoner being subjected to more onerous conditions. *See Coleman v.*

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))

*Sutton,* 530 F.Supp.2d 451, 453 (W.D.N.Y.2008) (prisoner failed to state a retaliation claim where he did not allege that conditions into which he was transferred were more onerous than his original placement) *Compare Shine v. Hofman,* 548 F.Supp.2d 112 (D.Vt.2008) (transfer from general population to "close custody"). Here, Plaintiff has not alleged that the conditions he experienced at the facility to which he was transferred were more onerous than the conditions he experienced at his original facility. Therefore, I recommend that the Court dismiss this claim with leave to amend.

6. *Law Library and Notary Access*

Plaintiff alleges that Defendant Redel retaliated against him by denying him access to the law library and a notary. (Dkt. No. 1 at 19, 20.) Defendants move to dismiss this claim. (Dkt. No. 23 at 12–13.)

As currently plead, the complaint does not state a retaliation claim against Defendant Redel. The complaint does not state when Defendant Redel denied Plaintiff access to the law library and notary, so the Court cannot assess the temporal proximity of the denials to Plaintiff's protected conduct. The complaint does not allege that Defendant Redel made any statements concerning a retaliatory motive. Therefore, I recommend that the Court dismiss the retaliation claims against Defendant Redel with leave to amend.

7. *Failure to Remove SOP Sign From Plaintiff's Cell*

Construed broadly, the complaint alleges that Defendant Chase retaliated against Plaintiff by not removing a sign from Plaintiff's general population cell indicating that Plaintiff was a sex offender. (Dkt. No. 1 at 9–10.) Defendants have not addressed this claim. I recommend that the Court dismiss the claim *sua sponte* with leave to amend.

The Second Circuit has held in the context of employment law that where "timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise ...." *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir.2001). The Second Circuit routinely cites to employment cases when discussing retaliation in the prison law context. *See, e. g., Espinal,* 558 F.3d at 129 (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268,

273–74 (2001)). Thus, it is appropriate to apply the *Slattery* rule here. Timing is the only basis for a retaliation claim against Defendant Chase regarding the failure to remove the SOP sign. The complaint does not allege that Defendant Chase made any statements regarding any retaliatory motive for failing to remove the sign. Indeed, the complaint does not even clearly allege that Defendant Chase saw the sign. Therefore, I recommend that the Court *sua sponte* dismiss this claim with leave to amend.

**D. Due Process Claims**

**\*10** Plaintiff alleges that Defendants Chase and Liemuex violated his right to due process in the course of the disciplinary hearing that followed the magazine incident. (Dkt. No. 1 at 17, 22, 23.) Construed broadly, the complaint may also assert due process claims against Defendants Chase and Redel regarding Plaintiff's IPC confinement. *Id.* at 10–11. Defendants move to dismiss these claims, arguing that Plaintiff was not deprived of any actionable liberty interest. (Dkt. No. 23 at 14–16.) Defendants are correct.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). An inmate has a liberty interest in remaining free from a confinement or restraint where the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

In the Second Circuit, determining whether a disciplinary confinement constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004). Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions." [FN12] *Id.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))

FN12. "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

Here, the complaint alleges that Plaintiff served thirty days in keeplock as a result of the disciplinary hearing. (Dkt. No. 1 at 9.) The complaint alleges that Plaintiff served another five days in IPC. *Id.* at 10, 11. This total is far less than 101 days. Plaintiff has not alleged that he was confined in conditions more severe than normal SHU conditions. Normally I would recommend that the Court dismiss these claims with leave to amend. However, Plaintiff admits in his opposition to the motion to dismiss that he did not suffer atypical and significant hardship during his keeplock and IPC confinements. (Dkt. No. 27 at 12.) Therefore, I recommend that the Court dismiss Plaintiff's due process claims without leave to amend.

**E. Claims Regarding Violations of DOCCS Directive 4040**

The complaint asserts five claims that Defendants violated DOCCS Directive 4040, which prohibits staff reprisals against inmates. (Dkt. No. 1 at 23, 24–25.) Defendants move to dismiss these causes of action, arguing that such allegations fail to state a federal claim. (Dkt. No. 23 at 14.) Defendants are correct.

Violations of state law do not give rise to claims under 42 U.S.C. § 1983. *Young v. Cnty. of Fulton,* 160 F.3d 899, 902 (2d Cir.1998). More specifically, a violation of a DOCCS directive does not state a claim for a constitutional violation under § 1983. *See Dillhunt v. Theriault,* No. 9:07–CV–0412 (GTS/DEP), 2009 U.S. Dist. LEXIS 117125, at * 3, 2009 WL 4985477, at *11 (N.D.N.Y. Dec. 15, 2009).[FN13] Therefore, I recommend that the Court dismiss these claims without leave to amend.

FN13. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron,* 557 F.3d 76.

**F. Verbal Harassment Claims**

*11 The complaint asserts three claims that mention verbal harassment. (Dkt. No. 1 at 17, 23.) The first involves Defendant Lopez's statement at a Program meeting that Plaintiff would be found guilty and punished for possessing an unauthorized magazine. *Id.* at 17. The second involves Defendant Chase's statement to Plaintiff that he should not file a grievance regarding his placement in IPC because the issue was not grievable. *Id.* at 23. The third involves Defendant Benware's statement to Plaintiff that he should stop filing grievances. *Id.* Defendants move to dismiss these claims, arguing that claims of verbal harassment are not independently actionable. (Dkt. No. 23 at 16–17.) Defendants are correct.

Although a defendant's statements may be relevant to other claims, verbal harassment, in and of itself, does not rise to the level of a constitutional violation. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 364 (N.D.N.Y.2010); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Therefore, I recommend that the Court dismiss Plaintiff's verbal harassment claims without leave to amend.

**G. Eighth Amendment Claims**

The complaint asserts that Defendants violated the Eighth Amendment by removing him from the Program and by placing him in the general population. (Dkt. No. 1 at 19, 20.) Defendants move to dismiss these claims, arguing that they fail to state a constitutional claim because participation in the Program "is not a basic human need and no physical harm resulted from the removal ...." (Dkt. No. 23 at 17–18.) Defendants are correct.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

must 'take reasonable measures to guarantee the safety of the inmates.' " *Id.* (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

To state an Eighth Amendment claim, a plaintiff must plead both an objective and a subjective component. *Id.* at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v.. Seiter,* 501 U.S. 294, 298 (1991)). To allege facts plausibly suggesting the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must plead facts suggesting that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Id.* Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992).

**\*12** Here, Plaintiff has not alleged any such facts. It is apparent from the face of the current pleading that Plaintiff could not amend his Eighth Amendment claims to cure this defect. Therefore, I recommend that the Court dismiss Plaintiff's Eighth Amendment claims without leave to amend.

**H. Equal Protection Claim**

The complaint alleges that Defendants violated Plaintiff's right to equal protection by removing him from the Program. (Dkt. No. 1 at 19.) Defendants move to dismiss this claim, arguing that Plaintiff has not stated a claim because he has not alleged that he was treated differently from any similarly situated individual. (Dkt. No. 23 at 18–19.) Defendants are correct.

The Equal Protection Clause provides that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to

injure a person.' " *Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005) (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980)). Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Id.* (citing *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)). Thus, a plaintiff asserting an equal protection claim must allege facts plausibly suggesting that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right, acted out of malice, or acted irrationally and arbitrarily.

Here, Plaintiff has not alleged that he was treated differently from any similarly situated individual. Therefore, I recommend that the Court dismiss Plaintiff's equal protection claim with leave to amend.

**I. Claim Regarding Violation of Criminal Statutes**

The complaint asserts a claim that Defendants violated 18 U.S.C. §§ 241 and 242, which are federal criminal statutes prohibiting conspiracy and civil rights violations. (Dkt. No. 1 at 19.) Defendants move to dismiss this cause of action, arguing that the statutes do not authorize civil suits or give rise to civil liability. (Dkt. No. 23 at 19–20.) Defendants are correct. *McLaughlin v. CitiMortgage, Inc.,* 726 F.Supp.2d 201, 220 (D.Conn.2010) (quoting *LeClair v. Coughlin,* 613 F.Supp. 849, 852 n. 1 (S.D.N .Y.1985). Therefore, I recommend that the Court dismiss this claim without leave to amend.

**J. Interference with Mail**

**\*13** Construed broadly, the complaint may assert a claim that Defendants violated Plaintiff's constitutional rights by interfering with his mail. (Dkt. No. 1 at 6–7.)

"A prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis,* 320 F.3d at 351. A prisoner's right to receive and send mail may, however, be regulated. *See, e.g., Davidson v. Mann,* 129 F.3d 700, 702 (2d Cir.1997). When challenges are brought to such regulations, "courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Davis,* 320 F.3d at 351.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))

District courts in the Second Circuit have articulated the test for analyzing regulations on prisoners' mail in two ways. Some courts have applied the formulation set out in *Davis,* which states that "[r]estrictions on prisoners' mail are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation and must be no greater than is necessary or essential to the protection of the governmental interest involved." *Id.* (citations and punctuation omitted).[FN14] Other courts have applied the formulation set out in *Turner v. Safley,* 482 U.S. 78, 89 (1987), which states that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89.[FN15] The Second Circuit itself has applied both standards. *Davis,* 320 F.3d at 351 (applying *Davis* test to prisoner's claim that mailroom clerk, on two occasions, opened outgoing legal mail); *Johnson v. Goord,* 445 F.3d 532, 534 (2d Cir.2006) (applying *Turner* test to prisoner's challenge to prison regulation limiting keeplock prisoners to one stamp per month for personal, non-legal use); *Duamutef v. Hollins,* 297 F.3d 108 (2d Cir.2002) (applying *Turner* test to prisoner's claim that prison officials violated his First Amendment rights by placing a watch on all of his outgoing and incoming non-privileged mail).

FN14. Examples of courts applying the *Davis* test include *LeBron v. Selsky,* No. 05–CV–172, 2009 U.S. Dist. LEXIS 126401, at *35–36, 2009 WL 6312275, at *11 (N.D.N.Y. Sept. 11, 2009) (Suddaby, J.) (Homer, M.J.) (applying *Davis* test to prisoner's claim that prison officials violated his First Amendment rights by placing him under a 'mail watch' and monitoring all of his outgoing mail) and *Midalgo v. Bass,* No. 9:03–CV–1128, 2006 U.S. Dist. LEXIS 69030, 2006 WL 2795332, at *12 (N.D.N.Y. Sept. 26, 2006) (Mordue, C.J.) (Treece, M.J.) (applying *Davis* to prisoner's claim that officer read his outgoing legal mail).

FN15. Examples of courts applying the *Turner* test include *Robinson v. N.Y. State Dep't of Corr. Servs.,* No. 9:08–CV–911, 2009 U.S. Dist. LEXIS 92294, at *29–36, 2009 WL 3246818, at

*10–11 (N.D.N.Y. Sept. 30, 2009) (McAvoy, J.) (DiBianco, M.J.) (applying *Turner* to prisoner's claim that his outgoing mail was delayed while commissary purchase of stamps was processed) and *Mitchell v. N.Y. State Dep't of Corr. Servs,* No. 06–CV–6278, 2009 U.S. Dist. LEXIS 5157, at *11–14, 2009 WL 185757, at *3 (W.D.N.Y. Jan. 26, 2009) (applying *Turner* to prisoner's claim that mailroom tampered with his mail).

Under the *Turner* standard, the burden is on the plaintiff to show that Defendants' conduct was not reasonably related to legitimate penological interests. *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004). The Second Circuit "has repeatedly found, without doubt, a valid, rational connection between the decision to impose a watch on a prisoner's mail and the desire to ensure the good order of the prison and the rehabilitation of prisoners by preventing a prisoner from engaging in illegal activities while incarcerated." *Duamutef,* 297 F.3d at 112 (citation and punctuation omitted); *see also United States v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("The investigation and prevention of ongoing illegal activity constitute legitimate penological objectives.").

Here, because the complaint does not specify what material was in the mail with which Defendants allegedly interfered, Plaintiff has not met his burden of showing that Defendants' conduct was unreasonable. Therefore, I recommend that the Court *sua sponte* dismiss this claim with leave to amend.

**K. Access to Courts**

**\*14** Construed broadly, the complaint asserts a claim that Defendant Redel interfered with Plaintiff's access to the courts. (Dkt. No. 1 at 19–20.) Defendants have not addressed this claim.

"A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F .2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821–23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815

Slip Copy, 2013 WL 877439 (N.D.N.Y.)

(Cite as: 2013 WL 877439 (N.D.N.Y.))

F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). To state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not alleged facts plausibly suggesting that he suffered any actual injury from Defendant Redel's alleged interference with his access to the courts. Therefore, I recommend that the Court dismiss this claim *sua sponte* with leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 23) be *GRANTED IN PART AND DENIED IN PART.*

**IT IS RECOMMENDED** that the Court dismiss the following claims without leave to amend: (1) all claims against Defendants in their official capacities; (2) all claims alleging conspiracy; (3) all claims alleging violations of DOCCS directives; (4) all claims alleging verbal harassment; (5) all Eighth Amendment claims; (6) the claim alleging violations of federal criminal statutes; and (7) the due process claim against Defendants Liemuex and Chase regarding the misbehavior report and disciplinary hearing; and it is further

**RECOMMENDED** that the Court dismiss the following claims with leave to amend: (1) the retaliation claim against Defendants Lopez, Benware, and Chase regarding Plaintiff's transfer to a different facility; (2) the retaliation claims against Defendant Redel regarding access to the law library and a notary; (3) the retaliation claim against Defendant Chase regarding the failure to remove the SOP sign; (4) the equal protection claim regarding removal from the Program; (5) the retaliation claim regarding placement in IPC; (6) the interference with mail claim; and (7) the access to courts claim; and it is further

**RECOMMENDED** that Defendants be directed to

respond to the following claims: (1) the retaliation claims against Defendants Lopez, Benware, Chase, and Liemuex regarding the magazine incident; (2) the retaliation claim against Defendants Lopez, Benware, and Chase regarding Plaintiff's removal from the Program; and (3) the retaliation claim against Defendants Lopez and Benware regarding Plaintiff's placement in the general population; and it is further

**\*15 ORDERED** that the Clerk provide Plaintiff with copies of *Tolliver v. N.Y. State Corr. Officers,* No. 99 CIV 9555, 2000 WL 1154311, at \*2 (S.D.N.Y. Aug. 14, 2000); *Bond v. Board of Educ. of City of New York,* No. 97–cv–1337, 1999 WL 151702 (W.D.N.Y. Mar. 17, 1999); *See Samms v. Fischer,* No. 9:10–CV–0349 (GTS/GHL), 2011 U.S. Dist. LEXIS 97807, 2011 WL 3876528 (N.D.N.Y. Mar. 25, 2011); and *Dillhunt v. Theriault,* No. 9:07–CV–0412 (GTS/DEP), 2009 U.S. Dist. LEXIS 117125, 2009 WL 4985477 (N.D.N.Y. Dec. 15, 2009) in accordance with the Second Circuit's decision in *LeBron v.. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2013.

Tuitt v. Chase
Slip Copy, 2013 WL 877439 (N.D.N.Y.)
END OF DOCUMENT

Slip Copy, 2013 WL 877617 (N.D.N.Y.)

(Cite as: 2013 WL 877617 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Brian TUITT, Plaintiff,
v.
P. CHASE, Lieutenant, Clinton Annex; MR. Lopez,
Senior Correction Counselor of Clinton–Annex; N.
Benware, Counselor, Social Worker; Liemuex,
Correction Officer, Clinton–Annex; Redel, Correction
Officer, Clinton Annex; and John Doe 1–3, Clinton
Annex, Defendants.
No. 9:11–CV–0776 (DNH/TWD).

March 8, 2013.
Brian Tuitt, Marcy, NY, pro se.

Hon. Eric T. Schneiderman Attorney General for the State
of New York, Christopher W. Hall, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff brought this civil rights action pursuant to
42 U.S.C. § 1983. On January 30, 2013, the Honorable
Thérèse Wiley Dancks, United States Magistrate Judge,
advised, by Report–Recommendation that defendants'
motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6) be granted in part and denied in part.
Plaintiff timely filed objections to the
Report–Recommendation. Following the issuance of the
Report–Recommendation, plaintiff also filed an amended
complaint on February 21, 2013. Dkt. No. 40.

Based upon a de novo review, the
Report–Recommendation is accepted. See 28 U.S.C. §
636(b)(1). Plaintiff's amended complaint will be
forwarded to Magistrate Judge Dancks for review. The
defendants are directed not to respond to the amended
complaint until further notice from the court.

Therefore, it is

ORDERED that

1. Defendants' motion to dismiss is **GRANTED in
part** and **DENIED in part;**

2. The following claims are **DISMISSED without
leave to amend**: (1) all claims against defendants in their
official capacities; (2) all claims alleging conspiracy; (3)
all claims alleging violations of New York State
Department of Correctional Services' directives; (4) all
claims alleging verbal harassment; (5) all Eighth
Amendment claims; (6) the claim alleging violations of
federal criminal statutes; and (7) the due process claim
against defendants Liemuex and Chase regarding the
misbehavior report and disciplinary hearing;

3. The following claims are **DISMISSED with leave
to amend**: (1) the retaliation claim against defendants
Lopez, Benware, and Chase regarding plaintiff's transfer
to a different facility; (2) the retaliation claims against
defendant Redel regarding access to the law library and a
notary; (3) the retaliation claim against defendant Chase
regarding the failure to remove the "SOP" (Sex Offender
Program) sign; (4) the equal protection claim regarding
removal from the Sex Offender Counseling and Treatment
Program; (5) the retaliation claim regarding placement in
Involuntary Protective Custody; (6) the interference with
mail claim; and (7) the access to courts claim;

4. Defendants are directed to **respond** to the
following claims: (1) the retaliation claims against
defendants Lopez, Benware, Chase, and Liemuex
regarding the magazine incident; (2) the retaliation claim
against defendants Lopez, Benware, and Chase regarding
plaintiff's removal from the Sex Offender Counseling and
Treatment Program; and (3) the retaliation claim against
defendants Lopez and Benware regarding plaintiff's
placement in the general population;

5. Plaintiff's amended complaint, Dkt. No. 40, be
forwarded to Magistrate Judge Dancks for review; and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 877617 (N.D.N.Y.)

(Cite as: 2013 WL 877617 (N.D.N.Y.))

6. The defendants are directed not to respond to the amended complaint until further notice from the court.

The Clerk is directed to serve a copy of this Decision and Order in accordance with the Local Rules.

IT IS SO ORDERED.

N.D.N.Y.,2013.

Tuitt v. Chase
Slip Copy, 2013 WL 877617 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Edmund J. SZARZYNSKI, Plaintiff,
v.
ROCHE LABORATORIES, INC., Defendant.
No. 07–CV–6008.

March 1, 2010.
West KeySummary**Civil Rights 78**🗝 **1551**

78 Civil Rights

    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1551 k. Age Discrimination. Most Cited Cases

    Employee's allegation that his supervisor disliked him, but it was not a "mutual" personality conflict, did not establish discrimination, and thus, the employer was not liable on the employee's Age Discrimination in Employment Act claim. The employee alleged that the dislike was one sided, but the record showed the contentious relationship the employee had with his supervisor and the hostile tone that the employee took to dispute the supervisor's evaluations. Furthermore, while the employee claimed that he was treated differently from other employees, he also asserted that co-workers requested that he talk to the supervisor about his management style and policies, because representatives of all ages found it difficult to work for the supervisor. Age Discrimination in Employment Act of 1967, § 2, 29 U.S.C.A. § 621.

Christina A. Agola, Rochester, NY, for Plaintiff.

Susan C. Roney, Nixon Peabody LLP, Buffalo, NY, for Defendant.

**DECISION and ORDER**

MICHAEL A. TELESCA, District Judge.

*INTRODUCTION*

   **\*1** Plaintiff Edmund J. Szarzynski, ("plaintiff"), brings this action asserting claims of age discrimination and retaliation pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), the New York State Human Rights Law, Executive Law § 290 et seq. ("NYSHRL") and Title VII of the Civil Rights Act of 1964 ("Title VII"), (codified at 42 U.S.C. § 2000(e), et seq.), against his employer Roche Laboratories, Inc. ("defendant" or "Roche"). Specifically, plaintiff alleges he was discriminated against on the basis of age, and retaliated against after complaining of the alleged discriminatory treatment. Defendant denies plaintiff's allegations, and moves for summary judgment dismissing plaintiff's Amended Complaint on grounds that plaintiff does not meet the elements of a prima facie case of discrimination or retaliation. According to the defendant, Szarzynski cannot establish any adverse employment action, or that any action taken by Roche had anything to do with plaintiff's age or protected activity. In addition, defendant argues that even if Szarzynski were able to prove a prima facie case, he cannot demonstrate that Roche's true reason for any action taken was a pretext for intentional discrimination or retaliation. Further, defendant contends that plaintiff's claims for emotional distress and for punitive damages are without merit and should be dismissed.

   For the reasons set forth below, I grant defendant's motion for summary judgment, and dismiss plaintiff's Amended Complaint in its entirety.

*BACKGROUND*

   As a threshold matter, defendant points out that plaintiff submitted a Counter Statement of Undisputed Facts in opposition to defendant's motion for summary judgment ("Counter Statement"). *See* October 30, 2009 Declaration of Susan C. Roney ("Oct. Roney Decl."), ¶ 16. Defendant argues that since plaintiff has not cross moved for summary judgment, he may not submit a Counter Statement and defendant respectfully request that

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

it be stricken from the record on this motion. *See id.,* ¶ 17. Further, defendant argues that plaintiff's facts are supported with nothing more than "his own self-serving unsupported allegations made at his deposition, in his interrogatory responses, in his new affidavit, and the ... previously [un]disclosed, affidavits of Jeremy Knopp." [FN1] *See id.,* ¶ 20. With regard to the assertions in plaintiff's Counter Statement that are unsupported by the record, the Court "in its analysis of the motion[s] for summary judgment, will only consider relevant evidence that is admissible pursuant to the ... frame-work established in Rule 56(e) of the Federal Rules of Civil Procedure and Local Rule 56.1." *Morris,* 37 F.Supp.2d at 569; *see also* Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 74 (2d Cir.2001) (Court of Appeals held that "Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported by the record.")

> FN1. Jeremy Knopp ("Knopp") is a former employee of Roche. In plaintiff's opposition to the motion for summary judgment, he introduced two affidavits by Knopp, dated January 2007 and 2006. However, plaintiff produced neither one of these affidavits during the sixteen months of discovery. Defendant served a document request dated November 2007 asking for "[a]ll statements Plaintiff has received from any person in any form." Plaintiff did not produce the Knopp affidavits he has now disclosed even though both affidavits predate the date of the document request from defendant. In any event, plaintiff had a duty to supplement his responses. *See* Fed.R.Civ. P. 26(e)(1). The Second Circuit has explained that "a court may ... strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." Hollander v. American Cyanamid Co., 172 F.3d 192, 198 (2d Cir.1999). The *Hollander* Court also held that the district court had acted within its discretion by striking portions of the affidavit that the court described as "more resembl[ing] an adversarial memorandum than a bona fide affidavit." 172 F.3d at 198. "Alternatively, a court may, in considering a motion for summary judgment, simply decline to consider those aspects of a

supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible." Doe v. The National Board of Podiatric Med. Exam., 2004 WL 912599, at *4 (S.D.N.Y.2004); *see also* Wyler v. U.S., 725 F.2d 156, 160 (2d Cir.1983) ("An affidavit of the opposing [party] which does not contain specific facts or is not based on firsthand knowledge is not entitled to any weight"). "The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." Searles v. First Fortis Life Ins. Co., 98 F.Supp.2d 456, 461 (S.D.N.Y.2000). Based on well established case law, this Court will disregard plaintiff's submissions, which are inappropriate. Thus, both Knopp's affidavits will not be considered. *See* DeSimone v. JP Morgan/Chase Bank, 2004 WL 2978011, at *4 (S.D.N.Y.2004) ("[i]n this opinion, any inappropriate portions of the Plaintiff's submissions have been disregarded, and this Court's analysis relies upon admissible evidence"); *see also* Morris v. Northrop Grumman Corp., 37 F.Supp.2d 556, 569 (E.D.N.Y.1999) ("[r]ather than scrutinizing each line ... discussing whether they contain conclusory allegations ... or hearsay ... the Court, in its analysis of the motion ..., will only consider relevant evidence that is admissible").

**\*2** "Rule 56.1 of the Local Civil Rules ... requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to admissible evidence of record supporting each such fact." *See* Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir.2003) (citing Local Rule 56.1(a), (d)); *see also* W.D.N.Y. Loc. R. Civ. P. 56.1(a). Defendant has complied with this rule. "The papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried." *See id.* 56.1(b). "All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." *See id.* 56. 1(c). In other words, the moving party

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

must set forth the material facts that it contends are not in dispute, whereas the non-moving party must then set forth the material facts that he contends are in dispute (i.e., material facts as to which he contends that there is a genuine issue). Accordingly, while the Court will not strike plaintiff's Counter Statement, having undertaken an independent review of the record in this case, only the material undisputed facts supported by the record are set forth herein.

## I. *Plaintiff's Employment at Roche and Relationship With Sullivan*

In 1997 plaintiff, Edmund J. Szarzynski [FN2] began working as a pharmaceutical products sales representative for Roche in Texas. However, in 1999 and 2003 plaintiff's positions were eliminated due to workforce reductions. In early 2004 plaintiff accepted an Acute Care pharmaceutical sales representative position at Roche in Rochester, New York. In January 2005, plaintiff started working as a "Medical Representative" in Rochester in anticipation of the launch of Boniva®, a new osteoporosis drug manufactured by Roche. Plaintiff also promoted Tamiflu® during the flu season, but promoting Boniva® comprised the bulk of his responsibilities. Plaintiff's territory constituted "Rochester–East," which included Brighton, Pittsford, Penfield and Newark. There were nine representatives in plaintiff's division in 2005, six of them were over the age of 40.

FN2. Plaintiff was born on June 23, 1945.

Boniva was co-promoted with Glaxosmithkline ("GSK"), and as such two GSK medical representatives promoted Boniva® in plaintiff's territory. During the relevant time period, January 2005 to January 2006, plaintiff's direct supervisor was Division Sales Manager Lonny Sullivan ("Sullivan"). However, since November 2004, James Burke ("Burke") has been the Regional Sales Director in charge of the entire Mid–Atlantic Region, which includes New York State, and was Sullivan's supervisor.

Plaintiff met his new supervisor, Sullivan during a Roche national meeting to coordinate the Boniva® launch in Las Vegas in January 2005. During their first meeting in Las Vegas, plaintiff testified that Sullivan believed that he had been disrespectful by failing to shake his hand. On March 1, 2005, Sullivan wrote a letter to plaintiff, which was copied to Human Resources ("HR") and Burke, indicating that plaintiff failed a required quiz which tested his knowledge of osteoporosis, and would be required to retake it. The letter also stated that plaintiff's call activity for the first trimester was below expectations. Plaintiff responded by letter dated March 12, 2005 requesting that the March 1, 2005 letter be removed from his file. However, Burke indicated that it could not be removed because HR considered it an official document.

**\*3** During his deposition, plaintiff testified as follows:

Q. Do you have any reason to believe that Mr. Sullivan was building a record against you based on your—on that March 2005 letter, that that had anything to do with your age?

A. I—at that time, no. Subsequent to that, yes.

Q. Because of the comment that was attributed to Mr. Sullivan?

A. Yes.

*See* June 29, 2009 Declaration of Susan C. Roney ("June Roney Decl."), Ex. D. Plaintiff's testimony indicates that plaintiff did not believe that the March 1, 2005 letter incident was instigated by discriminatory animus until after hearing about a comment allegedly made by Sullivan in August 2005.

In August 2005 plaintiff questioned Sullivan concerning their allegedly strained relationship. Indeed in an August 2005 Field Coaching Report, [FN3] plaintiff summarized the situation to Sullivan as follows:

FN3. Once a month Szarzynski and Sullivan would agree to meet and Sullivan would accompany plaintiff on that day's visits to physicians. These ride-along trips are memorialized on various Field Coaching Reports. In the Field Coaching Reports for July, August and October 2005, plaintiff refutes Sullivan's comments and criticisms.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

the false impression of our first meeting 2005 was uncovered on [8/9/05]. Uncovering that fallacy on Tuesday explained your comment made on Monday that I "have been a thorn in your side since day one ." It also explained your negative attitude and behavior towards me. Hopefully you are no longer laboring under that completely false impression that you experienced during our first meeting in Las Vegas. Should you wish to re-visit that episode, feel free to bring it up for discussion and I will further disabuse your interpretations of our initial meeting.

See June Roney Decl., Ex. E. Defendant points out that nowhere in this account of plaintiff's and Sullivan's strained relationship did plaintiff ever state that their confrontation was fueled in any way by age-related animus.

## II. *Plaintiff's Performance Improvement Plan*

Sales representatives were ranked based on the market share that Boniva® had of the osteoporosis drug market within the representative's territory. Plaintiff was ranked last in the Mid–Atlantic region, 80 out of 80, and 561 out of 576 in the nation, in Boniva® market share for the year 2005 as of August 2005. Plaintiff testified that, although numerically he fell below division averages, he believed that his below average performance was reasonable under the circumstances, because in his territory doctors were slow to adopt new drugs and access was particularly difficult. Based on regional averages, defendant expected representatives to make two calls per month to certain doctors who prescribed osteoporosis drugs, like Boniva®, at a high rate. Defendant classified these doctors as decile FN4 5 to 10. For the relevant year 2005, as of September 2005, plaintiff only made an average 1.1 calls on these high decile doctors. During this same time frame, plaintiff's reach (a measurement of the number of high-decile physicians seen in a month expressed in a percentage) was 46%, which was well below the regional expectation of 85%. In addition, defendant also measured call averages, meaning the number of doctors visited by their representative on a daily basis. Plaintiff also failed to meet the eight calls per day requirement that was the average for Roche representatives regionally for the same time period, i.e. through September 2005.

FN4. "Decile" is defined as a measurement of the specific statistics of a physician in prescribing

certain types of drugs, and it is measured on a 1 to 10 scale. The higher the number, the more the physician prescribes the target drug category, in the case of Boniva, the drug category are osteoporosis drugs.

*4 Plaintiff was placed on a Performance Improvement Plan ("PIP") based on his performance in 2005 according to certain measurements applied to medical representatives at Roche. On October 11, 2005 plaintiff learned that he would be placed on a PIP during a meeting with Burke and Sullivan. The PIP was designed with input from Sullivan, Burke and Michelle Crocco ("Crocco"), a representative of Roche's HR department. Pursuant to the PIP, plaintiff was required to increase Boniva® sales to a level consistent with his division's average and provide call planning reports to Sullivan. In this regard, plaintiff testified that the goals set out in the PIP were unattainable and that he could not meet the division or regional call averages or percent of market share listed in the PIP. In addition, plaintiff testified that although numerically his performance fell below division averages, his performance was reasonable under the circumstances.FN5

FN5. Plaintiff testified as follows:

Q. Did you agree that your current call activity was below the divisional and regional average?

A. Based on arithmetic, yes. Based on the situation, I felt it was reasonable.

*See* June Roney Decl., Ex. D.

On December 12, 2005, plaintiff met with Sullivan to make changes to the original PIP and the PIP was extended until January 31, 2006. According to the PIP Addendum, plaintiff was given the opportunity to identify sixty specific physicians as targets and concentrate his efforts on these doctors. In a December 26, 2005 letter plaintiff acknowledged that the call requirement outlined in the PIP Addendum was "fair and reasonable." The PIP was ultimately discontinued on January 31, 2006 and plaintiff continues to be a Roche employee to this day.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

### III. *Plaintiff's Complaint to Human Resources*

Plaintiff testified that sometime around August 2005, during a breakfast meeting in the presence of two medical representatives, John Gagne and Michele Dewey, Sullivan allegedly said something to the effect that "in my experience older workers are just hanging around for retirement and need to be constantly challenged." *See* June Roney Decl., Ex. D. Gagney and Dewey subsequently relayed the comment to plaintiff. During the course of plaintiff's employment at Roche, he was made aware of Roche's complaint procedure and its antidiscrimination and anti-retaliation policies. Nevertheless, plaintiff did not complain to management regarding the alleged comment until after he was informed that he would be placed on a PIP. He did not complain to HR about the comment until November 2005, after the PIP was put in place. Accordingly, it was only in November 2005 that plaintiff complained to HR for the first time about age discrimination. Thereafter, HR investigated plaintiff's allegations and concluded that no age discrimination had occurred. After completing their investigation, Crocco and another HR professional, called plaintiff and sent him a memorandum dated February 28, 2006, memorializing the results of their investigation.

### IV. *Plaintiff's Miscellaneous Complaints*

### A. 2005 Performance Rating

Plaintiff's overall performance rating for 2005 was a 5, on a 1 to 6 scale, 6 being the lowest rating.[FN6] As previously mentioned, plaintiff's rank in the region for Boniva® sales was 80 out of 80. In spite of his low ranking, plaintiff complained that the performance rating Sullivan gave him in 2005 was unfair. In addition, while his market share was low, plaintiff blamed the size of the territory, and Rochester physicians' "wait and see" approach for his poor performance.

> FN6. The Variable Pay Reports and Cross Market Reports were "the foundation for evaluation." *See* June Roney Decl., Ex. D. Regarding the content of the Cross Market Report for the month of September 2005, plaintiff stated that the sales numbers and statistics contained therein were accurate,

including that his rank in the region was 80 out of 80, and that his efforts in promoting Boniva® produced nearly half as many prescriptions as the division, region and national averages. *See id.*

### B. Realignment of Territories

**\*5** Plaintiff complained that his territory had an excessive number of physician targets and asked Sullivan and Burke to realign it. Sullivan informed plaintiff that realignment would not be looked at until the spring of 2006. Defendant realigned plaintiff's territory in the spring of 2006.

### C. Variable Pay and Pay Raise

A mathematical formula is used by Roche when awarding its representatives Variable Pay. Roche representatives receive Variable Pay for their promotion of Boniva® based on a formula that takes into account market share and the representative's relative rank as compared to other representatives throughout the nation. According to defendant's policy, which plaintiff was made aware,[FN7] plaintiff was not eligible for variable pay for the third trimester of 2005 or the first trimester of 2006 because he was on a PIP. Had he been eligible for a Variable Pay award, plaintiff's variable pay for these trimesters would have totaled $3,906.77.[FN8] Out of the total amount of the variable pay sum plaintiff would have received, only $7.17 would have been attributable to Boniva® sales. Further, plaintiff did not receive a performance-based pay raise at the end of 2005 based on his overall performance.

> FN7. Burke referenced plaintiff to this policy in a March 23, 2006 e-mail. In addition, this same policy was set forth in the PIP discussed and provided to plaintiff.

> FN8. $1,458 for the third trimester of 2005 (although none of this amount was due to his efforts promoting Boniva®); $1,770.09 for the first trimester of 2006 for his promotion of Tamiflu, $671.51 for HCV screening and only $7.17 for his promotion of Boniva®.

### D. Incident with GSK Counterpart

In the spring or summer of 2005, plaintiff was visiting

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

a doctor's office with a GSK counterpart.[FN9] A physician's assistant ("PA") asked him "What have you got?" and plaintiff made a joke to break the ice by replying "Nothing that works, but we found real smart PAs that can make it work." The implication was that Roche's products did not work. The GSK counterpart informed her manager of the incident, and the manager relayed the incident to Sullivan. Sullivan reported the incident to HR. Plaintiff berated Sullivan for talking to HR without consulting him first.

> FN9. This is critical since Roche and GSK are partners in promoting Boniva®.

**V. *Emotional Distress Claim***

Plaintiff claims that he went to his primary care doctor in October 2005 because he was suffering from anxiety and loss of sleep due to the PIP and fears over losing his job. The doctor offered him medication, but plaintiff testified that he declined it. He was not referred for any other treatment and did not complaint to his physician about anxiety in subsequent visits.

### *DISCUSSION*

**I. *Defendant's Motion for Summary Judgment***

A motion for summary judgment shall be granted if the pleadings demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The moving party initially bears the burden of demonstrating that no genuine issues of material fact remain. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, the nonmoving party may not rely solely on "[c]onclusory allegations, conjecture, and speculation," *Niagara Mohawk Power Corp. v. Jones Chem. Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (internal citations and quotation marks omitted), but must present specific evidence in support of its contention that there is a genuine

dispute as to the material facts. *See* Fed.R.Civ.P. 56(e). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *See Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007) (citing Fed.R.Civ.P. 56(c)).

**II. *Plaintiff's ADEA Claim***

**\*6** The Second Circuit Court of Appeals has held that a plaintiff's ADEA claim is analyzed under the burden-shifting analysis first announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973);[FN10] *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253–256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The initial burden lies with the plaintiff. To establish a prima facie case of age discrimination, a plaintiff must show (1) he was within the protected class [age group], (2) his job performance was satisfactory, (3) he was subjected to an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of [age] discrimination. *See Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Kaplan v. Multimedia Entertainment, Inc.,* 2005 WL 2837561, at \*5 (W.D.N.Y.2005); *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000); *see also McDonnell Douglas,* 411 U.S. at 802 (stating the prima facie case more generally). Although the Second Circuit has stated that "the burden ... that must be met ... to establish a prima facie case is minimal," *Hollander,* 172 F.3d at 199, it has also noted that "[a] jury cannot infer discrimination from thin air." *Norton v. Sams Club,* 145 F.3d 114 (2d Cir.), cert. denied 525 U.S. 1001, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998).

> FN10. The principles governing discrimination claims under the ADEA, Title VII and the NYSHRL are virtually identical, and as such these claims are evaluated using the same analytical framework. *See Tarshis v. Riese Org.,* 66 Fed.Appx. 238, 240 (2d Cir.2003); *see also Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 98 (2d Cir.2001); *Ferrante v. American Lung*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

*Assoc.,* 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25, 687 N.E.2d 1308 (1997).

Once a plaintiff has established a prima facie case of discrimination, the defendant must articulate a legitimate, nondiscriminatory rationale for its actions. *See Burdine,* 450 U .S. at 254. The burden then shifts to the plaintiff to demonstrate that the employer's stated rationale is merely a pretext for discrimination. *See McDonnell–Douglas,* 411 U.S. at 802; *see also St. Mary's Honor,* 509 U.S. at 510–11; *Reeves,* 530 U.S. at 143. Thus, to defeat a defendant's properly supported motion for summary judgment, the plaintiff must produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons ("LNDR") proffered by the employer were false, and that more likely than not discrimination was the real reason for the discharge. *See Viola v. Philips Med. Sys. of N. Am.,* 42 F.3d 712, 716 (2d Cir.1994).

**A. Plaintiff has failed to state a prima facie case of Age Discrimination**

Plaintiff's Amended Complaint alleges that he was born on June 23, 1945 and as such defendant concedes and this court finds that plaintiff has satisfied the first element of the prima facie case that plaintiff was within the protected age group. However, plaintiff has failed to establish a prima facie case with respect to the remaining three elements. *See McDonnell–Douglas,* 411 U.S. at 802.

**1. Plaintiff Was Not Performing His Job Satisfactorily**

While plaintiff is within the protected age group, he nonetheless cannot establish a prima facie case of age discrimination because he cannot demonstrate that he performed his duties satisfactorily. *See Bailey v. Frederick Goldman, Inc.,* 2006 WL 738435, at *4 (S.D.N.Y.2006) (plaintiff had been placed on two PIPs geared at improving her deficient performance and as such the court found that she could not establish a prima facie case of age discrimination because she was not performing her duties satisfactorily). In *Bailey,* the court concluded that the defendant offered a "trail of performance reviews and improvement plans that document[ed] plaintiff's deteriorating performance." *Id.* Moreover, the court noted that in evaluating employee performance under this second prong, a court should look to an "employer's legitimate

expectations of performance, and may rely on legitimate supervisory evaluations to do so." *Id.* Likewise here, plaintiff's deficient performance are well-documented. As early as March 2005, plaintiff's performance was below expectations. Indeed, on March 1, 2005, Sullivan wrote a letter to plaintiff and Burke, indicating that plaintiff failed a required quiz which tested his knowledge of osteoporosis. The letter also stated that plaintiff's call activity for the first trimester was below expectations. In addition, sales representatives were ranked based on the market share that Boniva® had of the osteoporosis drug market within the representative's territory. Plaintiff was ranked last in the Mid–Atlantic region, 80 out of 80, and 561 out of 576 in the nation, in Boniva® market share for the year 2005 as of August 2005. Accordingly, plaintiff cannot demonstrate that he performed his duties satisfactorily.

**2. Plaintiff was not subjected to an adverse employment action**

*7 Plaintiff argues that the Court must look at the totality of the events surrounding defendant's conduct. *See* Pl. Opp. Br. at 12. In addition, plaintiff contends that he was subjected to adverse employment action throughout the duration of Sullivan's supervisory position over him. *See id.* Further, the failure of defendant to increase his salary and give him variable pay also qualifies as an adverse employment action. *See id.* at 13.

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment. To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *See Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (citations and footnote omitted). In an age discrimination case, "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993), quoted in *Galabya,* 202 F.3d at 640. As this Court stated in *Sank v. City University of New York,* 2003 WL 1807142, at *10 (S.D.N.Y.2003), "[w]hile adverse employment actions extend beyond readily quantifiable losses, "not everything

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

that makes an employee unhappy is an actionable adverse action." *See Phillips v. Bowen,* 278 F.3d 103, 117 (2d Cir.2002) (stating that employee's "trivial complaints about an unpleasant working environment" do not constitute adverse employment actions).

Here, plaintiff has failed to establish that he sustained an adverse employment action. Plaintiff was not terminated and his title was not changed in any way. Even plaintiff's argument regarding not receiving his variable pay is without merit since that was not a decrease in wage or salary or a material loss of benefits. *See Galabya,* 202 F.3d at 640. For instance, had plaintiff been eligible for a Variable Pay award, plaintiff's variable pay for the third trimester of 2005 would have been $1,458. None of this amount was due to his efforts promoting Boniva®, which comprised the bulk of his responsibilities. Had he been eligible for the first trimester of 2006 for his promotion of Tamiflu® his variable pay would have been $1,770.09, once again not for promoting Boniva®.[FN11] Significantly, out of the total amount of the variable pay sum plaintiff would have received, only $7.17 would have been attributable to Boniva® sales.

> FN11. Also for the first trimester of 2006 he would have received $671.51 for HCV screening.

Further, Sullivan's March 2005 letter to plaintiff's personnel file, allegedly containing criticism and negative rating of plaintiff are not adverse employment actions. *See Arrieta v. Yellow Trans., Inc.,* 2008 WL 5220569, at *5 (N.D.Tex.2008) citing *Roberson v. GameStop/Babbage's,* 152 Fed.Appx. 356, 360 (5th Cir.2005) (Court admonished "not to expand the definition of adverse employment action to include 'events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee-anything that might jeopardize employment in the future' "). Similarly, placing plaintiff on a PIP, the goal of which was to improve his performance and avoid his termination, is not an adverse employment action. *See Cannon v. St. Paul Fire and Marine Ins. Co.,* 2005 WL 1107372, at *3 (N.D.Tex.2005) (holding that requiring employee to participate in and complete PIP was not adverse employment action).

**\*8** In addition, plaintiff's argument that the restructuring of the territories constitutes an adverse employment action does not pass muster. Notably, plaintiff does not claim he was placed in his territory for discriminatory reasons or that the territory was purposely formed to make his work more difficult or impractical. Plaintiff complained that his territory had an excessive number of physician targets and asked Sullivan and Burke to realign it. Defendant addressed his complaints by realigning the territories in the spring of 2006, within one year of his original complaint. The Court finds that plaintiff has failed to establish a prima facie case of adverse employment action.

**3. Inference of Age Discrimination**

**a. Plaintiff Was Hired while a Member of the Protected Class contradicting an inference of age discrimination**

Plaintiff was hired by Roche in Texas at the age of 52 and in Rochester at the age of 59 years old, when he was already a member of the protected class. This fact negates any inference of age discrimination. In addition, plaintiff is currently 64 years old and still remains an employee of Roche to this day. All these facts cut against plaintiff's claim of an inference of discriminatory animus. *See Bailey,* 2006 WL 738435, at *4 ("Furthermore, even if plaintiff could prove that her performance was satisfactory, her prima facie case would fail because she cannot establish an inference that her discharge was related to age discrimination. Courts in this Circuit have recognized that any inference of age discrimination is undercut where, as here, a plaintiff is over 40 years old when she is hired"); *Boyle v. McCann–Erickson, Inc.,* 949 F.Supp. 1095, 1104 (S.D.N.Y.1997) ("Plaintiff was hired at the age of 46 ..., a fact which undercuts an inference of age discrimination"); *See Piasecki v. Daughters of Jacob Nursing Home, Inc.,* 808 F.Supp. 1136, 1141 (S.D.N.Y.1992) ( "While the fact that [employer] hired plaintiff at age 70, when he was well within the protected class, suggests a non-discriminatory intent"); *Melnyk v. Adria Lab.,* 799 F.Supp. 301, 319 (W.D.N.Y.1992) (plaintiff failed to establish prima facie case given that she was hired at 39, one year prior to entry into protected class).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

**b. Isolated Comment**

Moreover, plaintiff has failed to offer any evidence that any employees ever made comments specifically about his age. His claim of age discrimination seems to rest on a supervisor's comment to other people and not to the plaintiff personally that "in my experience older workers are just hanging around for retirement and need to be constantly challenged." However, this basis is not sufficient.

While an employer's remarks may give rise to an inference of discrimination, *Gregory v. Daly,* 243 F.3d 687, 697 (2d Cir.2001), the discriminatory comment alleged here is supported, in significant part, by hearsay statements. *See* W.D.N.Y. Loc. R. 56.1 (requiring that plaintiff support his assertions of material fact with citation to admissible evidence); *see also Cooper v. John D. Brush & Co.,* 242 F.Supp.2d 261, 270 (W.D.N.Y.) (plaintiff's submission of an alleged comment reported to plaintiff by another co-worker who claimed he heard the supervisor call a third employee a racial epithet was inadmissible hearsay); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 71 (2d Cir.2000) ("while second-hand comments may be relevant, a district court deciding a summary judgment motion must be provided with admissible evidence demonstrating the truth of the non-movant's assertions"). Here, plaintiff has not provided an affidavit from either of his co-workers who allegedly heard Sullivan's statement. Accordingly, Sullivan's comment is inadmissible hearsay. [FN12]

FN12. Plaintiff argues that the alleged comment would be admissible as an admission against interest. *See* Pl. Opp. Br. at 8. However there are two levels of declarants here, Sullivan and the two representatives and both levels must be subject to hearsay exceptions for the comment to be admissible. The comment, as said by Sullivan, is not hearsay, because plaintiff is not submitting it for the truth of the matter asserted (that older workers need to be challenged). The comment, as retold by Dewey and Gagney ("Sullivan said that ..."), however, is inadmissible hearsay, as plaintiff is trying to submit it for its truth, that Sullivan indeed made the comment. *See Vilien v. Dep't of Educ.,* 2009 WL 857458, at *4 (S.D.N.Y.2009) (statement of supervisor relayed to plaintiff by another person was inadmissible hearsay). Accordingly, the admission against interest exception is in applicable to Gagney's or Dewey's statements, and no other hearsay exceptions apply. *See Fleming v. MaxMara, USA, Inc.,* 644 F.Supp.2d 247, 259 (E.D.N.Y.2009) (Although underlying statement was not hearsay, statement as retold by coworker was hearsay subject to no hearsay exceptions).

*9 Even crediting plaintiff's assertions however, based on the evidence, the allegedly discriminatory comment by Sullivan nevertheless was one isolated statement made during the length of the employment relationship. Absent further indicia of discrimination, such an allegation is insufficient to establish an inference of discrimination. *See Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir.2001) ("[S]tray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination.") *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998) (isolated statements, "cannot get a discrimination suit to a jury"); *Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 (2d Cir.1994) (stray remarks, without more, cannot prove a claim of employment discrimination); *Bailey,* 2006 WL 738435, at *4 ("[S]tray comments ... without some demonstrable connection to plaintiff's discharge, are insufficient to give rise to an inference of discrimination"). Moreover, it was not made about plaintiff, not made in the presence of plaintiff, to anyone with authority over plaintiff or in connection with any adverse employment action against plaintiff. There is not even a connection between the comment and plaintiff. In fact, out of the nine representatives supervised by Sullivan, five in addition to plaintiff were members of the same protected class, and none have made claims of age discrimination. Accordingly, such a remote comment cannot create an inference of discrimination. Thus, Sullivan's comment is insufficient to support plaintiff's prima facie age discrimination claim.

**4. Personality conflicts do not establish discrimination**

Plaintiff states that contrary to defendant's contention, his relationship with Sullivan was not a "mutual" personality conflict, but it was only Sullivan who disliked

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

him. *See* Pl. Opp. Br. at 7. Assuming arguendo the dislike was one-sided, which is not supported by the undisputed facts, the Court finds that the ADEA is not aimed at policing personalities in the workplace, rather the goal is addressing discrimination. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (human rights laws are not a civility code for the workplace, but rather seek to address the harms of discrimination); *see also Wilson v. Family Dollar Stores of New York, Inc.,* 2008 WL 4426957, at *8 (E.D.N.Y.2008) (While a supervisor's behavior may be "rude and unprofessional, it merely indicates personal enmity rather than discrimination and thus does not violate Title VII"); *Brown v. Society for Seaman's Children,* 194 F.Supp.2d 182, 192 (E.D.N.Y.2002) ("Plaintiff's complaints, in turn, that [the supervisor] was rude, threatening and combative toward her evidences the hostility between them, but does not provide ground for inferring that the hostility stemmed from plaintiff's race or gender").

In this case, plaintiff testified that Sullivan disliked him because he was under the impression that plaintiff did not shake his hand when they first met. The Field Coaching Reports exhibit the contentious relationship and show the hostile tone that plaintiff took to dispute Sullivan's evaluations. The apparent dislike of both plaintiff and Sullivan for each other, absent any claim of age-related animus, is not the province of the ADEA. Moreover, while plaintiff claims that he was treated differently from other employees, he also asserted that co-workers requested that he talk to Sullivan about his management style and policies, because representatives of all ages found it difficult to work for Sullivan. This negates that Sullivan's interactions with plaintiff were fueled by any age-related discriminatory animus. *See Stofsky v. Pawling Cent. School Dist.,* 635 F.Supp.2d 272, 294 (Finding that "[s]imply put, there is no admissible evidence from which a jury could reasonably infer that Plaintiff was mistreated on account of her gender or age," since supervisor was equally as demanding of younger men and of older women). [FN13] Accordingly, as neither policing the personal conflicts of Sullivan and plaintiff, nor addressing Sullivan's managerial style, is withing the scope of the ADEA, none of the evidence supports an inference of discriminatory animus.

FN13. Plaintiff also cites the performance of James Mateer, another Rochester representative, to support his allegations of differential treatment. As admitted by plaintiff, Mateer performed better than him, and thus, they were not similarly situated. *See* Szarzsynski Aff., ¶ 82). Further, plaintiff claims that Mateer was around 45 years old in 2005 (he was actually 49). *See id.* Accordingly, Mateer, like plaintiff was a member of the ADEA age protected class. That Mateer allegedly received no negative reviews or letters negates plaintiff's assertions that Sullivan treated members of the age protected class in a different manner.

**B. Legitimate, Non–Discriminatory Reason and Pretext**

**\*10** Even if plaintiff had stated a prima facie case of discrimination, defendant had LNDRs for its actions. *See* Def. Br. at 16. Defendant further contends that plaintiff does not establish that Roche's legitimate reasons for its actions were pretextual. *See* Def. Reply Br. at 9; *see also St. Mary's Honor,* 509 U.S. at 502; *Reeves,* 530 U.S. at 246 (burden of production shifts back to plaintiff to show that employer's stated reason was merely a pretext and that retaliatory animus was the true reason for employer's actions).

Plaintiff does not deny that he was ranked last in the Mid–Atlantic region in Boniva® sales. Indeed, he admits that "based on market share," the measure used to rank representatives across the nation, "I was not performing well." In this regard, plaintiff was simply expected to perform pursuant to the same standards applicable to all representatives. Plaintiff was rated using the same mathematical formulas and standards that apply to every Roche representative. Accordingly, defendant had ample justification for placing plaintiff on a PIP and had legitimate reasons for refusing to give him a performance-based salary increase or variable pay. The increase in his salary was discretionary, and was not given to him because of well-documented performance deficiencies. *See Skiff v. Colchester School Dist.,* 316 Fed.Appx. 83, 84 (2d Cir.2009) ("the role of the courts is "not to act as a 'super personnel department' that second guesses employers' business judgments"). It was defendant's policy that an employee could not receive

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

variable pay for any trimester in which he was on a PIP. There is no indication that defendant applied this policy in a discriminatory manner towards plaintiff. Thus, defendant articulated LNDR for its actions.

Further, plaintiff disagreed with the rating procedures and believed that his rating was unfair under the circumstances. In addition, plaintiff claims that the goals of the PIP were unattainable. However, plaintiff's claims are of no import. *See Karla v. HSBC BankUSA, N.A., 567 F.Supp.2d 385, 397 (E.D.N.Y.2008)* ("the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination"); *Ricks v. Conde Nast Publ'ns., Inc., 92 F.Supp.2d 338, 347 (S.D.N.Y.2000)* ("The mere fact that an employee disagrees with her employer's assessments of her work ... cannot[,] standing on its own[,] show that her employer's asserted reason[s] for termination [were] pretextual.") (internal citation omitted). Moreover, plaintiff constantly claimed that the actions taken by defendant were meant to build a file for his ultimate termination and he was certain a younger representative would replace him. However, the fact that plaintiff was taken off the PIP without being terminated and remains a Roche employee four years after the alleged efforts by Roche to prepare for his termination, directly negates any finding of discrimination.

**11** Pursuant to a recent Supreme Court decision, a plaintiff claiming discrimination under the ADEA must demonstrate, by a preponderance of the evidence, that age was not merely a motivating factor, but it was a "but for" cause of the challenged employer action. *See Gross v. FBL Fin. Servs., ——U.S. ——, ——, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009).* Defendant argues that plaintiff cannot prove that age motivated, much less was the "but for" cause of, and the challenged action by Roche. The Court agrees. Defendant articulated LNDRs for its actions. Defendant's proffered explanations were supported by plaintiff's poor work performance. In addition, plaintiff has offered nothing but excuses in opposition to this motion. Simply put, plaintiff provided no evidence to support his conclusory assertions that defendant's

explanations were pretextual. Consistent with that conclusion, the record lacks evidence from which a fact finder could conclude that age-related animus was the "but-for" cause of plaintiff's termination. *See id. at 2351; Wellesley v. Debevoise & Plimpton LLP, 2009 WL 3004102 at *1 (2d Cir.2009).* Based on the foregoing, there is no genuine issue of material fact regarding plaintiff's discrimination claim, and Roche is entitled to summary judgment.

### III. *Plaintiff's Retaliation Claim*[FN14]

> FN14. Retaliation claims are analyzed within the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green. McDonnell Douglas,* 411 U.S. at 792. On a motion for summary judgment, the plaintiff must first establish a prima facie case of retaliation. Once the plaintiff has done so, the burden shifts to the defendant to establish a legitimate non-retaliatory reason for the complained-of action. If the defendant does so, the burden returns to plaintiff, who must show that the legitimate, non-retaliatory reason articulated by the defendant is a mere "pretext," and that retaliation was more likely than not the reason for the complained-of action. *See Schnabel,* 232 F.3d at 90; *Gallagher v. Delaney,* 139 F.3d 338, 349 (2d Cir.1998).

To establish a prima facie case of retaliation, a plaintiff must demonstrate by a preponderance of the evidence that: (1) he engaged in a protected activity; (2) the employer was aware of his activity; (3) the employer took adverse action against him; and (4) a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. *See Sengillo v. Valeo Elec. Systems, Inc.,* 328 Fed.Appx. 39, 41 (2d Cir.2009); *Richardson v. Comm. on Human Rights & Opportunities,* 532 F.3d 114, 123 (2d Cir.2008); *Sista v. CDC Ixis N. Amer., Inc.,* 445 F.3d 161, 177 (2d Cir.2006); *Holt v. KMI–Continental,* 95 F.3d 123, 130 (2d Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027, 1997 WL 71191 (1997). Defendant contends that as to the first two elements, Roche concedes that plaintiff engaged in a protected activity when he complained of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

discrimination to the HR department in November 2005. *See* Def. Br. at 9. However, defendant claims that plaintiff's March 2005 complaint to HR did not constitute protected activity. *See id.* In addition, defendant argues that plaintiff cannot establish a prima facie case of retaliation because the purported "retaliatory" acts do not qualify as "adverse employment actions" and because there is no causal connection between his complaint and the employment decisions that affected him. *See id.* Plaintiff argues that Sullivan's March 2005 letter and the PIP were adverse employment actions. *See* Pl. Opp. Br. at 22.

**A. Plaintiff has failed to establish a Prima Facie Case of Retaliation**

**1. Plaintiff has failed to allege that she engaged in a protected activity.**

**\*12** On March 1, 2005, Sullivan wrote a letter to plaintiff, which was copied to Human Resources ("HR") and Burke, indicating that plaintiff failed a required quiz which tested his knowledge of osteoporosis. The letter also stated that plaintiff's call activity for the first trimester was below expectations. Plaintiff responded by letter dated March 12, 2005 requesting that the March 1, 2005 letter be removed from his file. Plaintiff asserts that one of the basis for defendant's alleged retaliation is the March 12, 2005 he wrote requesting that the March 1, 2005 letter by Sullivan be removed from his file. Plaintiff's letter, however, makes no reference to his age or alleged discrimination claim.

There is no admissible evidence in the record suggesting that the plaintiff complained of unlawful discrimination on the basis of age in the March 12 letter. Accordingly, the letter does not constitute the "protected conduct" required for a prima facie case of retaliation. *See Harrison v. New York City Housing Auth.,* 2001 WL 1658243, at *3 (S.D.N.Y.2001) (court held plaintiff's letter did not constitute "protected conduct" required for a prima facie case of retaliation since it did not pertain to plaintiff's disability, but instead, claimed that she was being harassed for "unknown reasons"); citing *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir.1998) (affirming JNOV for employer for retaliation claim under Title VII, where

plaintiff's complaints that co-workers were "slackers" and that she was required to do personal work for an executive on company time could not reasonably lead her employer to conclude that her complaints were based on allegations of gender discrimination); *Int'l Healthcare Exchange, Inc., v. Global Healthcare Exchange, LLC,* 470 F.Supp.2d 345, 357 (S.D.N.Y.2007) (to be considered protected activity, the employee's complaint must put the employer on notice that discrimination prohibited by Title VII is occurring); *Ramos v. City of New York,* 1997 WL 410493, at *3 (S.D.N.Y.1997) (stating that "when complaining about a supervisor, in order to be protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring").

According to the plaintiff's deposition testimony, Szarzynski did not believe that Sullivan's action relating to the March 1, 2005 letter incident was instigated by discriminatory animus until August 2005, after hearing about the alleged comment by Sullivan.[FN15] In addition, plaintiff stated he felt Sullivan's letter was "a little bit out of the ordinary. Not good business practice," but at that time he did not believe it had to do with his age. Plaintiff was merely complaining of behavior he thought was unfair to him or uncalled for, but not discriminatory. At no time during this period did plaintiff allege that he was being treated differently because of his age. Thus, plaintiff's March 2005 complaint does not constitute protected activity.[FN16] *See Ochei v. Coler/Goldwater Memorial Hosp.,* 450 F.Supp.2d 275, 287 (S.D.N.Y.2006) (plaintiff's general complaints about her working conditions did not constitute engaging in a protected activity where plaintiff did not allege that she was a victim of discrimination); *Holt v. Roadway Package Systems, Inc.,* 506 F.Supp.2d 194, 206 (W.D.N.Y.2007) (employee's claim that supervisor was "out to get him" did not constitute protected activity as complaint did not allege discriminatory animus for supervisor's actions).

FN15. During his deposition, plaintiff testified:

Q. Do you have any reason to believe that Mr. Sullivan was building a record against you based on your—on that March 2005 letter, that that had anything to do with your age?

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

A. I—at that time, no. Subsequent to that, yes.

Q. Because of the comment that was attributed to Mr. Sullivan?

A. Yes.

See June 29, 2009 Declaration of Susan C. Roney ("June Roney Decl."), Ex. D.

FN16. Even assuming that plaintiff's complaint constituted protected activity, plaintiff cannot establish any causal connection between this complaint and the PIP, which was seven months later. A plaintiff may allege proof of causation indirectly by showing close temporal proximity between the protected activity and the discriminatory treatment. See Gordon v. New York City Bd. of Ed., 232 F.3d 111, 115 (2d Cir.2000). Several courts in this Circuit have held that where an adverse employment action occurs long after the plaintiff engaged in a protected activity, such an action cannot support an inference of retaliatory discrimination. See Yarde v. Good Samaritan Hosp., 360 F.Supp.2d at 552, 562 (S.D.N.Y.2005) ("[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation. Six months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation"); Cunningham v. Consol. Edison Inc., 2006 WL 842914, at *19 (E.D.N.Y.2006) (three months too remote and "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85 (2d Cir.1990) (three months too remote); Woods v. Enlarged City Sch. Dist. of Newburgh, 473 F.Supp.2d 498, 529 (S.D.N.Y.2007) (five month time lapse precludes a finding of causal connection).

**\*13** Further, plaintiff alleges that Sullivan made the statement about "older workers" to Gagne and Dewey in August 2005. On October 11, 2005 Burke and Sullivan

met with plaintiff to inform him that he would be placed on PIP. It was not until after plaintiff was informed of the PIP during the October 2005 meeting that he complained to her about the alleged August 2005 statement. Accordingly, plaintiff, allegedly knowing of this remark for two months, made no complaint about it until after he was placed on a PIP, and only then claimed that the remark rose to the level of age discrimination. Thus, plaintiff's PIP placement could not be retaliatory since plaintiff had not yet engaged in any protected activity as of the commencement of the PIP.

Moreover, instead of terminating plaintiff on December 9, 2005 for not achieving the goals of the PIP, Sullivan met with plaintiff to expand the PIP. Plaintiff was allowed until January 31, 2006 to meet the reduced goals of the PIP Addendum. In fact, plaintiff admitted that the call requirement goals of the PIP Addendum were "fair and reasonable." Accordingly, the PIP extension cannot be considered retaliatory. In fact, plaintiff was taken off the PIP on January 31, 2006, was never terminated, and continues to work for Roche to this day. Thus, plaintiff has not satisfied the first element of the prima facie case.

**2. Plaintiff has failed to establish that he was subjected to an adverse employment action.**

To state a prima facie case of retaliatory discrimination, in addition to establishing that he or she engaged in protected activity, a plaintiff must also establish that he or she suffered an adverse employment action, or was subjected to action that would dissuade a reasonable worker from making or supporting a charge of discrimination. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Defendant contends that plaintiff's complaint fails to allege evidence establishing an adverse employment action.

To demonstrate the occurrence of an adverse employment action, plaintiff must show that she suffered a 'materially adverse' change in the terms and conditions of employment." See Galabya, 202 F.3d at 640 (citing Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 446 (2d Cir.1999)). There is no bright-line rule as to what constitutes an adverse employment action. However, the Second Circuit has held that, in order to qualify as " 'materially adverse' a change in working

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *See Galabya,* 202 F.3d at 640. In this regard, the Supreme Court also instructs that it is essential to distinguish "material adversity" from trivial harms." *See Burlington N.,* 548 U.S. at 68.

Here, the undisputed facts show that plaintiff has not set forth a single adverse employment action that would entitle him to relief on his retaliation claim. Several of the actions complained of, including the failure to ask plaintiff for input regarding the realignment of territories, are so minor that they fail to satisfy the *Burlington Northern* standard for adverse employment actions. Plaintiff argues that he was given a low performance rating for 2005 and this constitutes an adverse employment action. However, the fact that plaintiff was given a low rating for his overall performance in 2005 is not "materially adverse" and does not constitute an adverse employment action. *See Mauskopf v. Dist. 20 of the New York City Dep't of Educ.,* 299 Fed. Appx. 100, 101 (2d Cir.2008) (plaintiff's unsatisfactory rating in her performance review, "without any accompanying evidence of negative consequences," does not demonstrate that plaintiff was discharged in retaliation for her intervening complaint alleging age discrimination). In addition, the mere fact that plaintiff was subjected to a performance review, similar to all of his co-workers, and placed on a PIP aimed at improving his performance, does not constitute an adverse employment action. *See Gurry v. Merck & Co., Inc.,* 2003 WL 1878414, at *5 (S.D.N.Y.2003) (finding that the plaintiff's performance evaluation, which contained both positive and negative elements and PIP, did not constitute an adverse employment action and granting summary judgment for employer dismissing employee's retaliation claims).

**3. Plaintiff has failed to establish a causal connection between his complaints and any alleged employment action**

**\*14** In order to establish a causal connection, "a plaintiff must be able to provide either direct evidence of retaliatory animus or make an indirect showing that a protected activity 'was followed closely by [retaliatory] treatment.' " *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (citing *De Cintio v. Westchester County Med.*

*Ctr.,* 821 F.2d 111 (2d Cir.1987), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987)). Defendant argues that plaintiff is unable to establish either and thus his retaliation claims fail as a matter of law. *See* Def. Br. at 22. This Court agrees. Assuming arguendo that plaintiff experienced an adverse employment action, there is no nexus that exists between any protected activity and these actions that would allow an inference of retaliation. Further, the alleged employment action predates any protected activity. Thus, plaintiff fails to make out a prima facie case of retaliation because he cannot show a causal connection.

It is undisputed that plaintiff complained of age discrimination to the HR department for the first time in November 2005, after being placed on the PIP. Accordingly, placement on the PIP in October 2005 (one month before his complaint) cannot logically be an effect of his future complaint of retaliation. In addition, complaints regarding plaintiff's performance began as early as March 2005 and continued through his mid-year evaluation and PIP, *all before* he complained to HR about discrimination in November 2005. Moreover, the 2005 performance rating is nothing more than a culmination of these previous reviews that started before plaintiff engaged in any protected activity. Accordingly, this does not give rise to an inference of retaliation. *See Papasmiris v. District 20 of New York City Dep't of Ed.,* 299 Fed.Appx. 97, 99 (2d Cir.2008) (Court granted summary judgment in employer's favor in plaintiff's retaliation claim finding that "gradual adverse job actions [that] began well before the plaintiff had ever engaged in any protected activity" do not give rise to an inference of retaliation") quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir.2001). Similarly, since past actions cannot logically be made in retaliation for future protected activity, plaintiff's retaliation claim fails as a matter of law.

Because I find that plaintiff has failed to state a prima facie claim for retaliation, I grant defendant's motion for summary judgment.[FN17]

> **FN17.** As stated above (Point II.B), defendant has advanced a legitimate non-discriminatory/non-retaliatory reason for its actions, and plaintiff cannot refute it as pretextual. Accordingly, summary judgment is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

appropriate on plaintiff's retaliation claim.

**IV. *Plaintiff's Damages and Emotional Distress Claims***

**A. Punitive Damages Claim**

Plaintiff requests punitive damages. However, punitive damages are not recoverable under the ADEA. *See Johnson v. Al Tech Specialties Steel Corp.,* 731 F.2d 143, 147–148 (2d Cir.1984); *Boise v. N.Y.U.,* 2003 WL 22390792, at *3 (S.D.N.Y.2003).*FN18* Instead, for non-willful violations of the ADEA only reinstatement and backpay are allowed. *See* 29 U. S.C. § 626(b); *Johnson,* 731 F.2d at 147–148; *Hatter v. Fulton,* 1997 WL 411623 at *6 (S.D.N.Y.1997), aff'd, 165 F.3d 14 (2d Cir.1998) (ADEA does not provide for punitive damages, rather it permits remedies such as back pay, front pay, and reinstatements). *FN19* Because plaintiff's demand for punitive damages is not cognizable under the ADEA, defendant is entitled to summary judgment as a matter of law.

> **FN18.** It is undisputed that the NYSHRL also does not provide for punitive damages. *See Weissman v. Dawn Joy Fashions,* 214 F.3d 224, 235 (2d Cir.2000) (citing *Thoreson v. Penthouse Int'l, Ltd.,* 80 N.Y.2d 490, 591 N.Y.S.2d 978, 606 N.E.2d 1369 (1992)).

> **FN19.** For willful violations of the ADEA, the statute only allows liquidated or double damages, which are considered punitive in nature. *See Trans World Airlines Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Accordingly, punitive damages for federal retaliation claims under Title VII are limited "to cases in which the [defendant] has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 529–30, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (internal quotation marks omitted). "Malice and reckless indifference refer to 'the [defendant's] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.' " *Farias,* 259

F.3d at 101 (quoting *Kolstad,* 527 U.S. at 535). Here, the record is devoid of any evil intent, malice or reckless disregard for plaintiff's federally protected rights.

**B. Emotional Distress Claim**

**\*15** Plaintiff asserts an emotional distress claim. Defendant contends that plaintiff abandoned this claim because plaintiff did not even respond to any of the undisputed facts in the defendant's Statement of Undisputed facts relating to his claim for emotional distress and did not respond to defendant's arguments concerning this claim in his opposition to defendant's summary judgment motion. Defendant asks the Court to grant summary judgment on this basis.

While courts generally consider claims waived or abandoned when not fully briefed on a summary judgment motion, it is not required to do so. *See Barlow v. Connecticut,* 319 F.Supp.2d 250, 266–67 (D.Conn.2004) (Courts may deem abandoned any claims not fully briefed in a motion for summary judgment); *see also Blouin ex rel. Estate of Pouliot v. Spitzer,* 356 F.3d 348, 363 n. 9 (2d Cir.2004); *Arbercheski v. Oracle Corp.,* 2005 WL 2290206, at *3 (S.D.N.Y.2005) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed"). Rather, it is in the discretion of the court. *See Lipton v. County of Orange,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.") (internal citations omitted); *see also Abbatiello v. Monsanto Co.,* 522 F.Supp.2d 524, 530 (S.D.N.Y.2007); *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.,* 2007 WL 2694469 at *6 (S.D.N.Y.2007).

In *Taylor v. City of New York,* the court stated that "[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *See Taylor,* 269 F.Supp.2d 68, 75 (E.D.N.Y.2003); *see also Ostroski v. Town of Southold,* 2006 WL 2053761, at *10 (E.D.N.Y.2006). In the present case, defendant moved for summary judgment, but the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)

(Cite as: 2010 WL 811445 (W.D.N.Y.))

plaintiff did not address the defendant's argument concerning the emotional distress claim in its response to the summary judgment motion. As a result of plaintiff's failure to respond to the defendant's argument, the court finds that the plaintiff abandoned the claim relating to emotional distress and thus defendant's motion for summary judgment with respect to this claim is granted.

### *CONCLUSION*

For the reasons set forth above, I grant defendant's motion for summary judgment, and dismiss plaintiff's Amended Complaint in its entirety with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

W.D.N.Y.,2010.

Szarzynski v. Roche Laboratories, Inc.
Not Reported in F.Supp.2d, 2010 WL 811445 (W.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

---

**c**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Dawit NEGUSSEY, Plaintiff,

v.

SYRACUSE UNIVERSITY, Defendant.
No. 95–CV–1827.

March 24, 1997.
*MEMORANDUM–DECISION AND ORDER*

MUNSON, Senior District Judge.

**\*1** The court now confronts a defendant's motion for summary judgment upon all counts of the complaint. Plaintiff, a professor at Syracuse University, has lodged several federal and pendent state cause of action related to racial or national origin discrimination in the process that resulted in his being tenured. The parties presented oral argument on July 29, 1996 in Syracuse, New York. The following constitutes the memorandum-decision and order of the court.

*I. BACKGROUND*

The following facts have been culled for the most part from the report of the hearing panel appointed by Syracuse University's Affirmative Action Grievance Committee (often referred to by its initials, AAGC) to adjudicate plaintiff's administrative complaint. AAGC Rep., Ex. L att'd to Pl.'s Aff., Doc. 16. Plaintiff was originally hired in 1988 for a non-tenure track associate professor position in the Department of Civil and Environmental Engineering of the College of Engineering and Computer Science. He was tasked to develop a soil mechanics laboratory. His original appointment was for three years. Only one other professor in the 100–year history of the Engineering College had been hired as an associate professor without tenure. Plaintiff, who hales from Africa, was one of two black faculty members in that college's history. He was subsequently reappointed to another three-year term.

After Professor Steven Chamberlain became dean of the Engineering College, he and plaintiff met on August 2, 1993. At that meeting the dean advised plaintiff that he would not be tenured and that he should leave the University. At the administrative hearing on plaintiff's affirmative action complaint, the dean confirmed that this conversation took place.

Plaintiff nevertheless came up for tenure in the 1993–94 academic year. As apparently is traditional, he worked closely with a tenured colleague in his faculty department, Professor Charles Driscoll, who would present his case to the College-level tenure committee. Professor Driscoll was also a member of the College-level committee.

The Department-level tenure committee had to first review plaintiff's file. That committee approved plaintiff for tenure by a vote of 5 in favor and 2 opposed with no abstentions. Plaintiff was not informed of the voting numbers as is required by the procedures governing the Department-level tenure committee. When the College-level tenure committee met and began its review of tenure cases, including plaintiff's, they somewhat unusually decided that a member of their committee could not also present a case on behalf of a tenure candidate. That of course disqualified Professor Driscoll, so plaintiff had to request a second presenter who had much less time to prepare the case. The vote of the Engineering College tenure committee was 4 in favor of tenuring plaintiff, 5 opposed, with 1 abstention. Professor Driscoll subsequently wrote a letter to the Faculty Council complaining about the College tenure committee procedures. *See* Ex. A.[FN1]

> FN1. The exhibits referenced in this section of the opinion are appended to the defendant's affidavit, Doc. 16, unless otherwise noted.

**\*2** Dean Chamberlain then sent a letter to Vice Chancellor Gershon Vincow recommending plaintiff be denied tenure. Ex. B. One notable line criticizes plaintiff as "not experientially African–American." The affirmative

---

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

action hearing panel found that this letter, rather than conveying the consensus of the College-level tenure committee, contained the Dean's personal thoughts on tenure. The Vice Chancellor decided to deny tenure, and so notified plaintiff by letter. Ex. C. The second paragraph of this letter informed plaintiff that he had the right to appeal the decision before the Senate Committee on Appointments and Promotions or before the Senate Committee on Academic Freedom, Tenure and Professional Ethics. Professor Negussey was also informed that there was an affirmative action grievance procedure.

Plaintiff went to defendant's Office of Human Resources to consult about the grievance procedure. He filed a formal complaint with the Affirmative Action Grievance Committee. The Committee appointed an investigatory subcommittee. Copies of the complaint were sent to several people the Committee termed "respondents," including Dean Chamberlain. Those persons responded, as required by University regulations. The investigatory subcommittee met with Chancellor Kenneth Shaw and attempted "mediation," but the chancellor declined to intervene, "leaving the AAGC to do its work." *See* Ex. L at 11. The AAGC voted for a full administrative hearing, with a hearing officer and three others to adjudicate. A hearing was held intermittently from February 17 to May 10, 1995. It was fully transcribed and almost fully videorecorded. The hearing panel ultimately concluded several procedural violations rendered both the Department-level and College-level tenure committee voting irregular. They concluded plaintiff was treated disparately from other tenure candidates. They also concluded that Dean Chamberlain "is capable, both by his position and his disposition, of engaging in the intimidation and discrimination of which Dr. Negussey complained." *Id.* at 36. They did not conclude, however, whether Dean Chamberlain actually did commit the acts which plaintiff complained of. The AAGC was limited in its authority to procedural reviews of complaints. They recommended that the Vice Chancellor conduct a substantive reconsideration of plaintiff's case for tenure. That reconsideration was performed, and plaintiff received notice on July 7, 1995 that he had been granted tenure. Ex. A att'd to Strodel Reply Aff., Doc. 21. Dean Chamberlain apparently resigned before plaintiff received tenure.

Plaintiff brought the instant suit upon the following theories: (1) that defendant violated the Civil Rights Act of 1871, 42 U.S.C. § 1981, by denying plaintiff tenure, and harassing and retaliating against him on account of race, color, and national origin; (2) that the same conduct violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; (3) intentional or negligent infliction of emotional distress; (4) that defendant breached its contract with plaintiff by failing to follow its own policies and procedures concerning the tenure process and its equal opportunity practices; and (5) that defendant's conduct violated the New York State Human Rights Law, N.Y. Exec. Law § 296 (McKinney 1993 & Supp.1996). Plaintiff's sixth cause of action is in fact a recitation of the injuries he has allegedly suffered as a result of defendant's conduct. Plaintiff seeks equitable and declaratory relief, "front pay and benefits until normal retirement age," compensatory damages in the amount of $500,000, and punitive damages in the amount of $1,000,000, along with fees and costs. Plaintiff has now withdrawn his claims for emotional distress. Def.'s Mem. Law, Doc, 15, at 16.

**\*3** Plaintiff has alleged the following facts in support of his claims: the dean (1) asked plaintiff to resign; (2) expressed dissatisfaction with "minority engineering" to the Minority Engineering Program Director, *see* Ex. D att'd to Pl.'s Aff., Doc. 16; (3) allegedly influenced the tenure process in an improper manner; (4) testified incredibly at the administrative hearing; (5) after he had resigned, reported to the *Daily Orange,* Syracuse University's student paper, that plaintiff had improperly received tenure; (6) expressed prejudicial views on racial and gender matters; (7) wrote the letter to the Vice Chancellor which contained the "experientially African–American" statement; and (8) expressed an irrational fear of blacks. Def.'s Reply Mem. Law, Doc. 20, at 7.

Defendant answered, then moved for judgment on the pleadings, or alternatively to dismiss for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6) and 12(c). Plaintiff responded and raised matters outside the pleadings, requesting that the court convert the motion to one for summary judgment pursuant to Rule 56. Defendant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

did not object to this, and replied with its own documentary and affidavit evidence. The court will therefore treat defendant's motion as one for summary judgment. Analysis follows.

## II. DISCUSSION

The standards for granting summary judgment under Rule 56 have been exposited ad nauseum in the case reporters. Generally, the motion is governed by a familiar triumvirate of 1986 Supreme Court cases. The movant bears the initial burden of persuading the court that the record demonstrates "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Genuine issues exist if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once a movant has carried her initial burden, the respondent "must do something more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion, the court must view the facts in the light most sympathetic to the nonmovant. *Id.* at 587 (quotation omitted). The district judge's inquiry is whether a triable issue exists with respect to the claim being moved upon—that is, whether there is enough of a material dispute over key facts that the finder of fact could reasonably decide either way. *See Anderson,* 477 U.S. at 250.

With respect to employment discrimination cases specifically, the Court of Appeals for the Second Circuit has advised caution in dismissing claims at the summary judgment stage. *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991); *accord Amin v. Quad/Graphics, Inc.,* 929 F.Supp. 73, 77–78 (N.D.N.Y.1996). This is so because actual employment discrimination is often conducted discretely, requiring the crucible of trial to sear through layers of falsehood and superficially plausible excuses.

**\*4** With these guidelines set forth, the court proceeds to examine plaintiff's causes of action for employment discrimination.

*A. Employment Discrimination*

Claims of employment discrimination arising under Title VII, § 1981, and the New York Human Rights Law are all subject to the same analysis. *Fairbairn v. Board of Educ.,* 876 F.Supp. 432, 437 (E.D.N.Y.1995); *Alie v. NYNEX Corp.,* 158 F.R.D. 239, 243–44 (E.D.N.Y.1991). *See also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (Title VII and § 1981); *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992) (Human Rights Law and Title VII). Moreover, because the events in this case all succeed the Civil Rights Act of 1991, Pub.L. 102–166, 105 Stat. 1071–1100 (codified in scattered sections of 29 and 42 U.S.C.), plaintiff may recover compensatory and punitive damages under his Title VII claim. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

While substantive analysis, such as the *McDonnell Douglas* burden-shifting regime, is essentially identical with respect to employment discrimination theories under all three statutory schemes set forth by Professor Negussey, the questions of who may be sued and who can expose a proper defendant to liability are answered somewhat differently. These issues are important to the instant motion, as only Syracuse University is named in the complaint, and not Dean Steven Chamberlain or any other individual. Under Title VII, only employers, employment agencies, and labor organizations are prohibited from discrimination in employment practices. 42 U.S.C. § 2000e–2(a)–(c). The term "employer" includes "agents." *Id.* § 2000e(b). "Agent" in turn is generally defined as someone with supervisory responsibilities. *E.g., McIlwain v. Korbean Int'l Inv. Corp.,* 896 F.Supp. 1373, 1381 (S.D.N.Y.1995). Although an agent may subject the employer to liability, he or she cannot be held individually liable for Title VII transgressions in the Second Circuit. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313–17 (2d Cir.1995); *Ausfeldt v. Runyon,* 950 F.Supp. 478, 488 (N.D.N.Y.1997). Despite some confusing usage in *Tomka,*[FN2] the liability an "agent" within Title VII's meaning incurs for the employer is not completely governed by the common law of respondeat superior. *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (courts should usually look to agency principles, but "such

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

common-law principles may not be transferable in all their particulars to Title VII"). Nevertheless, respondeat superior appears to be the general rule, or at least the general rule is indistinguishable from it. If, in a hostile work environment claim for instance, a supervisor "uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship," the employer may be held liable. *Karibian v. Columbia Univ.,* 14 F.3d 773, 780 (2d Cir.), U.S. 1213 (1994). By way of comparison, the doctrine of respondeat superior makes the principal answerable for all acts of the agent performed within the course and scope of the agent's employment. 3 N.Y. Jur.2d Agency § 254 (1980). In contrast, harassment by a coworker—i.e., someone not an "agent" within the scope of Title VII—will only subject the employer to liability if the "employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 63 (2d Cir.1992); *accord Talada v. International Serv. Sys., Inc.,* 899 F.Supp. 936, 950 (N.D.N.Y.1995).

> FN2. Although in candor, that confusion arises mainly from Circuit Judge Parker's synopsis of the majority's holding in his dissenting opinion: "The majority ... reads that 'agent' clause to permit recovery available for Title VII violations only against the "employer/entity" under the doctrine of *respondeat superior.*" 66 F.3d at 1319. The majority opinion itself reflects that the circumstances in which an agent can subject the principal to liability for Title VII violations are more discrete than would be the case if respondeat superior were the governing theory. *See id.* at 1316 (*Karibian* case, cited above, sets forth "standards under which an employer would be liable for the acts of supervisors and lower level employees").

**\*5** The Human Rights Law defines the term "employer" only by saying that it excludes those entities employing fewer than four persons, making no reference to agents or supervisors. N.Y. Exec. Law § 292(5) (McKinney 1993). In a 1984 per curiam opinion, the New York Court of Appeals held that an employee cannot be

individually liable for discrimination under the Human Rights Law. *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 473 N.E.2d 11, 483 N.Y.S.2d 659 (N.Y.1984). But as the Second Circuit explained in Tomka, 66 F.3d at 1317, several courts, including the Northern District of New York, have held that managers or supervisors may be held individually liable if they aid and abet discrimination as proscribed by § 296(6) of the Human Rights Law. *E.g.,* McNulty v. New York City Dep't of Fin., 941 F.Supp. 452, 459 (S.D.N.Y.1996); *Jungels v. State Univ. Col. of New York,* 922 F.Supp. 779, 786 (W.D.N.Y.1996); *Wanamaker v. Columbian Rope Co.,* 740 F.Supp. 127, 135–36 (N.D.N.Y.1990) (McCurn, C.J.). *Contra Foley v. Mobil Chem. Co.,* 647 N.Y.S.2d 374, 380–82 (N.Y.Sup.Ct.1996) (rejecting this interpretation of § 296(6)). *But cf. Bush v. Raymond Corp.,* 96–CV–302, 1997 WL 74165, at *6 n. 4 (N.D.N.Y. Feb.21, 1997) (McAvoy, C.J.) (acknowledging *Foley's* contrary holding, but adhering to the controlling precedent of *Tomka* ). What is the law with respect to imputing employee conduct in derogation of the Human Rights Law to the employer? Respondeat superior has been squarely rejected. Instead, "the employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." *Totem Taxi, Inc. v. New York State Human Rights Appeal Board,* 65 N.Y.2d 300, 305, 480 N.E.2d 1075, 1077, 491 N.Y.S.2d 293, 295 (N.Y.1985); *see Karibian v. Columbia Univ.,* 930 F.Supp. 134, 138–39 (S.D.N.Y.1996) (discussing difference between employer's liability for employee actions under Title VII and the Human Rights Law).

As for suits pursuant to § 1981, both "employers and agents of those employers face unlimited civil liability." *Tomka,* 66 F.3d at 1323 (Parker, J., dissenting); *id.* at 1316 (majority agrees); *accord Amin,* 929 F.Supp. at 78 ("Individual supervisors may be found liable if personally involved in the discriminatory activity."). As for who may subject an employer to liability and under what circumstances they may do so, the law has developed that the actions of supervisors may be imputed to private employers under the respondeat superior doctrine. *E.g., Shen v. A & P Food Stores,* No. 93–CV–1184, 1995 WL 728416, at *4 (E.D.N.Y. Nov. 21, 1995) (citing cases from the 10th, 9th, and 7th circuits) *cf. General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 102

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

S.Ct. 3141, 73 L.Ed.2d 835 (1982) (assuming that respondeat superior applies to § 1981 suits, but finding no evidence of agency relationship). *But cf. Jett v. Dallas Independent Sch. Dist.,* 491 U.S. 701, 738, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (municipal defendant may not be held liable pursuant to respondeat superior under § 1981).[FN3] This court believes one caveat should be issued: in the case of harassment by coworkers, an employer will not be liable except in accordance with the principles in the *Kotcher* case—that is, the employer must either have neglected to provide a complaint procedure or knew of the harassment and took no steps to remedy it.[FN4] Thus, avenues for imputation of conduct in § 1981 cases are identical to those under Title VII.

> **FN3.** Understanding the *Jett* and *General Building Contractors* cases is essential to putting this broad statement from Judge Muir of the Middle District of Pennsylvania into perspective: "Liability under § 1981 is personal in nature ... and cannot be imposed vicariously." *Boykin v. Bloomsburg Univ. of Pennsylvania,* 893 F.Supp. 400, 406 (M.D.Pa.1995), *aff'd,* 91 F.3d 122 (3d Cir.1996), *cert. denied sub nom. Mirin v. Everly,* 519 U.S. 1078, 117 S.Ct. 739, 136 L.Ed.2d 678 (1997). The defendant in that case was a county district attorney, not a private actor. In support of the proposition Judge Muir cited *Jett* which applies only to governmental defendants and *General Building Contractors* which held that there was no agency relationship between the private defendants upon which to predicate the respondeat superior doctrine.

> **FN4.** The Civil Rights Act of 1991 has restored harassment claims to the purview of § 1981, after *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), briefly excluded them from the sweep of the statute.

**\*6** To summarize: except in the case of harassment by nonsupervisory coworkers, the employer is liable for the acts of supervisors under the rule of respondeat superior in both Title VII and § 1981 cases. Supervisors may be independently liable under § 1981 if personally involved

in the discrimination, but not under Title VII. Supervisors may be independently liable under the Human Rights Law if they aid and abet the discrimination. However the Human Rights Law does not subject an employer to liability for the acts of an employee (supervisor or otherwise) unless the employer encouraged, condoned, or acquiesced to the discriminatory conduct.

Plaintiff has alleged that defendant violated these laws in three ways: by denying him tenure, by retaliating against him, and by harassing him. The court treats these theories seriatim.

*1. Tenure Denial*

The three-part analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972), is applicable in determining whether invidious discrimination has poisoned a university tenure decision. Plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Zahorik v. Cornell Univ.,* 729 F.2d 85, 92 (2d Cir.1984); *accord Louis v. Board of Educ.,* 705 F.Supp. 751, 756 (E.D.N.Y.1989). A prima facie case consists of evidence that plaintiff belongs to a protected class, was qualified for tenure, and was denied tenure in circumstances permitting an inference of discrimination. 729 F.2d at 92. If plaintiff presents a prima facie case, the university must articulate some legitimate, nondiscriminatory reason for the decision. Plaintiff may then rebut with proof that the offered explanations are pretextual. Although the burden of production shifts, the plaintiff bears the burden of persuasion throughout his case.

Courts have been cautious in second-guessing tenure decisions, since it is recognized that the granting of tenure is qualitatively different than other employment decisions. *See Lieberman v. Gant,* 630 F.2d 60, 64 (2d Cir.1980). This court does not sit as a super tenure-review committee. *Zahorik v. Cornell Univ.,* 579 F.Supp. 349, 352 (N.D.N.Y.1983), *aff'd,* 729 F.2d 85 (2d Cir.1985). Nevertheless, tenure decisions are not immune from suits for employment discrimination, 729 F.2d at 93, and "faculty votes should not be permitted to camouflage discrimination." *Namenwirth v. Board of Regents,* 769 F.2d 1235, 1243 (7th Cir.1985), *cert. denied,* 474 U.S.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

1061, 106 S.Ct. 807, 88 L.Ed.2d 782 (1986). *See also* Equal Opportunity Act of 1972, Pub.L. No. 92–261, § 3, 86 Stat. 103, 103–04 (codified as amended at 42 U.S.C. § 2000e-l) (eliminating Title VII exemption for educational institutions); H.R.Rep. No. 238, 92d Cong., 2d Sess. 19, *reprinted in* 1972 U.S.C.C.A.N. 2137, 2155 (legislative history of same). The Second Circuit has warned that judicial deference to tenure decisions should not rise to a "policy of self-abnegation where colleges are concerned." *Powell v. Syracuse University,* 580 F.2d 1150, 1153 (2d Cir.) (expressing regret that policy of caution in tenure cases advanced in *Faro v. New York University,* 502 F.2d 1229, 1231–32 (2d Cir.1974) had been extended "beyond all reasonable limits" by other courts, possibly to the detriment of federal antidiscrimination law),*cert. denied,* 439 U.S. 984 (1978).

**\*7** The instant matter is distinguished from the universe of tenure cases by the fact that plaintiff did receive tenure, albeit nine months after an initial denial. Defendant argues that the first tenure denial was an intermediate or interlocutory decision, and not actionable by dint of the fact that the decision was subject to appeal via several administrative channels, and was ultimately reversed. Plaintiff responds that the delay was unreasonable, that the final determination to grant him tenure was received two months after his termination, and that he was injured thereby.

Even these seemingly unique circumstances are not without precedent. The Western District of Virginia confronted a similar situation on a motion to dismiss in *Howze v. Virginia Polytechnic,* 901 F.Supp. 1091 (W.D.Va.1995). In *Howze* the plaintiff brought a sex discrimination and retaliation suit pursuant to § 1983 and Title VII. Id. at 1093. When she came up for tenure, her division-level tenure committee recommended against her. Id. The next month, the college-level committee and the dean concurred. *Id.* at 1094. The plaintiff appealed that decision to the provost, and her case was subsequently reviewed by the university-level tenure committee. *Id.* Three months later the university committee recommended that plaintiff should be tenured. The university's Board of Visitors apparently had to approve the promotion, and did so six months later. Notwithstanding the last interim, plaintiff had received the salary and rank increase

commensurate with her becoming a tenured associate professor four months after the university committee approved her. *Id.*

Chief Judge Kiser held that the *Howze* plaintiff had not suffered an adverse employment action within the reach of federal antidiscrimination law: "[W]here the tenure decision was following the chain of appeal, each decision along the way is not actionable. Only the final decision is the ultimate act." Id. at 1097. Since plaintiff in the instant matter ultimately received tenure, application of the *Howze* rationale would preclude relief upon this theory. Senior Judge McCurn cited *Howze* with approval in *Wanamaker v. Columbian Rope Company,* 907 F.Supp. 522, 536 n. 20 (N.D.N.Y.1995), *aff'd,* No. 95–9246, 1997 WL 102487 (2d Cir. Mar.10, 1997).

Judge Stein of the Southern District of New York came to a conclusion similar to *Howze* in *Davis v. City Univ. of New York,* No. 94 CIV 7277, 1996 WL 243256 (S.D.N.Y. May 9, 1996). In that case the plaintiff, an African American female and professor at CUNY's nursing school, received negative tenure recommendations first from the school-level committee and subsequently from the college-level committee. *Id.* at *2. Thereafter she appealed these decisions to the college president who recommended she be tenured, and she eventually was. *Id.* at *3. Upon CUNY's motion for summary judgment, the Southern District dismissed plaintiff's Title VII, § 1981, and New York Human Rights Law claims because there was no material adverse change in the terms or conditions of employment. Id. at *8.

**\*8** "An adverse action is one that affects the terms, privileges, duration, or conditions of employment." *Yerdon v. Henry,* 91 F.3d 370, 378 (2d Cir.1996) (retaliation claim) (internal quotations omitted). *See also Campbell v. Grayline Air Shuttle, Inc.,* 930 F.Supp. 794, 802 (E.D.N.Y.1996) (in § 1981 action plaintiff must show that he "suffered a materially adverse change in the terms or conditions of employment" (quoted case omitted)); *Medwid v. Baker,* 752 F.Supp. 125, 136–37 (S.D.N.Y.1990) (material adverse change "has an attendant negative result, a deprivation of a position or an opportunity" (quoted case omitted)). The definition of adverse action is not limited to discharges, demotions, and

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

reductions in pay. *See Pantchenko v. C.B. Dolge Co., Inc.,* 581 F.2d 1052, 1055 (2d Cir.1978) (employer's refusal to provide a reference for former employee seeking new job could be retaliatory adverse action). But an adverse action is not merely the first or second step in the decisionmaking process; it is rather the ultimate result affecting lasting consequences upon the employee. Defendant relies on *Page v. Bolger* for this proposition:

> [T]here are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the direct proscriptions of ... Title VII. We hold here merely that among the latter are mediate decisions such as those concerning composition of the review committees in the instant case that are simply steps in a process for making such obvious end-decisions as those to hire, to promote, etc.

645 F.2d 227, 233 (4th Cir.) (en banc), *cert. denied,* 454 U.S. 892 (1981).

This principle has found favor with other courts. *E.g., Dollis v. Rubin,* 77 F.3d 777, 781–82 (5th Cir.1995); *Hurley–Bardige v. Brown,* 900 F.Supp. 567, 569 (D.Mass.1995); *Williams v. McCausland,* 782 F.Supp. 272, 279 (S.D.N.Y.1992). The opinion in *Howze* appears to be a more specific application of *Page*'s rationale that it is the employment decision which is potentially actionable, not the rungs climbed to reach it.

This court agrees with the reasoning of *Page, Howze,* and *Davis.* The rule is particularly appropriate respecting the complex, multilayered process of tenure review. *See* Frank M. Baglione, Title VII and The Tenure Decision: The Need For A Qualified Academic Freedom Privilege Protecting Confidential Peer Review Materials In University Employment Discrimination Cases, 21 Suffolk U.L.Rev. 691, 700–01 & n. 38 (1987) (noting prevalence of internal appeals processes for tenure denials). As Circuit Judge Winter observed in affirming this court's decision in *Zahorik v. Cornell University,* tenure decisions are highly decentralized, informed by an extensive number of factors, and are a source of unusually great disagreement. 729 F.2d 85, 92–93 (2d Cir.1984). Not every negative faculty review, criticism offered in

committee, or disfavorable student evaluation affects the terms, conditions, or privileges of employment. It is the outcome of this intensive process upon which the plaintiff's complaint stands or fails.

**\*9** Plaintiff offers a number of responses to this line of argument. He contends that the initial denial of tenure was a final, ultimate employment decision. Pl.'s Mem. Law, Doc. 15, at 11–12. He notes that the May 6, 1994 letter from Dean Chamberlain states that "this letter constitutes official notice that your appointment on the faculty of Syracuse University will terminate ... with the completion of the 1994–95 academic year, May 14, 1995." Ex. C att'd to Pl.'s Aff., Doc. 16. He points to the fact that he "made a voluntary choice to pursue the matter, first through informal means, and then through a formal hearing." Pl.'s Mem. Law, Doc. 15, at 12. Alternatively, it is suggested the remedial action taken by defendant was not sufficiently prompt. *Id.* at 11.

The court first rejects the suggestion that the initial denial was final. That assertion is belied by the fact that Vice Chancellor Vincow granted plaintiff tenure on July 7, 1995. Ex. A att'd to Strodel Rep. Aff., Doc. 21. Also, the second paragraph of the initial denial letter from Dean Chamberlain informed plaintiff of three appeal/review processes available to him:

> Please note that under University policy, it is the right of every faculty member, when informed by the University of the denial of tenure, to appeal this decision on procedural grounds before the Senate Committee on Appointments and Promotions or before the Senate Committee on Academic Freedom, Tenure and Professional Ethics on the basis of denial of academic freedom or violation of professional ethics. Finally, please note also that Syracuse University is an Affirmative Action/Equal Opportunity employer, and, in accordance with law, maintains a grievance procedure whereby any employee believing himself or herself to have been subject to discrimination because of sex, race, color, religion, national origin, physical handicap, or age is encouraged to attempt the resolution of his or her problem through either informal or formal means.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

Ex.C att'd to Pl.'s Aff., Doc. 16.

Far from leaving the impression that plaintiff was without recourse, Dean Chamberlain's letter "encourages" anyone who believes they have been discriminated against to seek resolution by formal or informal means. This is of course what plaintiff did, and how he prevailed.

The fact that plaintiff had to take an affirmative step to continue the process does not sway the court otherwise. The plaintiff in *Howze* appealed her initial tenure denial to the provost. 901 F.Supp. at 1094. Any other result would defeat Congress' purpose in mandating internal procedures for resolving workplace discrimination charges at institutions of higher learning. Id. at 1096–97.

Defendant's objection that the remedial measures were not sufficiently prompt is a stickier question. Some nine months elapsed between the May 6, 1994 tenure denial letter from Dean Chamberlain and the July 7, 1995 letter from Vice Chancellor Vincow granting tenure. And, as *Howze* reads *Page,* a plaintiff cannot recover for an interlocutory or mediate decision "where the effects of the adverse action have not yet been felt by the plaintiff." Id. at 1097. That interpretation is supported by the Page opinion: "[T]here are many interlocutory or mediate decisions *having no immediate effect* upon employment conditions which were not intended to fall within ... Title VII." *Page,* 645 F.2d at 233 (italics added). The longer the delay, obviously the greater the risk that plaintiff is suffering adverse effects of the otherwise interlocutory decision. The court agrees that merely labeling an employment decision 'mediate' should not shield an employer if subsequent processes stagnate, and the employee is subject to the same adverse effects that an ultimate employment decision would produce. And, perhaps regardless of whether harm has been felt, remedial action should be "timely and adequate." *Dennis v. County of Fairfax,* 55 F.3d 151, 156 (4th Cir.1995).

**\*10** We ask first whether injuries accrued during the pendency of the grievance process. At first blush, the fact defendant was unemployed between May 14 and July 7, 1995 would seem to indicate adverse consequences. However, the uncontested affidavits of defendant's payroll manager and associate vice-president for human resources

reveal that because plaintiff elected to receive his salary for the typical nine-month academic year over a twelve-month period, he never missed a paycheck. *See* Webb Aff., Doc. 22; Strodel Aff., Doc. 21. Deductions for plaintiff's health, accidental death and dismemberment insurance, and for his pension were made from all paychecks during the academic year. However, "benefits are provided for a full year." *Id.* at 2. He also received no-cost life insurance. The insurance coverage was never cancelled, but flowed uninterrupted into his 1995–96 academic appointment as a tenured professor. In short, plaintiff never felt adverse economic consequences of the initial denial of tenure.

Other consequences alleged by plaintiff are less tangible, and are related mostly to the uncertainty and anxiousness he felt awaiting the result of his grievance. See Pl.'s Aff, Doc. 16, ¶ 24. For instance, plaintiff experienced "considerable turmoil and personal upheaval." He was "unable to plan for the next year of teaching" and instead "was forced to spend half of the summer considering my options, including the possible sale of our home, relocation and other possible employment." There is an allegation that he was instructed at some point to clear out of his office, but it is not clear whether he ever did, or whether the order was even still effective or relevant come May 30, 1995, when Chancellor Shaw was still communicating with plaintiff via interoffice memoranda even though plaintiff ostensibly was out-of-work some two weeks earlier. *See* Ex. M att'd to Pl.'s Aff., Doc. 16.[FN5] In any event, these alleged consequences do not have a lasting effect on the terms, privileges, or duration of plaintiff's employment. To the extent they can be said to detrimentally affect the conditions of employment, they are insufficiently material to warrant converting an intermediate, nonfinal decision into an ultimate one.

FN5. Even if plaintiff did vacate, this court concurs with Judge McCurn that the loss of an office for a short period, standing alone, does not constitute an adverse employment action. *Wanamaker v. Columbian Rope Co.,* 907 F.Supp. 522, 536 & n. 21 (N.D.N.Y.1995) (McCurn, Sr. J.).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

As for Professor Negussey's "considerable turmoil and personal upheaval," the *Davis* case makes the valid point that the authorities have focused on "such tangible matters as transfers and changes in salary, job title, and job responsibilities ... rather than such inchoate matters as a plaintiff's embarrassment or anxiety." 1996 WL 243256, at *8 (citations omitted). Judge Stein was also

> unaware of any case where a plaintiff claimed that the anxiety that she claimed to be a "materially adverse change" in her employment was the result of a process that ultimately redounded to her benefit....

*Id.* at *9.

The plaintiff professor in *Davis* experienced "added inconvenience and anxiety ... because her tenure and promotion application allegedly were delayed and almost denied." Id. at *8. The Southern District held these harms insufficient to amount to a materially adverse change in the terms or conditions of employment, particularly in light of Professor Davis' eventual victory. That case is on point with the matter sub judice, and the reasoning therein is sound. The stress Professor Negussey experienced because of the length and complexity of his tenure decision are not the sort of job-related consequences redressable through an antidiscrimination claim—especially since he succeeded in achieving tenure.

**\*11** The allegation that comes closest to being an adverse employment action during the critical nine month period is the University's refusal to finance Professor Negussey's planned trips to academic conferences in China, Greece, and Japan during May of 1995. Plaintiff avers that his consequent cancellation of those trips resulted in certain of his scholarly writings remaining unpublished, thus injuring his professional standing. Pl.'s Aff., Doc. 16, ¶ 20. The letter exhibits attached to plaintiff's affidavit actually show that the University would finance his trip to Japan, but not to Greece. Ex. H. Nothing is said about a trip to China. Syracuse University characterizes Professor Negussey's cancellation of these trips as "his own decision" and states that "[t]he University took no action to prevent him from attending." Def.'s Reply Mem. Law, Doc. 20, at 4. The court nevertheless assumes for the sake of the present motion

that University underwriting of travel to academic conferences is an employment privilege normally accorded to professors.

The type of harm alleged—loss of reputation—is not generally considered an adverse employment action. *Wanamaker,* 907 F.Supp. at 535. In the case of a college professor however, the court understands how injury to professional reputation could constitute adverse action within the meaning of antidiscrimination law. The *Howze* court recognized as much. In *Howze* the Western District of Virginia opined that a negative report issued by a university committee could conceivably "hinder the plaintiff in obtaining research grants, endowed professorships, publications, and other similar accoutrements of a tenured professor." 901 F.Supp. at 1091. It must be remembered though that the instant offense complained of is not a printed negative report, but the mere refusal to finance a trip to Greece.

The District of Maine has also grappled with the question of whether injury to the professional reputation of a college professor rises to the level of an adverse employment action. *Nelson v. University of Maine Sys.,* 923 F.Supp. 275 (D.Me.1996). In *Nelson* the plaintiff professor complained that his university's president placed a letter of reprimand in his file, and that student complaints were placed in his equal opportunity file. *Id.* at 281. Comparing these incidents to the *Howze* report, Judge Brody observed that the report was much more public than the reprimand and student complaints, and that with respect to *Howze,* it "appears from the facts of the case that this report may have caused significant damage to the professor's reputation." *Id.* at 283. The District of Maine ultimately rejected the possibility that the events proffered by the *Nelson* plaintiff constituted any adverse employment action. *Id.* at 283–84.

This court is constrained to conclude that Syracuse University's refusal to pay for Professor Negussey's Greece trip is different in kind than the offending report in *Howze,* and indeed, is even less problematic than the reprimand and complaints held insufficient to state a claim in *Nelson.* The University did nothing to actively disparage Professor Negussey's reputation; at most, they declined to underwrite an opportunity for the professor to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

enhance his academic standing by presenting his paper in Greece. Even assuming this denial of travel money was some sort of adverse action, it is by no means a material change as required by the applicable legal standard. *See McKenney v. New York City Off–Track Betting Corp., 903 F.Supp. 619, 623 (S.D.N.Y.1995).* The court will revisit the issue of reputational injury as an adverse action below, in its discussion of Dean Chamberlain's newspaper interview.

**\*12** The professor's son would have been entitled to free tuition at Syracuse University. Because of his father's difficulties and feud with Dean Chamberlain however, the plaintiff's son elected to matriculate at the University of Rochester. Pl.'s Aff., Doc. 16, ¶ 25. The court certainly recognizes that free tuition for one's children is an important privilege of university professorship, and had defendant denied this benefit to plaintiff we would not hesitate to recognize that a materially adverse employment action had occurred. As it transpires though, there is no allegation that Syracuse University refused to waive tuition for Professor Negussey's son: it appears that the young man decided on his own to attend another school. As no privilege of employment was denied, no adverse action was suffered here.

It thus seems that plaintiff suffered no harm during the nine months between the initial denial and ultimate granting of tenure. It remains for the court to decide whether the sheer length of time, regardless of the fact no injuries accrued, is an independent, actionable harm, as the Fourth Circuit has suggested in the *Dennis* case, 55 F.3d at 156. Suffice it for the court to observe that considering the apparent comprehensiveness of the affirmative action investigation and hearing, and taking into account the fact that all involved had to be seconded from their usual responsibilities at the University, nine months does not seem unduly long. The remedial action was sufficiently prompt.

In short, plaintiff has not made out an essential element of the prima facie case necessary under Title VII, § 1981, and the New York Human Rights Law. It is difficult, likely impossible, to sue for discriminatory tenure denial when tenure was not denied. Moreover none of the intermediate steps leading to the granting of tenure

resulted in any harm that could be characterized as an ultimate adverse employment action. And the nine month period itself was not so long that antidiscrimination law provides a remedy. As plaintiff has suffered no material adverse change in the terms or conditions of employment, Syracuse University's motion for summary judgment upon this aspect of plaintiff's discrimination theories is granted.

*2. Retaliation*

A prima facie case for retaliation is made out when the plaintiff demonstrates by a preponderance of the evidence that (1) he participated in a protected activity known to defendant; (2) he suffered a disadvantageous employment action; and (3) a causal connection exists between the adverse action and protected activity. *See Wanamaker, 907 F.Supp. at 534* (quoting *Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir.1995)*). Logically, none of the incidents analyzed in the preceding section can substantiate a claim of retaliation any more than they support a tenure denial claim. Both theories require a materially adverse employment action, and the question of what constitutes such an action is the same in either case. *Compare, e.g., Yerdon, 91 F.3d at 378* (retaliation) *with Davis, 1996 WL 243256, at \*8* (tenure denial). Besides, a plaintiff may not predicate a retaliation claim on acts that predate the protected activity—in this case, the professor's initiation of the internal grievance process. *Bernheim v. Litt, 79 F.3d 318, 325 (2d Cir.1996).* Plaintiff however has suggested a number of other events, exclusive to the retaliation claim and subsequent to his petition to the AAGC, which he argues constitute adverse employment actions taken in retaliation for plaintiff's engagement of the University's affirmative action procedure.

**\*13** As near as the court can fathom, the preferred incidents of retaliation are these: Dean Chamberlain lied at the AAGC hearing, "selectively leak[ed]" portions of Professor Negussey's tenure file to the AAGC, Pl.'s Aff., Doc. 16, ¶ 18, and gave an interview to the University's student newspaper condemning the decision to grant plaintiff tenure. Moreover, it is alleged that Syracuse University drew out the tenure reconsideration process as long as possible, refused to mediate the dispute, and refused to disclose documents important to plaintiff in making his cases before the AAGC hearing panel.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

The court does not find in any of these acts, assuming the truth of them, any adverse employment consequence. Dean Chamberlain's purported perjury did not persuade the AAGC hearing panel—they found for plaintiff. The dean's sour grapes interview with the *Daily Orange* succeeded the letter from Vice Chancellor Vincow granting Professor Negussey tenure, and did not change plaintiff's tenure status. Any bad faith malingering by the University itself (of which the evidence is paltry) did not affect the terms, privileges, duration, or conditions of employment.

To be fair, more attention must be paid to the article appearing in the student paper. Admittedly, *Howze* states that the term adverse employment action includes not only ultimate decisions such as failing to promote or firing, but "also includes actions that would adversely affect one's professional reputation." 901 F.Supp. at 1098. In that case, the offending action was a negative report produced by a university committee. As noted above, the Western District of Virginia postulated that the negative report might injure Professor Howze's chances for obtaining grants, endowed professorships, and the like. *Id.* at 1098. Because this court relies heavily on *Howze* for the tenure denial claim, it would be disingenuous to ignore the possibility that Dean Chamberlain's interview materially changed the terms or conditions of Professor Negussey's employment.

The court first examines the authorities underpinning Chief Judge Kiser's conclusion in *Howze* that injuries to professional reputation can constitute adverse action within the meaning of antidiscrimination law. In the first instance, the opinion cited *Nelson v. Upsala College,* 51 F.3d 383 (3d Cir.1995) (cited at *Howze,* 901 F.Supp. at 1098) for a string of cases supporting the proposition. An examination of the explanatory parentheticals in the cases listed at 51 F.3d at 387–38 illustrates the difference between what *Howze* means by injury to professional reputation, and what has occurred in the matter sub judice. In one case listed the employer deleted positive comments from the plaintiff's personnel file; three cases involved a defendant employer's unfavorable references about a plaintiff to subsequent employers; in another case the defendant actually persuaded a subsequent employer to terminate the plaintiff; and a last case involved the

defendant terminating plaintiff's severance benefits. In the words of the *Nelson* case, all of these cases "impaired or might impair the plaintiff in employment situations." 51 F.3d at 387. In most of the listed cases the plaintiff was seeking new employment and the old employer's recommendation was integral to success. Indeed, in the last two cases described here, far more than reputational harm was done—job and benefits were lost. In the case at bar, Professor Negussey's status was unaffected by the interview. If he had been denied tenure, and was subsequently plagued in his search for new work by negative references from Dean Chamberlain that were motivated by discriminatory and retaliatory animus, the situation would be different.

**\*14** *Nelson* itself further indicates that any harm to plaintiff in this case caused by the *Daily Orange* interview is not redressable by way of a retaliation claim under the antidiscrimination laws. In *Nelson* the plaintiff choir director alleged that the dean of students at Upsala College published defamatory remarks about her to the effect that she was stealing from the college. The trial court found that these remarks did not have any adverse effect on Nelson's future employment, and the Third Circuit affirmed, referring to an earlier discussion in its opinion. 51 F.3d at 389. That earlier language opined that injuries traditionally redressed through the common law of defamation should not be recharacterized as retaliatory actions under the antidiscrimination laws. *See id.* at 388. In fact, the *Nelson* plaintiff had pled pendent state actions for defamation in her complaint. Then–Chief Judge McCurn echoed these sentiments in *Wanamaker,* 907 F.Supp. at 537 ("[I]f plaintiff believed that his reputation was damaged on a defamation theory ... he could seek 3 6 relief under the common law ...." (citing *Nelson* )). This court concurs that discrimination claims under statutory schemes such as Title VII, § 1981, and the New York Human Rights Law should not swallow the torts of defamation and libel.

We find another flaw in plaintiff's invocation of the *Daily Orange* interview as a retaliatory act. The interview followed Chamberlain's resignation as dean of the Engineering College. Senior Judge Schwartz of the District of Delaware has opined that in the university context

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

college employees below the administration level are "agents" of the college ... so long as they participate in the promotion and tenure process to such an extent they significantly control or influence the decisions which govern some aspect of the compensation, terms, conditions or privileges of employment.

*Dutt v. Delaware State College,* 854 F.Supp. 276, 283 (D.Del.1994).

Certainly, when he was dean of the college, Chamberlain fit this description. His position as dean was presumably supervisory, and he was obviously intricately involved in plaintiff's tenure review. However after his resignation and after the final tenure decision in Professor Negussey's favor, it is not clear that Chamberlain was an agent capable of subjecting the University to liability under a Title VII or § 1981 retaliation theory. As has been said, generally only the employer or supervisory employees can subject the employer to liability, and then only for conduct taken in the scope of the actor's agency. It appears that at the time of the interview Steven Chamberlain was no longer in a position of authority over Professor Negussey. Additionally, it is difficult to argue that a newspaper interview by a professor is the sort of act that would subject Syracuse University to liability under the respondeat superior doctrine. Certainly, there has been no showing that Syracuse University encouraged or condoned Chamberlain's interview, precluding any vicarious liability under the Human Rights Law.

**\*15** As no proffered act of retaliation by defendant affected any materially adverse change in the terms or conditions of plaintiff's employment, this aspect of Professor Negussey's discrimination claims must be dismissed. To the extent Professor Negussey suffered any reputational injury from the *Daily Orange* article, the court does not find it amounted to an adverse employment action. Plaintiff's remedy for that harm is in defamation, and in any event the interview cannot be attributed to Syracuse University, the only named defendant, under any antidiscrimination theory. PH1H *3. Harassment*

The Supreme Court has expounded on the requirements for a hostile work environment claim in

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Generally, the workplace must be permeated with discriminatory intimidation, ridicule, and insult. The discriminatory conduct must be so severe and pervasive that the plaintiff's employment conditions are altered. Mere epithets are insufficient, *id.* at 21 (quoting *Meritor,* 477 U.S. at 67), but "Title VII comes into play before the harassing conduct leads to a nervous breakdown," *id.* at 22. There is no requirement for tangible psychological damage.

This is not to say that a material change in the terms, privileges, and conditions of employment is not required to state a claim for an abusive workplace—it is. *See Meritor,* 477 U.S. at 67 (noting that not all harassment affects a term, privilege, or condition of employment). But in the hostile work environment context, the required material change is the pervasive workplace abuse itself. That is to say, many of the incidents which have failed to amount to a denial of tenure or to unlawful retaliation may in the aggregate create a hostile work environment. *Cf. Harris,* 510 U.S. at 23 (hostile work environment "can be determined only by looking at the circumstances," including frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it interferes with the plaintiff's work performance).

Many of the incidents conceivably contributing to a hostile work environment have been described above. All or nearly all are attributable to Dean Steven Chamberlain. Those acts, insofar as they were taken in the dean's supervisory capacity within the Engineering College, would be imputed to Syracuse University in accordance with the principles enunciated in *Karibian,* 14 F.3d 773, at least with respect to plaintiff's Title VII and § 1981 causes.

But are the discriminatory acts sufficiently pervasive and severe as to potentially constitute an actionable hostile workplace? The difficulty the court faces in answering that question at this stage of the game is that the record is not well developed compared to the typical summary judgment motion. It bears remembering that at the request of plaintiff, the defendant's motion for judgment on the pleadings was converted to a motion under Rule 56. The court has no deposition transcripts. The transcribed

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

testimony from the grievance hearing is not available. There is not even an affidavit from Dean Chamberlain.

**\*16** The court is particularly reluctant to grant summary judgment on plaintiff's harassment theory given that even the current record discloses evidence that Dean Chamberlain's recommendation to Vice Chancellor Vincow against tenuring plaintiff was influenced by an impermissible factor, *viz.* national origin. Also, some consideration may be given to the fact that the AAGC, after 35–40 hours of testimony, concluded in its report that "the Dean is capable, both by his position and disposition, of engaging in the intimidation and discrimination of which Dr. Negussey complained." AAGC Rep., Ex. L att'd to Pl.'s Aff., Doc. 16, at 36. That, coupled with the Second Circuit's admonition not to routinely dismiss employment discrimination cases at the summary judgment stage, *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991), persuades the court to allow discovery to proceed on the hostile work environment claim, notwithstanding doubts about whether plaintiff can demonstrate the required pervasiveness and severity.

To clarify, plaintiff may proceed on the harassment theory under all three statutory schemes—but if discovery does not produce evidence that Syracuse University condoned or approved of Dean Chamberlain's action, the Human Rights Law cause will not be established. And of course, if the evidence does not present a material factual issue as to whether plaintiff's workplace was inundated with severe discriminatory ridicule, insult, and harassment such that the performance of the professor's duties were compromised, all discrimination causes will be ripe for dismissal.

The court must still address defendant's motion for summary judgment upon the plaintiff's breach of contract claim.

*B. Breach of Contract*

Syracuse University argues that Professor Negussey's claim that his employment contract was breached must be dismissed for his inability to prove contract damages. The argument is compelling. The court has already concluded that plaintiff never missed a paycheck or suffered any

interruption of benefits during the pendency of his tenure decision. Plaintiff responds by alleging the following damages: hardship to plaintiff and his family; the possibility that plaintiff may be forced to leave Syracuse University because of the hostile work environment; and the loss of his son's tuition benefits. Pl.'s Mem. Law, Doc. 15, at 16.

The court has discussed these harms already. Insofar as the "hardship" to Professor Negussey was not economic, and was not a result of any wrongful demotion or failure to promote, discharge, or denial of emolument, it is not compensable through a breach of employment contract action. If by "hardship" the professor is also referring to any reputational injury he may have suffered, that also is not recoverable on a contract claim. *Pryles v. New York,* 86 Misc.2d 205, 209, 380 N.Y.S.2d 429, 433 (N.Y.Ct.Cl.1975), *aff'd,* 51 A.D.2d 827, 380 N.Y.S.2d 628 (N.Y.App.Div.1976). As for the allegedly hostile work environment, if plaintiff can prove the necessary severity and pervasiveness of the discrimination, that injury may be redressed through his hostile work environment theory. And the court has already observed that Syracuse University did not deny plaintiff's son the benefit of free tuition—his son chose not to attend.

**\*17** More generally, plaintiff argues that New York permits "special damages" in an employment contract action, and cites 52 N.Y. Jur.2d Employment Relations § 264 in support.[FN6] Even a cursory examination of that authority shows that whatever "special damages" are recoverable must ordinarily be related to compensation. *E.g.,* 52 N.Y. Jur.2d Employment Relations § 250 (1996) (commissions); *id.* § 253 (profit sharing plans).

> FN6. Plaintiff and defendant are referring to an older version of volume 52. The edition of *New York Jurisprudence* in the court's library is the revised 1996 edition, and according to the table at the beginning of the volume, the material previously at § 264 is now set forth in §§ 249–251.

Plaintiff has failed to show he suffered any damages as a result of any putative breach of his employment contract. Summary judgment upon this issue is appropriate.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)

(Cite as: 1997 WL 141679 (N.D.N.Y.))

*III. CONCLUSION*

In dismissing plaintiff's tenure denial, retaliation, and breach of contract claims, the court has not relied on niggling minutiae. Rather, the grants of summary judgment herein stem from the ancient and basic precept that a complainant must suffer legally redressable damages in order to obtain legal relief or compensation for an injury. Thus, without a materially adverse employment action, any discrimination that Dean Chamberlain may have subjected plaintiff to was injuria absque damno: a wrong without damages, which will not sustain an action. Or as the Third Circuit has put it:

> Until the individual has demonstrated actual injury to himself, the court may not direct individual relief. Just as in the tort field, where "negligence in the air" is not enough to fasten liability on a defendant, so in a Title VII case discrimination in general does not entitle an individual to specific relief.

*Dillon v. Coles,* 746 F.2d 998, 1014 (3d Cir.1984).

Defendant's motion for summary judgment upon the tenure denial and retaliation theories of his first, second, and fifth causes of action is GRANTED. Defendant's motion for summary judgment upon the third cause of action is also GRANTED. The motion for summary judgment upon the harassment or hostile work environment aspect of plaintiff's first, second, and fifth causes of action is DENIED.

The parties may proceed with discovery, and make new or renewed motions for summary judgment at the appropriate time.

It is So Ordered.

N.D.N.Y.,1997.

Negussey v. Syracuse University
Not Reported in F.Supp., 1997 WL 141679 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.